**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| THE TOWN OF BENNINGTON, VERMONT<br><br>        Plaintiff,<br><br>    v.<br><br>MALLINCKRODT PLC; MALLINCKRODT LLC; SPECGX LLC; RICHARD SACKLER; BEVERLY SACKLER; DAVID SACKLER; ILENE SACKLER LEFCOURT; JONATHAN SACKLER; KATHE SACKLER; MORTIMER D.A. SACKLER; THERESA SACKLER; JOHN STEWART; MARK TIMNEY; CRAIG LANDAU; RUSSELL GASDIA; INDIVIOR; RECKITT BENCKISER PHARMACEUTICALS INC.; ENDO PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL COMPANIES, INC.; PAR PHARMACEUTICAL, INC.; HIKMA PHARMACEUTICALS; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; BARR LABORATORIES, INC.; WATSON LABORATORIES, INC.; ACTAVIS PHARMA, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC.; NORAMCO, INC.; TASMANIAN ALKALOIDS LIMITED;KVK-TECH, INC.; AMNEAL PHARMACEUTICALS LLC; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS OF NEW YORK, LLC; MYLAN PHARMACEUTICALS, INC.; MYLAN INSTITUTIONAL, INC.; MYLAN TECHNOLOGIES, INC.; BURLINGTON DRUG COMPANY; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN DRUG CORPORATION; BELLCO DRUG CORPORATION; H.D. SMITH; WALMART INC.; WALMART PHARMACY WAREHOUSE #45; WALMART | **MDL 2804**<br><br>**Case No. 1:17-md-2804-DAP**<br><br>**Member Case No. _____**<br><br>**Judge Dan Aaron Polster**<br><br><br>**COMPLAINT**<br>**AND JURY DEMAND** |

PHARMACY WAREHOUSE #46;
WALMART PHARMACY 10-2289; CVS
HEALTH CORPORATION; CVS
PHARMACY, INC.; CVS RX SERVICES,
INC.; VERMONT CVS PHARMACY, LLC;
RITE AID MID-ATLANTIC; RITE AID OF
VERMONT, INC.; MAXI GREEN, INC.;
RITE AID DAYVILLE DISTRIBUTION
CENTER; ECKERD CORPORATION; THE
PHARMACY, INC.; PRICE CHOPPER
OPERATING CO. OF VERMONT, INC.;
GOLUB CORPORATION; EXPRESS SCRIPTS
HOLDING COMPANY; EXPRESS
SCRIPTS, INC; EXPRESS SCRIPTS
PHARMACY, INC.; CAREMARK RX,
L.L.C.; CAREMARKPCS HEALTH, L.L.C.;
CAREMARK, L.L.C.; CAREMARKPCS,
L.L.C.;UNITEDHEALTH GROUP
INCORPORATED; OPTUM, INC.;
OPTUMRX, INC.; WALGREEN BOOTS
ALLIANCE, INC.; WALGREEN CO.;
WALGREEN EASTERN CO.; and DOES 1-
100,

       Defendants.

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, the Town of Bennington, Vermont, by and through the undersigned attorneys, (hereinafter "Plaintiff," "Town of Bennington," or "Bennington") against Defendants: Mallinckrodt PLC; Mallinckrodt LLC; SpecGx LLC; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Indivior; Reckitt Benckiser Pharmaceuticals, Inc.; Endo Pharmaceuticals, Inc.; Par Pharmaceutical Companies, Inc.; Par Pharmaceuticals, Inc.; Hikma Pharmaceuticals; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Barr Laboratories, Inc.; Watson Laboratories, Inc.; Watson Pharma, Inc.; Actavis Pharma, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc.; Noramco, Inc.;  Tasmanian Alkaloids Limited; KVK-Tech, Inc.; Amneal Pharmaceuticals LLC; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals of New York, LLC; Mylan Pharmaceuticals, Inc.; Mylan Institutional Inc.; Mylan Technologies, Inc. (collectively, "Manufacturer Defendants"); Burlington Drug Company; McKesson Corporation; Cardinal Health, Inc.; AmerisourceBergen Drug Corporation; Bellco Drug Corporation; H.D. Smith, LLC; CVS Health Corporation (in its distributor capacity); CVS Pharmacy, Inc. (in its distributor capacity); CVS Rx Services, Inc.;  Rite Aid Corp. (in its distributor capacity); Rite Aid Mid-Atlantic; Rite Aid Dayville Distribution Center; Eckerd Corporation; Walmart Inc.; Walmart Pharmacy Warehouse #45; Walmart Pharmacy Warehouse #46 (collectively, "Distributor Defendants"); The Pharmacy, Inc.; Vermont CVS Pharmacy, L.L.C.; Walmart, Inc. (in its retail and mail order pharmacy capacity); Walmart Pharmacy 10-2289; Rite Aid of Vermont, Inc.; Maxi Green, Inc.; Price Chopper Operating Co. of Vermont, Inc.; Golub Corporation; Walgreen Boots Alliance, Inc.; Walgreen Co.; Walgreen Eastern Co. (collectively, "Pharmacy Defendants"); Express Scripts Holding Company (in its pharmacy benefit management capacity); Express

1

Scripts, Inc.; CVS Health Corporation (in its pharmacy benefit management capacity); Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C. d/b/a CVS/Caremark; Caremark, L.L.C.; UnitedHealth Group Incorporated; Optum, Inc.; OptumRx Inc. (in its pharmacy benefit management capacity); (collectively, "PBM Defendants"); and DOES 1 through 100 inclusive (collectively, "Defendants") alleges as follows:

## I.    INTRODUCTION

1.    Defendants have caused an opioid epidemic that has resulted in economic, social and emotional damage to virtually every community in the United States and tens of thousands of Americans. It is indiscriminate and ruthless. It has impacted across demographic lines, harming every economic class, race, gender and age group. It is killing more than one hundred fifteen (115) Americans every day.[1] Prescription and illegal opioids account for more than sixty percent (60%) of overdose deaths in the United States, a toll that has quadrupled over the past two decades, according to the United States Centers for Disease Control and Prevention ("CDC"). More people died from opioid-related causes in 2016 than from car accidents[2] or guns.[3] More than one hundred seventy-five (175) people die every day from drug overdoses, as if an airplane crashes killing everyone on board, every day.[4]

---

[1] *Opioid Overdose Crisis*, NATIONAL INSTITUTE ON DRUG ABUSE, revised March 2018, , CTRS FOR DISEASE CONTROL & PREVENTION, https://www.cdcdrugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis.

[2] *Deaths from Opioid Overdoses Now Higher Than Car Accident Fatalities*, HEALTHLINE, March 30, 2018, https://www.healthline.com/health-news/deaths-from-opioid-overdoses-higher-than-car-accident-fatalities#1

[3] Ethan Siegal, *Opioid Epidemic So Dangerous, Says CDC, It's Finally Killing As Many Americans As Guns*, FORBES, March 20, 2018, https://www.forbes.com/sites/startswithabang/2018/03/20/opioid-epidemic-so-dangerous-says-cdc-its-finally-killing-as-many-americans-as-guns/#32f5256f6c21

[4] Jerry Mitchell, *With 175 Americans dying a day, what are the solutions to the opioid epidemic?* USA TODAY NETWORK, Jan. 29, 2018, https://www.usatoday.com/story/news/nation-now/2018/01/29/175-americans-dying-day-what-solutions-opioid-epidemic/1074336001/

2.      According to the CDC, the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement due to opioid misuse ***alone*** is $78.5 billion a year.[5]

3.      Prescription drug manufacturers, wholesalers/distributors, pharmacy benefit managers ("PBMs"), and pharmacies have created this epidemic. The manufacturers make the opioids and lie about their efficacy and addictive properties. The wholesalers distribute the opioids from the point of manufacture to the point of delivery to the patient. The PBMs control, through their pharmacy plan design and formulary management, which drugs go where and how they are paid for. And the retail pharmacies serve as the final link in the chain by releasing the opioids into the public.

4.      Each defendant group profits enormously from the movement of the opioid products. Each has incentives to move certain drugs over others. Defendants themselves create the incentives and share in their perversity—usually without disclosure to those who reasonably rely on Defendants to abide by their federal, state and common law duties. They do so at the expense of Plaintiff and communities like it nationwide.

5.      Each defendant group bears culpability in the crisis and is a necessary party to addressing the damage it has wreaked, including the costs of abatement.

6.      The devastating impact of opioid abuse cannot be overstated. After years of decreasing death rates in the United States, they are now on the rise fueled by an increase in opioid-related drug overdose deaths. Drug overdoses are now the leading cause of death for Americans under the age of fifty (50). The number of Americans who died of drug overdose deaths in 2017

---

[5] *Supra*, note 1.

was roughly equal the number of Americans who died in the Vietnam, Iraq, and Afghanistan wars combined.[6]

7.     The Town of Bennington has been hit hard by the opioid epidemic. For example, the rate of overdose deaths in Bennington County has sharply risen from 6.78 deaths per 100,000 people in 2003 to 14.5 deaths per 100,000 people in 2017.[7] That startling increase in recorded overdose deaths is likely not inclusive of all opioid overdose deaths in Bennington, as local information reflects the fact that the Town of Bennington averages about ten fatal opioid overdoses per year.[8] Perhaps not surprisingly, the body count in Bennington has increased over the last two decades as the amount of opioids distributed in Bennington has increased.[9]

8.     The increase in the volume of opioids in Bennington is a microcosm of the statewide pattern in Vermont. In 2010, 482,572 opioid prescriptions were dispensed in Vermont, a state with a population of just over 625,000.[10] That number continued to rise. In 2015, the number of opioid prescriptions increased to 498,973[11], the equivalent of giving a prescription to every 1.3 people living in Vermont, including infants.

9.     There is no question that this volume of opioids leads to increased incidence of dependence and addiction. In a 2014 survey by the U.S. Department of Health and Human

---

[6] Nicholas Kristof, *Opioids, a Mass Killer We're Meeting With a Shrug*, NEW YORK TIMES, Jun. 22, 2017, https://www.nytimes.com/2017/06/22/opinion/opioid-epidemic-health-care-bill.html
[7] Centers for Disease Control and Prevention Drug Poisoning Mortality Rates in the United States, 2003-2017, https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/.
[8] Christie Wisniewski, *Testimony Supports Call For Opioid Recovery Housing,* BENNINGTON BANNER, https://www.benningtonbanner.com/stories/testimony-supports-call-for-opioid-recovery-housing,557014
[9] ARCOS Data
[10] Anne VanDorisel, Shayla Livingston, and John Searles (Vermont Department of Health), *Opioids in Vermont: Prevalence, Risk, and Impact* (October 27, 2016), http://www. healthverm ont. gov I sites/ default/fi I es/ do cum ents/20 16/12/ AD AP Opi o ids Prevalence Risk Impact.pdf, at 30 ("Number of Prescriptions by Drug Type and Year"); Vermont Department of Health, *Special Report: Opioid Prescriptions and Benzodiazepines, 2014* (February 20 16), http://www.healthvermont.gov /sites/ default/files/ documents/20 16/12/ ADAP Opioids Benzodiazepenes Report.pdf, at 3.
[11] Id.

4

Services, more than three percent of Vermonters – approximately 18,000 people – reported a dependence on a controlled substance.[12] Vermont ranks as the 8th-highest state for drug dependence nationwide[13], despite other favorable health indicators like better access to health care and insurance coverage as compared to other states.[14]

10.    Opioids are killing Vermont citizens at a skyrocketing rate, and a common origin is prescription opioids. Drug-related fatalities involving opioids nearly doubled between 2012 and 2016.[15] While the national average of opioid-related overdose deaths in 2016 was 13.3 per 100,000 persons, the rate in Vermont was 18.4.[16] These overdose deaths have a broad impact. In a state like Vermont, there are no anonymous deaths.

11.    Defendants' opioid-related misconduct causes heroin abuse. A 2015 study found that four out of five heroin users reported that their addiction started with opioid pain relievers.[17] In this way, prescription opioids—now, thanks to Defendants, provided to patients for everyday conditions such as chronic knee pain and dental pain—can operate as a "gateway" drug to heroin use and involvement with the illegal drug market.

12.    The Town of Bennington is now having to allocate substantial taxpayer dollars, resources, staff, energy and time to address the damage the opioid scourge has left in its wake and to address its many casualties. Fire and emergency medical services are over-utilized because of an increased number of opioid-related overdoses. The burden on law enforcement is substantially

---

[12] amfAR Opioid & Health Indicators Database, *Percent of People 12+ Reporting Drug Dependence,* https://opioid.amfar.org/indicator/drugdep

[13] Id.

[14] State Health Assessment Plan—Healthy Vermonters 2020 (December 2012), https://www.healthvermont.gov/sites/default/files/documents/2016/11/Healthy%20Vermonters%202020%20Report.pdf

[15] Vermont Department of Health, *Opioid-Related Fatalities Among Vermonters (updated August 2018)* https://www.healthvermont.gov/sites/default/files/documents/pdf/ADAP_Data_Brief_Opioid_Related_Fatalities.pdf

[16] National Institute on Drug Abuse, *Vermont Opioid Summary* (March 2018), https://www.drugabuse.gov/opioid-summaries-by-state/vermont-opioid-summary

[17] NAT'L SAFETY COUNCIL, PRESCRIPTION NATION 2016: ADDRESSING AMERICA'S DRUG EPIDEMIC 9 (2016), http://www.nsc.org/RxDrugOverdoseDocuments/Prescription-Nation-2016-American-Drug-Epidemic.pdf

increased by opioid-related crimes related to prescription opioid theft, diversion, and sales on the black market. Courts, social workers, schools' treatment centers, intervention programs, clinics, employee benefit plans, and others directly spending on opioids and opioid antagonists have all been harmed. Nearly every aspect of the Town of Bennington's services and budget has been significantly and negatively impacted by this Defendant-made epidemic.

13. Defendants' efforts to deceive and make opioids widely accessible have also resulted in a windfall of profits. Opioids are now the most prescribed class of drugs; they generated $11 billion in revenue for drug companies in 2014 alone. While Americans represent only five percent (5%) of the world's population, they consume eighty percent (80%) of the world production of prescription opioids.[18]

14. The recipe for generating sky-high revenues is clear: patients who are prescribed opioids become physically and psychologically dependent on the drugs. When these opioid-addicted patients can no longer legally obtain opioids, they seek the drugs on the black market or turn to heroin which provides a similar high to prescription opioids. Defendants have generated a loyal customer base: hundreds of thousands of patients whose addiction guarantees an insatiable demand for the drugs and consistently high profits.

15. The scheme begins with Manufacturer Defendants who deliberately polluted the national marketplace, including in the Town of Bennington, with lies and misinformation about the efficacy of opioids to treat chronic pain, safety and abuse deterrent properties of their particular opioid products, and the risks of addiction. Using hired guns, advertising, and marketing materials, the Manufacturers promoted the fictitious concept of "pseudoaddiction," advocated that signs of

---

[18] Dina Gusovsky, *Americans Consume Vast Majority of the World's Opioids*, CNBC, Apr. 27, 2016 9:13 AM, http://www.cnbc.com/2016/04/27/americans-consume-almost-all-of-the-global-opioid-supply.html

addiction should be treated with more opioids, falsely claimed that opioid dependence and withdrawal could be easily managed, and denied the risks of higher and protracted opioid dosages.

16.     Even those Opioid manufacturers who may not have affirmatively polluted the national marketplace with false information about the dangers of opioids substantially contributed to the epidemic by purposefully and knowingly riding the coattails of the false narrative that had been intentionally developed by others. The generic opioid manufacturers identified in this complaint recognized the profits to be made from the lies that had been spun regarding opioid addiction and offered "spread pricing[19]" to motivate the purchase, dispensing, utilization, and reimbursement of their products by distributors, retailers, mail order pharmacies, and pharmacy benefit managers.

17.     The Distributor Defendants did nothing to stem the excess flow of opioids into Vermont and the Town of Bennington. Wholesale drug distributors receive prescription opioids from drug manufacturers and transfer the opioids to hospitals, pharmacies, doctors, and other healthcare providers who then dispense the drugs to patients. Distributors are required by federal and state law to control and report unlawful drug diversions. The Distributor Defendants purposefully ignored these responsibilities, lobbied for higher reporting thresholds and pocketed profits on every opioid they moved – all at the expense of the Town of Bennington.

18.     The Pharmacy Defendants (retail and mail order) likewise did nothing to stem the flow of excess opioids into The Town of Bennington.  To the contrary, each of the Pharmacy Defendants dispensed opioids—and profited therefrom—through both their brick and mortar

---

[19] "Spread pricing" is a phrase used to describe the practice of purposefully causing a reimbursement price (such as Average Wholesale Price "AWP" or Maximum Allowable Cost "MAC") to be higher than the actual acquisition cost of a drug.  In a commodity marketplace, such as the retail and mail order pharmacy market for generic drugs, pharmacies generally will stock their shelves with whichever commodity generates the most profit.  That profit is largely influenced by the "spread" between the price the pharmacy is reimbursed for the drug (based on AWP or MAC, for example) and the pharmacy's acquisition cost.  Generic drug manufacturers compete based on spreads and intentionally set prices to maximize spread.

stores, and mail order pharmacies.

19.     The Pharmacy Defendants made money on every opioid prescription they filled; even more so when filled through their mail order facilities or shipped by their own distribution centers.  Much of the money Pharmacy Defendants made came from opioid manufacturers themselves (either directly or as a result of favorable "spread pricing", *see* FN 19 above) or distributors—both of whom were likewise incentivized to maximize opioid use.

20.     The Pharmacy Defendants ignored their responsibilities under federal and state law to monitor, detect, investigate, refuse to fill, and report suspicious orders which the Pharmacy Defendants knew or should have known were likely to be diverted in and around the Town of Bennington.

21.     The Manufacturer, Distributor, and Pharmacy Defendants' efforts to promote their scheme to distribute unnecessary opioids were purposefully facilitated by pharmacy benefit managers ("PBMs") who—in addition to operating mail order pharmacies and, at times, acting as distributors—ensured that opioids were available, paid for, reimbursed, and at all times covered by public and private pharmacy benefit plans.

22.     PBMs are the gatekeepers to the vast majority of opioid prescriptions filled in the United States. For most of the relevant time period, Caremark, Express Scripts, and OptumRx (all named defendants here) managed the drug benefits for approximately ninety-five percent (95%) of the United States' population, or 253 million Americans.[20]  Today, they manage approximately 75%.

---

[20] Brittany Hoffman-Eubanks, *The Role of Pharmacy Benefit Managers in American Health Care: Pharmacy Concerns and Perspectives: Part 1*, PHARMACY TIMES, Nov. 14, 2017, http://www.pharmacytimes.com/news/the-role-of-pharmacy-benefit-mangers-in-american-health-care-pharmacy-concerns-and-perspectives-part-1

23.     PBMs design plans and create formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed, numbers of refills permitted, number of pills per prescriptions, pre-authorization requirements, generic co-pay amount, branded drug co-pay amounts and other criteria. PBMs thereafter commit to monitor their customers' utilization and to manage drug plans and overall employee wellbeing. In these ways, PBMs influence prescription drug utilization overall.

24.     Because PBMs are the intermediary between drug manufacturers, pharmacies (including their own captive mail-order pharmacies and, in CVS's case, their additional brick and mortar retail stores), and ultimately patients, these companies impact everything from pharmacy reimbursements to what drugs are covered under formularies and pursuant to what terms.[21] In these ways, the PBMs influence which drugs enter the marketplace. Their fingerprints are on nearly every opioid prescription filled and they profit in myriad ways on every pill.

25.     Accordingly, Plaintiff seeks an order compelling Defendants to halt their unlawful dangerous practices and to abate and remove the foreseeable public nuisance they knowingly caused and from which they have profited mightily.

26.     Plaintiff also seeks to recover damages for the costs it has and will incur as a result of Defendants' unlawful conduct, which conduct will have multi-generational consequences for the Town.  Plaintiff seeks treble damages, punitive damages and disgorgement of all ill-gotten gains, together with attorneys' fees and costs in addition to any other equitable relief authorized by law.

## II.        VENUE AND JURISDICTION

---

[21] Matthew Kandrach, *PBM stranglehold on prescription drug market demands reform*, THE HILL, May 2, 2017, http://thehill.com/blogs/pundits-blog/healthcare/331601-pbm-stranglehold-on-prescription-drug-market-demands-reform

27.     This Court has original jurisdiction over this action for purposes of pretrial proceedings pursuant to 28 U.S.C. § 1407, and Case Management Order One entered on April 11, 2018 as ECF Doc. No. 232 in *In re: National Prescription Opiate Litigation,* Case No. 1:17-cv-2804 (N.D. Ohio).

28.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations ACT, 18 U.S.C. §§ 1961, *et seq.* ("RICO"). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

29.     Defendants are subject to the Court's jurisdiction because Defendants conduct business in Vermont, purposefully direct or directed their actions toward Vermont, consented to be sued in Vermont by registering an agent for service of process, consensually submitted to the jurisdiction of Vermont when obtaining a manufacturer, distributor or pharmacy license, and have the requisite minimum contacts with Vermont necessary to permit the Court to exercise jurisdiction over Defendants.

30.     Venue is proper within this District pursuant to 28 U.S.C. § 1391, as this District is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. §§ 1391(a) and (c).

31.     Certain Defendants are non-domiciliaries of Vermont who regularly engage in business within Vermont. These defendants have committed tortious acts outside and within Vermont that have caused injury within Vermont and to the Town of Bennington. Defendants expect or should reasonably have expected those acts to have consequences in Vermont. Defendants, moreover, solicited business within Vermont, engaged in persistent courses of conduct in Vermont, and derived substantial revenue from goods used and services rendered in

Vermont through interstate commerce, including through the Vermont Medicaid program.

32.      Defendants are regularly engaged in the business of manufacturing, distributing, dispensing and reimbursing prescription opioids in Vermont and, specifically, in the Town of Bennington. Defendants' activities in the Town of Bennington in connection with the manufacture, distribution, dispensation and reimbursement of prescription opioids was, and is, continuous and systematic, and give rise to the causes of action alleged herein.

### III.      PARTIES

**A.      PLAINTIFF**

33.      The Town of Bennington is a municipal corporation duly chartered and existing under the laws of Vermont with its governing body being the Bennington Select Board.  The Plaintiff has standing to bring this suit. 24 App. V.S.A. c. 103 § 101.

**B.      MANUFACTURER DEFENDANTS**

34.      Defendant, MALLINCKRODT PLC, is an Irish public limited company with its corporate headquarters in Staines-upon-Thames, United Kingdom. MALLINCKRODT PLC may be served through its registered agent in the United States: CT Corporation System, 120 South Central Avenue, Suite 400, Clayton, Missouri 63105.

35.      Defendant, MALLINCKRODT LLC, is a wholly owned subsidiary of MALLINCKRODT PLC and is a Delaware limited liability company with its principal place of business in St. Louis, Missouri. MALLINCKRODT LLC is registered to do business in Vermont and has been since at least October 4, 2013.

36.      Defendant, SPECGX LLC is a Delaware limited liability company with its principal place of business in Clayton, Missouri and is a wholly-owned subsidiary of MALLINCKRODT PLC.  SPECGX LLC may be served in Vermont through its registered agent:

C T Corporation System, 17 G W Tatro Dr, Jeffersonville, VT, 05464. SPECGX LLC is licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals.

37.    MALLINCKRODT PLC, MALLINCKRODT LLC and SPECGX LLC are referred to collectively as "Mallinckrodt."

38.    Mallinckrodt manufactures, markets, sells and distributes pharmaceutical drugs throughout the United States. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States, based on prescriptions.

39.    In Vermont and nationally, Mallinckrodt is engaged in the manufacture, promotion, and distribution of Roxicodone, oxycodone, and hydrocodone, among other drugs. Mallinckrodt transacts business in Vermont, targeting the Vermont market for its products, including the opioids at issue in this lawsuit, which Mallinckrodt has sold in Vermont.

40.    According to the DEA ARCOS database, drugs manufactured by Mallinckrodt represented approximately 15.1% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by Mallinckrodt totaled over 41.6 million MME, or more than 4.3 million dosage units.

41.    On information and belief, Mallinckrodt hires employees to service the Vermont market, including a Medical Science Liaison for Nephrology,[22] and also directs advertising and informational materials to impact Vermont physicians and potential users of Mallinckrodt products.

42.    At all times relevant hereto, the PBM Defendants listed the brand drug Roxicodone or its generic alternative oxycodone as approved reimbursable drugs on their formularies. They

---

[22] https://www.linkedin.com/jobs/view/medical-science-liaison-nephrology-connecticut-rhode-island-massachusetts-new-hampshire-vermont-at-mallinckrodt-pharmaceuticals-29984951/

imposed no pre-authorization requirements or quantity limits on prescriptions until 2014 at the earliest and even there, the limitations did not extend to the PBM commercial plans. The PBM Defendants listed other generic opioids manufactured by Mallinckrodt as approved reimbursable drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

43. Defendant, RICHARD SACKLER, a resident of Riviera Beach, Florida, has served on the board of directors for Purdue at all relevant times and until 2018.

44. Defendant, BEVERLY SACKLER, a resident of Connecticut, has served on the board of directors for Purdue at all relevant times and until 2017.

45. Defendant, DAVID SACKLER, a resident of New York, has served on the board of directors for Purdue from 2012 to 2018.

46. Defendant, ILENE SACKLER LEFCOURT, a resident of New York, has served on the board of directors for Purdue at all relevant times.

47. Defendant, JONATHAN SACKLER, a resident of Connecticut, has served on the board of directors for Purdue at all relevant times.

48. Defendant, KATHE SACKLER, a resident of Connecticut, has served on the board of directors for Purdue at all relevant times.

49. Defendant, MORTIMER D.A. SACKLER, a resident of New York, has served on the board of directors for Purdue at all relevant times.

50. Defendant, THERESA SACKLER, a resident of the United Kingdom, has served on the board of directors for Purdue at all relevant times and until 2018.

51. At all relevant times, the aforementioned Defendants (collectively, the "Sackler Defendants") comprised a majority of the board of directors for Purdue, enabling the Sackler Defendants to exert control over Purdue's business decisions, including the implementation of

13

deceptive sales and marketing practices associated with opioids.

52.     Defendant, JOHN STEWART, a resident of Florida, served as Purdue's CEO from 2007 to 2013.

53.     Defendant, MARK TIMNEY, a resident of Connecticut, served as Purdue's CEO from 2014 to 2017.

54.     Defendant, CRAIG LANDAU, a resident of Connecticut, served as Purdue's CEO from 2017 to the present.

55.     Defendants, JOHN STEWART, MARK TIMNEY, and CRAIG LANDAU, in their capacities as CEO of Purdue Pharma L.P. and Purdue Pharma, Inc., each directed Purdue's misconduct.

56.     Defendant RUSSELL GASDIA, a resident of Massachusetts, carried out the misconduct in his capacity as Vice President of Sales and Marketing for Purdue at all relevant times until 2014.

57.     Defendants, John Stewart, Mark Timney, Craig Landau, and Russell Gasdia are collectively referred to as the "Purdue Officer Defendants".  The Sackler Defendants and the Purdue Officer Defendants are collectively referred to as the "Purdue Individual Defendants."

58.     Substantially all of the Sackler Defendants (except David Sackler) were heavily involved in the conduct that led to the fines and criminal convictions in 2007.  From the 1990s until 2007, they directed a decade of misconduct, which led to criminal convictions and commitments that Purdue would not deceive doctors and patients again. That background confirms that their misconduct since 2007 was knowing, purposeful, reckless, and intentional.

59.     While the Sackler Defendants relinquished their officer titles in or around 2003 to try to shield themselves from future criminal and civil liability, they remained Purdue's owners, in control of its Board of Directors, and thus in control of the firm.

14

60.     At all relevant times, at least through the end of 2018, the Sackler Defendants controlled Purdue's deceptive sales campaign. They directed the company to hire hundreds more sales representatives to visit doctors thousands more times. They insisted that sales representatives repeatedly visit the most prolific prescribers. They directed representatives to encourage doctors to prescribe more of the highest doses of opioids. They studied unlawful tactics to keep patients on opioids longer and then ordered staff to use them. They asked for detailed reports about doctors suspected of misconduct, how much money Purdue made from them, and how few of them Purdue had reported to the authorities. They sometimes demanded more detail than anyone else in the entire company, so staff had to create special reports just for them. Richard Sackler even went into the field to promote opioids to doctors and supervise representatives face-to-face. In connection with a single meeting in 2011, for example, sales and marketing staff scrambled to prepare responses to questions from the Sackler Defendants, Defendant Mortimer Sackler asked about launching a generic version of OxyContin to "capture more cost sensitive patients," Defendant Kathe Sackler recommended looking at the characteristics of patients who had switched to OxyContin to see if Purdue could identify more patients to convert, and Defendant Jonathan Sackler wanted to study changes in market share for opioids, focusing on dose strength.

61.     On information and belief, the Sackler Defendants' micromanagement was so intrusive that staff begged for relief. Defendant Gasdia wrote to the CEO: "Anything you can do to reduce the direct contact of Richard into the organization is appreciated." To convince the Sackler Defendants to make him CEO, Defendant Landau wrote a plan that he titled: "SACKLER PHARMA ENTERPRISE." He started by admitting that the Sackler Defendants in fact controlled the company like chief executive officers. The family ran "the global Sackler pharmaceutical enterprise … with the Board of Directors serving as the 'de-facto' CEO." The Sackler Defendants concealed their ongoing, extensive involvement with Purdue and its sales and marketing practices.

15

62. From the money that Purdue collected as a result of its wrongful conduct, the Sackler Defendants paid themselves and their family billions of dollars. From the 2007 convictions (of certain Purdue officers) until 2018, the Sackler Defendants voted dozens of times to pay out Purdue's opioid profits to their family - in total **more than four billion dollars.**

63. The Purdue Individual Defendants all actively participated in the common law torts and federal and state statutory violations of Purdue and benefited therefrom. The tortious conduct of the Purdue Individual Defendants was not, and could not have been through the exercise of due diligence, known to the public until their conduct was detailed in recent court filings by the Attorney General of Massachusetts.

64. Under the Purdue Individual Defendants, Purdue has engaged in the manufacture, promotion, and distribution of opioids, including: (a) OxyContin (oxycodone hydrochloride extended release), a Schedule II opioid agonist tablet first approved in 1995 and marketed by Purdue for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." OxyContin was indicated, or legally approved, for the "management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time"; and (b) MS Contin (morphine sulfate extended release), a Schedule II opioid agonist tablet first approved in 1987 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."

65. Both OxyContin and MS Contin are brand drugs. The original OxyContin formulation first faced generic competition in 2004. MS Contin has faced generic competition since 1998.

66. Purdue secured a new patent for an abuse-deterrent formulation of OxyContin in 2010.

67.     OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up almost four-fold from 2006 sales of $800 million. OxyContin constitutes roughly thirty percent (30%) of the entire market for analgesic drugs (painkillers).

68.     In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the United States $635 million. At the time, this was one of the largest settlements with a drug company for marketing misconduct. Purdue's misconduct has continued, as alleged herein, settlement notwithstanding.

69.     Purdue transacts business in Vermont, targeting the Vermont market for its products, including the opioids at issue in this lawsuit. On information and belief, Purdue hires and/or has hired employees to service the Vermont market. On information and belief, Purdue also directs advertising and informational materials to impact Vermont physicians and potential users of Purdue products.

70.     According to the DEA ARCOS database, drugs manufactured by Purdue represented approximately 6.1% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by Purdue totaled approximately 16,793,125 Milligram Morphine Equivalent ("MME") which translates to over 303,000 dosage units of opioids.[23]

---

[23] MME is a value assigned to opioids to represent their relative potencies by comparing a given opioids strength to an equivalently strong dose of morphine. While a 100 mg of hydrocodone dose would equate to a 100 MME dose due to its being comparably potent to morphine, it would take only a 769 *micro*gram dose of a fentanyl tablet to reflect a 100 MME dose due to its relatively high potency compared to morphine.

71.     Rhodes Pharmaceuticals, also under the guidance of many of the Purdue Individual Defendants, is presently among the largest producers of generic opioids in the U.S.[24] Together with Purdue, Rhodes accounted for 14.4 million opioid prescriptions in 2016, or 6% of the US Opioid market.[25]

72.     Rhodes also owns, together with Purdue, the '919 Patent entitled "Oxycodone Compositions" and is involved in the manufacture of the active pharmaceutical ingredient used in Purdue's OxyContin.

73.     Rhodes is also now the registered holder of approved New Drug Application No. 19-891, which covers the manufacturer and sale of Dilaudid.

74.     Upon information and belief, Rhodes manufactures, promotes, distributes and/or sells generic opioids nationally, in Vermont, and in the Town of Bennington, including but not limited to oxycodone, morphine sulfate, hydrocodone and hydromorphone.

75.     According to the DEA ARCOS database, drugs manufactured by Rhodes represented approximately .3%% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by Rhodes totaled approximately 755,924 Milligram Morphine Equivalent ("MME"), which translates to more than 42,000 dosage units of opioids.

76.     Defendant, ENDO PHARMACEUTICALS, INC., is a wholly owned subsidiary of Endo Health Solutions, Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

---

[24] David Crow, *Billionaire Sackler family owns second opioid drugmaker,* FINANCIAL TIMES, Sept. 9, 2018, https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132

[25] *Id.*

77.     ENDO PHARMACEUTICALS, INC. may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

78.     Defendant PAR PHARMACEUTICAL COMPANIES, INC. ("Par Pharmaceutical Cos.") is a Delaware corporation, having a principal place of business in Chestnut Ridge, New York. On information and belief, Par Pharmaceutical Cos. is a holding company and is a wholly-owned subsidiary, directly or indirectly, of Endo International plc.

79.     Defendant, PAR PHARMACEUTICAL, INC. ("Par Pharmaceutical") is a New York corporation, having a principal place of business located in Chestnut Ridge, New York.  On information and belief, Par Pharmaceutical is a wholly-owned subsidiary of Par Pharmaceutical Cos. and holds itself out as "an Endo International Company." Par Pharmaceutical is and has been licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals since 1992.

80.     Par Pharmaceutical Cos. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Par Pharmaceutical may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

81.     Par Pharmaceutical and Par Pharmaceutical Cos. are referred to collectively as "Par."

82.     ENDO PHARMACEUTICALS, INC., and Par are, at times, referred to collectively as "Endo."

83.     Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, throughout the United States, including Vermont. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012.

Opana ER yielded $1.15 billion in revenue from 2010 to 2013, and it accounted for ten percent (10%) of Endo's total revenue in 2012. Endo, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc., also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, meperidine and hydrocodone products across the United States, including Vermont.

84.     Par develops, markets, and sells prescription drugs including the brand opioid Endocet and generic opioids consisting of oxycodone, oxymorphone, hydrocodone, morphine sulfate, and fentanyl citrate, throughout the United States, including Vermont.

85.     According to the DEA ARCOS database, drugs manufactured by Endo Pharmaceuticals represented approximately .3% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by Endo totaled nearly 800,000 MME, or more than 35,000 dosage units.

86.     According to the DEA ARCOS database, drugs manufactured by Par Pharmaceutical represented approximately 3.9% of the opioid market share in Bennington from 2006 through 2012. Through this period, opioids in Bennington manufactured by Par totaled nearly 10.8 million MME, or more than 1 million dosage units.

87.     At all times relevant hereto, the PBM Defendants listed generic opioids manufactured by Endo as approved reimbursable drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

88.     On information and belief, Endo transacts business in Vermont, targeting the Vermont market for its products, including the opioids at issue in this lawsuit. On information and belief, Endo hires employees to service the Vermont market. On information and belief, Endo also directs advertising and informational materials to impact Vermont physicians and potential users of Endo products.

89.     Defendant, TEVA PHARMACEUTICALS USA, INC. ("Teva USA"), is a Delaware corporation with its principal place of business in North Whales, Pennsylvania and is a wholly owned subsidiary of Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), an Israeli corporation.

90.     Defendant, CEPHALON, INC. ("Cephalon"), is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired Cephalon, Inc.

91.     Defendant, BARR LABORATORIES, INC. ("Barr"), is a Delaware corporation with its principal place of business in Horsham, Pennsylvania. In 2008, Teva Ltd. acquired Barr.

92.     Defendant, WATSON LABORATORIES, INC., is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

93.     Defendant, ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc.

94.     WATSON LABORATORIES, INC., WATSON PHARMA, INC. and ACTAVIS PHARMA, INC. are wholly-owned indirect subsidiaries of Teva, Ltd., which acquired the companies in 2016. Prior to 2016, each of these companies were subsidiaries of Allergan plc.

95.     TEVA USA, has a may be served through its registered agent: 1233 Shelburne Road, Suite 400, South Burlington, VT, 05403. TEVA USA is licensed and has been licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals since 1992. CEPHALON may be served at 41 Moores Road, Frazer, Pennsylvania 19355.

96.     WATSON LABORATORIES, INC. may be served through its registered agent: Corporate Creations Network Inc., 8275 South Eastern Avenue, #200, Las Vegas, Nevada 89123. ACTAVIS PHARMA, INC. may be served through its registered agent: Corporate Creations Network Inc. 3411 Silverside Road, Tatnall Building STE 104, Wilmington, DE 19810.

CEPHALON, INC. and BARR LABORATORIES may be served through their registered agent: Corporate Creations Network Inc. 3411 Silverside Road, Tatnall Building STE 104, Wilmington, DE 19810.

97.     TEVA USA, CEPHALON, BARR, WATSON LABORATORIES, INC., Watson pharma, Inc., and ACTAVIS PHARMA, INC. are referred to collectively as "Teva."

98.     Teva manufactures, promotes, distributes and sells both brand name and generic versions of opioids nationally, and in The Town of Bennington, including the following: (a) Actiq, and (b) Fentora. Teva also was in the business of selling generic opioids, including morphine, hydromorphone, tramadol, codeine, and meperidine from at least 2000, and a generic form of OxyContin from 2005 to 2009, among others.

99.     Teva transacts business in Vermont, targeting the Vermont market for its products, including the opioids at issue in this lawsuit. Teva hires employees to service the Vermont market, including a Clinical Nurse Educator CNS in Burlington, Vermont.[26] On information and belief, Teva also directs advertising and informational materials to impact Vermont physicians and potential users of its products.

100.     According to the DEA ARCOS database, drugs manufactured by Teva represented approximately 10.7% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by Teva totaled over 29.3 million MME, or nearly 1.8 million dosage units.

101.     At all times relevant hereto, the PBM Defendants listed the generic opioids manufactured by Teva as approved reimbursable drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

---

[26] https://www.linkedin.com/jobs/view/clinical-nurse-educator-cns-albany-ny-burlington-vt-western-ma-at-teva-pharmaceuticals-138500477/

102.    At all times relevant hereto, PBM Defendant OptumRx listed both Actiq and Fentora as approved reimbursable brand drugs on its formularies.  In many years, the products had preferred brand status.

103.    OptumRx did not impose any quantity limits or pre-authorization requirements for the generic Teva OxyContin.

104.    Defendant, JOHNSON & JOHNSON, is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Johnson & Johnson Health Care Systems Inc. is a wholly owned subsidiary of JOHNSON & JOHNSON, has been registered to do business in Vermont since at least 2019 and may be served through their registered agent: CT Corporation System, 17 GW Tatro Dr, Jeffersonville, VT 05464.

105.    Defendant, JANSSEN PHARMACEUTICALS, INC. (formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc.) is a Pennsylvania corporation with is principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON.

106.    Upon information and belief, JOHNSON & JOHNSON controls the sale and development of JANSSEN PHARMACEUTICALS, INC.'s drugs and JANSSEN PHARMACEUTICALS, INC.'s profits inure to JOHNSON & JOHNSON's benefit.

107.    Defendant, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

108.    Defendant, JANSSEN PHARMACEUTICA, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

109.    JANSSEN PHARMACEUTICALS, INC. may be served at 1125 Trenton-

23

Harbourton Road, Titusville, New Jersey 08560.

110.    Defendant NORAMCO, INC. is a Georgia corporation with its principal place of business in Wilmington, Delaware.  NORAMCO, INC. is an active pharmaceutical ingredient ("API") developer and manufacturer of pharmaceutical products including opioids.  NORAMCO, INC. is and has been registered to do business in Vermont since at least 2016 and may be served through its registered agent: CT Corporation System, 17 GW Tatro Dr, Jeffersonville, VT 05464.

111.    TASMANIAN ALKALOIDS PTY. LTD. is an Australian company that cultivates and processes opium poppy plants to manufacture narcotic raw materials that are imported into the U.S.

112.    NORAMCO, INC. and TASMANIAN ALKALOIDS PTY. LTD. were wholly owned subsidiaries of JOHNSON & JOHNSON at all relevant times until July 2016 when JOHNSON & JOHNSON sold its interest in both companies to private equity firm SK Capital.

113.    NORAMCO, INC. and TASMANIAN ALKALOIDS PTY. LTD. worked together to shepherd the production of opioids through the pharmaceutical supply chain from cultivation and development to the processing of ingredient APIs.  These ingredient APIs were then sold to other pharmaceutical companies who in turn developed and manufactured their own opioid drugs that they ultimately unleashed unto the U.S. and Vermont markets, including Bennington.

114.    Upon information and belief, JOHNSON & JOHNSON controlled the sale and development of NORAMCO, INC.'s drugs during all relevant times until July 2016, and in that time NORAMCO, INC.'s profits inured to JOHNSON & JOHNSON's benefit.

115.    JANSSEN  PHARMACEUTICALS,  INC.,  ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC, JANSSEN PHARMACEUTICA, INC., JOHNSON & JOHNSON, NORAMCO, INC., and TASMANIAN ALKALOIDS LTD. are collectively referred to as "Janssen."

116.    Up until 2016, when Janssen sold its Noramco/Tasmanian Alkaloids businesses, Tasmanian Alkaloids and Noramco were sister companies, as both of them were members of Janssen's family of companies. Janssen, Noramco, and Tasmanian Alkaloids shared employees and resources that were required to operate the business. Noramco employees physically worked at Janssen facilities in New Jersey at various times, and employees simultaneously held positions at multiple companies within the Janssen family of companies at times. During this time, Noramco and Tasmanian Alkaloids were key parts of Janssen's pain management franchise, which included all of Janssen's pain products and was an important part of Janssen's business from the mid-1990s to after 2010.

117.    Dr. Paul Janssen originally invented fentanyl in the 1950s, and since at least the mid-1990s, Janssen has been engaged in the manufacture, promotion, distribution, and sale of opioids nationally and in Bennington, including the following: (i) Duragesic, a transdermal patch made out of the active pharmaceutical ingredient ("API"), fentanyl; (ii) Ultram and Ultram Extended Release ("ER") tablets made out of the API, tramadol; (iii) Ultracet-tablets made out of the APIs, tramadol and acetaminophen; (iv) Nucynta and Nucynta ER, tablets made out of the API, tapentadol; (v) Tylenol with Codeine, tablets made out of the APIs, acetaminophen and codeine; (vi) Tyloxcapsules made out of the APIs, acetaminophen and oxycodone. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

118.    According to the DEA ARCOS database, drugs manufactured by Janssen Pharmaceuticals represented approximately 3.4% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by Janssen totaled over 9.4 million MME, or more than 12,900 dosage units.

119.    Janssen transacts business in Vermont, targeting the Vermont market for its

25

products, including the opioids at issue in this lawsuit. Janssen hires employees to service the Vermont market. For example, Janssen recently advertised online that it was seeking a District Manager to operate out of Montpelier, Vermont.[27]  On information and belief, Janssen also directs advertising and informational materials to impact Vermont physicians and potential users of its products.

120.     At all times relevant hereto, Janssen promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Vermont and Bennington. Between 2013 and 2016, Janssen made 25,606 payments totaling $2.04 million to promote the sale and use of Nucynta (tapentadol).

121.     At all times relevant hereto, the PBM Defendants have ensured access to and reimbursement of Janssen's opioids.

122.     PBM Defendant OptumRx has routinely listed Janssen's Duragesic as an approved reimbursable brand drug on its formularies, often with preferred brand status and without pre-authorization requirements.  It has also reimbursed for the Nucynta products, again without pre-authorization requirements and with preferred brand status.

123.     PBM Defendant Express Scripts has listed Janssen's Nucynta and Nucynta ER as approved reimbursable brands on its formulary without quantity limits or preauthorization requirements.

124.      PBM Defendant Caremark also has listed Duragesic and Nucynta products as approved brands on its formularies without prior authorization requirements. The publicly available DEA ARCOS data reveals that Janssen's opioids were widely purchased in the mail order pharmacy environment.  From 2006-2012, Janssen sold over 1.24 billion MME to mail order

---

[27] https://find.jobs/jobs/johnson-johnson/district-manager-oncology-new-england-so/1566214097568320161

pharmacies. This translates to over 8 million dosage units of opioids- all purchased for dispensing by mail nationwide.

125.    The publicly available ARCOS data reveals that the PBM Mail Order Pharmacies named herein each purchased Janssen opioids for dispensing by mail nationwide.  During the 2006-2012 time period, Express Scripts Mail Order Pharmacy purchased over 702 million MME in Endo's opioids, Caremark's Mail Order Pharmacy purchased over 416 million MME and Optum's Mail Order Pharmacy purchased over 25 million MME.

126.    Defendant, KVK-TECH, INC. ("KVK-Tech") is a Pennsylvania corporation with its principle place of business in Newton, Pennsylvania. KVK-Tech may be served through its registered agent: Frank Ripp, Jr., 110 Terry Drive, Newton, Pennsylvania 18940.

127.    KVK-Tech is currently licensed as Wholesale Drug Outlet with the Vermont Department of Health Professionals. Upon information and belief, KVK-Tech manufactures, promotes, distributes and/or sells generic opioids nationally, in Vermont, and in the Town of Bennington, including but not limited to oxymorphone and oxycodone.

128.    According to the DEA ARCOS database, drugs manufactured by KVK-Tech represented approximately .3% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by KVK-Tech totaled over 907,000 MME, or more than 79,000 dosage units.

129.    At all times relevant hereto, the PBM Defendants listed generic opioids manufactured by KVK-Tech as approved reimbursable drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

130.    Defendant, AMNEAL PHARMACEUTICALS LLC, is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. AMNEAL PHARMACEUTICALS LLC has been registered to do business in Vermont since at least 2015

27

and is currently licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals.  AMNEAL PHARMACEUTICALS LLC may be served through its registered agent: The CT Corporation System, 17 G W Tatro DR, Jeffersonville, VT, 05464 .

131.    Upon information and belief, in May of 2018 Impax Laboratories, Inc. merged with and into AMNEAL PHARMACEUTICALS LLC to form Defendant, AMNEAL PHARMACEUTICALS, INC., a Delaware corporation with its principal place of business in Bridgewater, New Jersey.  AMNEAL PHARMACEUTICALS, INC. may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

132.    Defendant, AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, is a Delaware limited liability company with its principal place of business in Hauppauge, New York. Upon information and belief, AMNEAL PHARMACEUTICALS OF NEW YORK, LLC is a subsidiary of AMNEAL PHARMACEUTICALS, INC. AMNEAL PHARMACEUTICALS OF NEW YORK, LLC is currently licensed as a wholesale drug outlet with the Vermont Department of Health Professionals. AMNEAL PHARMACEUTICALS OF NEW YORK, LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

133.    AMNEAL PHARMACEUTICALS, INC., AMNEAL PHARMACEUTICALS LLC, and AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, are collectively referred to as "Amneal."

134.    Upon information and belief, Amneal manufactures, promotes, distributes and/or sells generic opioids nationally, in Vermont, and in the Town of Bennington, including but not limited to oxycodone, oxymorphone, hydrocodone and codeine.

135.    According to the DEA ARCOS database, drugs manufactured by Amneal represented approximately .6% of the opioid market share in the town of Bennington from 2006 through 2012. Through this period, opioids in the town of Bennington manufactured by Amneal totaled over 1.7 million MME, or more than 327,000 dosage units.

136.    At all times relevant hereto, the PBM Defendants listed generic opioids manufactured by Amneal as approved reimbursable drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

137.    Defendant, MYLAN PHARMACEUTICALS, INC., is a West Virginia corporation with its principal place of business in Canonsburg, Pennsylvania.   Mylan Pharmaceuticals, Inc. is and has been registered to do business in Vermont since 2019 and may be served in Vermont through its registered agent: CT Corporation System, 17 G W Tatro DR, Jeffersonville, VT, 05464.

138.    Defendant, MYLAN INSTITUTIONAL, INC. is an Illinois corporation with its principal place of business in Rockford, Illinois. Mylan Institutional, Inc. is and has been registered to do business in Vermont since 1991 and may be served through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464.

139.    Defendant, MYLAN TECHNOLOGIES, INC. is a West Virginia corporation with its principal place of business in St. Albans, Vermont. Mylan Technologies, Inc. is and has been registered to do business in Vermont since 1993 and may be served through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464. Mylan Technologies, Inc. is currently licensed as an In-State Manufacturing Drug Outlet with the Vermont Department of Health Professionals.

140.    MYLAN PHARMACEUTICALS, INC., MYLAN INSTITUTIONAL, INC., and MYLAN TECHNOLOGIES, INC. are collectively referred to as "Mylan."

141.    Upon information and belief, Mylan manufactures, promotes, distributes and/or sells generic opioids nationally, in Vermont, and in the Town of Bennington, including but not limited to oxycodone, hydrocodone, and morphine sulfate.

142.    According to the DEA ARCOS database, drugs manufactured by Mylan represented approximately 6.4% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by Mylan totaled over 17.6 million MME, or more than 51,900 dosage units.

143.    At all times relevant hereto, the PBM Defendants listed generic opioids manufactured by Mylan as approved reimbursable drugs on their formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

144.    Defendant, RECKITT BENCKISER PHARMACEUTICALS, INC. is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Reckitt Benckiser Pharmaceuticals, Inc. may be served through its registered agent: The Corporation Service Company, 251 Little Falls Drive, Wilmington DE 19808.

145.    Defendant, INDIVIOR, is a Delaware corporation with its principal place of business in Richmond, Virginia. Indivior is and has been registered to do business in Vermont since 2007 and may be served through its registered agent: Corporation Service Company, 100 North Main Street, Suite 2, Barre, Vermont 05641. Indivior, Inc. is currently licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals.

146.    According to the DEA ARCOS database, drugs manufactured by Indivior represented approximately 42.4% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by Indivior totaled nearly 116.8 million MME, or more than 550,700 dosage units.

147.    Defendant, HIKMA PHARMACEUTICALS USA, INC., is a Delaware corporation with its principal place of business in Eatontown, New Jersey. Hikma Pharmaceuticals is and has been registered to do business in Vermont since 2017 and may be served through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464. Hikma Pharmaceuticals USA, Inc. is currently licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals.

148.    According to the DEA ARCOS database, drugs manufactured by Hikma Pharmaceuticals USA, Inc. represented approximately 6.3% of the opioid market share in the Town of Bennington from 2006 through 2012. Through this period, opioids in the Town of Bennington manufactured by Hikma Pharmaceuticals USA, Inc. totaled over 17.3 million MME, or more than 574,000 dosage units.

149.    The corporate defendants listed above are all engaged in the manufacturing of opioids. Together with the Purdue Individual Defendants, they are collectively referred to herein as the "Manufacturer Defendants."

150.    The failure of all Manufacturer Defendants to effectively monitor and report suspicious orders of prescription opioids, their aggressive misinformation campaign aimed at increasing public consumption of highly addictive opioids nationally, in Vermont, and in the Town of Bennington, their failure to forthrightly provide accurate information to the United States Food and Drug Administration ("FDA"), their failure to adhere to FDA regulations regarding misbranding, their failure to implement measures to prevent the filling of suspicious orders, and their perverse utilization of so-called "patient advocacy" groups to evade FDA regulations concerning consumer drug-marketing greatly contributed to a vast increase in opioid overuse and addiction. Manufacturer Defendants' conduct thus directly caused a public-health and law-enforcement crisis across this country, including in the Town of Bennington.

31

## C.    DISTRIBUTOR DEFENDANTS

151.    Defendant McKESSON CORPORATION ("McKesson") is a Delaware corporation with its principal place of business in San Francisco, California.

152.    McKesson is currently licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals. McKesson has been registered to do business in Vermont since at least August 24, 1994 and does substantial business in Vermont. McKesson has a Vermont taxpayer number and may be served in Vermont through its registered agent: Corporation Service Company, 100 North Main Street, Suite 2, Barre, VT, 05641.

153.    McKesson is the largest pharmaceutical distributor in North America. It distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Vermont.

154.    Upon information and belief, McKesson is one of the largest distributors of opioid pain medications in the country, including Vermont. In 2015, McKesson had a net income in excess of $1.5 billion.

155.    In its 2017 Annual Report, McKesson states that it "partner[s] with pharmaceutical manufacturers, providers, pharmacies, governments and other organizations in healthcare to help provide the right medicines, medical products and healthcare services to the right patients at the right time, safely and cost-effectively."[28]

156.    According to the 2017 Annual Report, McKesson "pharmaceutical distribution business operates and serves thousands of customer locations through a network of 27 distribution centers, as well as a primary redistribution center, two strategic redistribution centers and two repackaging facilities, serving all 50 states and Puerto Rico."[29]

---

[28] McKesson 2017 Annual Report found at investor.mckesson.com/sites/mckesson.investorhq.businesswire.com/files/report/file/2017_McKesson_Annual_R eport_0.pdf
[29] *Id.*

157.    McKesson hires employees to service the Vermont market. For example, McKesson recently advertised online that it was seeking an EnterpriseRx Implementation Consultant to operate out of Vermont and a Technical Solutions Sales Representative to operate out of Vermont.[30]

158.    The DEA ARCOS database reveals that between 2006-2012, McKesson distributed over 32.5 million MME into the Town of Bennington, across over 1.2 million dosage units.

159.    Defendant CARDINAL HEALTH, INC. ("Cardinal") is an Ohio corporation with its principal place of business in Dublin, Ohio. Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Vermont.

160.    Cardinal may be served in through its registered agent: CT Corporation System, 4400 Easton Commons Way Suite 125, Columbus, Ohio 43219.

161.    Cardinal, through its many subsidiaries, including Cardinal Health 100, Inc., is currently licensed as a Third-Party Logistics Provider with the Vermont Department of Health Professionals. Cardinal has been registered to do business in Vermont since at least June 29, 1992 and may be served in Vermont through its registered agent: CT Corporation System, 17 GW Tatro Dr, Jeffersonville, VT, 05464.

162.    Upon information and belief, Cardinal is one of the largest distributors of opioid pain medications in the country, including Vermont.

163.    The DEA ARCOS database reveals that between 2006-2012, Cardinal distributed over 72.4 million MME into the Town of Bennington, across over 2.3 million dosage units.

164.    Defendant AMERISOURCEBERGEN DRUG CORPORATION ("Amerisource") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania.

---

[30] https://mckesson.wd3.myworkdayjobs.com/en-US/External_Careers/job/Atlanta-Metro/Technical-Solutions-Sales-Representative_JR0013922

Amerisource distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Vermont.

165.    Amerisource is currently licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals. Amerisource has been registered to do business in Vermont since at least September 27, 1994 and may be served in Vermont through its registered agent: CT Corporation System, 17 GW Tatro Dr, Jeffersonville, VT, 05464.

166.    Defendant, BELLCO DRUG CORPORATION, is a New York corporation with its principal place of business in Amityville, New York. Bellco Drug Corporation is a subsidiary of Amerisource. Bellco Drug Corporation is currently licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals and may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York, 10005.

167.    Defendant, H.D. SMITH LLC, is a Delaware corporation with its principal place of business in Springfield, Illinois. H.D. Smith is a subsidiary of Amerisource. H.D. Smith is and has been registered to do business in Vermont since 2018 and may be served through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464. H.D. Smith is currently licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals.

168.    According to its 2016 Annual Report, Amerisource is "one of the largest global pharmaceutical sourcing and distribution services companies, helping both healthcare providers and pharmaceutical and biotech manufacturers improve patient access to products and enhance patient care."[31]

---

[31]  Amerisource 2016 Annual Report found at http://www.amerisourcebergen.com/investor/phoenix.zhtml ?c=61181&p=irol-irhome

169.     Amerisource hires employees to service the Vermont market. For example, Amerisource recently advertised online that it was seeking a Client Service Manager in Vermont.[32]

170.     Upon information and belief, Amerisource is one of the largest distributors of opioid pain medications in the country, including Vermont.

171.     The DEA ARCOS database reveals that between 2006-2012, Amerisource distributed over 22.5 million MME into the Town of Bennington, across over 592 thousand dosage units.

172.     Defendant CVS HEALTH CORPORATION ("CVS Health"), formerly known as CVS Caremark Corporation, is a Delaware corporation with its principal place of business located in Woonsocket, Rhode Island. CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange, Street, Wilmington, Delaware 19801. CVS Health is named as a defendant in its capacities as a distributor, retail and mail order pharmacy, and PBM (*see* Sections D and E, *infra*).

173.     Defendant CVS PHARMACY, INC. ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. On information and belief, CVS Health is the direct parent company of CVS Pharmacy.  CVS Pharmacy has been registered to do business in Vermont since at least 1996 and may be served in Vermont through its registered agent: CT Corporation System, 17 GW Tatro Dr, Jeffersonville, VT, 05464 - 9919. CVS Pharmacy is currently licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals. CVS Pharmacy is named as a defendant in its capacities as a distributor and retail and mail order pharmacy (*see* Section D, *infra*).

---

[32] https://abccareers.taleo.net/careersection/2/jobdetail.ftl?job=00001VRE&tz=GMT-04%3A00&tzname=America%2FNew_York

174. Defendant CVS RX SERVICES, INC. ("CVS Rx") is a New York company whose principal place of business is at the same location as CVS Health and CVS Pharmacy. CVS Rx is and has been registered to do business in Vermont since at least 1999 and may be served through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464.

175. Upon information and belief, CVS Health, CVS Pharmacy, and CVS Rx distribute pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Vermont.

176. The DEA ARCOS database reveals that between 2006-2012, CVS Health distributed over 16.6 million MME into the Town of Bennington, across over 1 million dosage units.

177. Defendant WALMART INC., formerly known as Wal-Mart Stores, Inc. ("Walmart"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart has been registered to do business in Vermont since at least 1990 and may be served in Vermont through its registered agent: CT Corporation System, 17 GW Tatro Dr, Jeffersonville, Vermont 05464.

178. Upon information and belief, Walmart distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Vermont.

179. The DEA ARCOS database reveals that between 2006-2012, Walmart distributed over 13.2 million MME into the Town of Bennington, across over 965 thousand dosage units.

180. Defendant RITE AID CORP. is a Delaware corporation with its principal place of business in Camp Hill, Pennsylvania. RITE AID CORP. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, Delaware 19801. RITE AID CORP. is named as a defendant in its capacities as a distributor and retail and mail order pharmacy (*see* Section D, *infra*).

181. Defendant RITE AID of Maryland is a Maryland corporation whose principal place

36

of business is in Perryman, Maryland.  RITE AID MID-ATLANTIC may be served through its registered agent: The Corporation Trust, Incorporated, 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093-2264. Rite Aid of Maryland is currently licensed as a Wholesale Drug Outlet with the Vermont Department of Health Professionals.

182.     Defendant ECKERD CORPORATION is a Delaware corporation whose principal place of business is in Camp Hill, Pennsylvania. Eckerd Corporation may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange, Street, Wilmington, Delaware 19801.

183.     RITE AID CORP., in its distribution capacity, RITE AID MID-ATLANTIC, RITE AID DAYVILLE DISTRIBUTION CENTER, and ECKERD CORPORATION are collectively referred to as "Rite Aid Distribution."

184.     Upon information and belief, Rite Aid Distribution distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Vermont.

185.     The DEA ARCOS database reveals that between 2006-2012, Rite Aid distributed over 31.8 million MME into the Town of Bennington, across over 923 thousand dosage units.

186.     Defendant, BURLINGTON DRUG COMPANY, is a Vermont corporation with its principal place of business in Milton, Vermont. Burlington Drug Company is and has been registered to do business in the state of Vermont since at least 1998 and may be served through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464.

187.     The DEA ARCOS database reveals that between 2006-2012, Burlington Drug Company distributed over 85.4 million MME into the Town of Bennington, across over 2.3 million dosage units.

188.     Defendant WALGREENS BOOTS ALLIANCE, INC. ("Walgreens Boots") is a Delaware corporation with its principal place of business in Deerfield, Illinois.  Walgreens Boots

37

may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Walgreens Boots is named as a defendant in its capacities as a distributor and retail pharmacy (*see* Section D, *infra*).

189.    Defendant WALGREEN CO. is an Illinois corporation whose principal place of business is at the same location as Walgreens Boots. On information and belief, Walgreens Boots is the parent company of WALGREEN CO.  WALGREEN CO. may be served through its registered agent: Illinois Corporation Services Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

190.    Defendant, WALGREEN EASTERN CO. ("Walgreen Eastern") is an Illinois corporation whose principal place of business is at the same location as Walgreens Boots. On information and belief, Walgreens Boots is the parent company of Walgreen Eastern. Walgreen Eastern has been registered to do business in Vermont since at least 2003 and may be served through its registered agent: Corporation Service Company, 100 North Main Street, Suite 2, Barre, VT 05641.

191.    Defendants Walgreens Boots, WALGREEN CO. and Walgreen Eastern, in their distributor capacities, are collectively referred to as "Walgreens Distribution."

192.    Walgreens Distribution distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Vermont.  Walgreens Distribution is currently licensed as a Wholesale Drug Outlet with the Vermont Office of Professional Regulation.

193.    The DEA ARCOS database reveals that between 2006-2012 Walgreens distributed over 73.2 million MME into Vermont, across over 3 million dosage units.

194.    The distributor defendants listed above are all engaged in the wholesale distribution of opioids. The distributor defendants listed above are collectively referred to herein as the "Distributor Defendants."

195.    The Distributor Defendants purchased opioids from manufacturers, such as the Manufacturer Defendants herein, and sold them to pharmacies throughout Vermont, including in the Town of Bennington. The Distributor Defendants played an integral role in opioids being distributed across Vermont, including the Town of Bennington.

196.    The failure of all Distributor Defendants to effectively monitor and report suspicious orders of prescription opioids and to implement measures to prevent the filling of invalid and medically unnecessary prescriptions greatly contributed to the vast increase in opioid overuse and addiction. Distributor Defendants' conduct thus directly caused a public-health and law-enforcement crisis across this country, including in the Town of Bennington.

**D.    PHARMACY DEFENDANTS**

197.    Defendant, VERMONT CVS PHARMACY, L.L.C. ("Vermont CVS"), is a Vermont limited liability company whose principal place of business is at the same location as CVS Health. Vermont CVS Pharmacy, LLC has been registered to do business in Vermont since at least February 8, 2008 and may be served in Vermont through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464.

198.    Defendant, CAREMARK RX, L.L.C., is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CAREMARK RX, L.L.C. is a wholly owned subsidiary of CVS Pharmacy. According to CVS Health's 2016 Annual Report, Defendant CAREMARK RX, L.L.C. is "the parent of [CVS Health]'s pharmacy services subsidiaries, is the immediate or indirect parent of many mail order, pharmacy benefit management, infusion, Medicare Part D, insurance, specialty mail and retail specialty pharmacy subsidiaries, all of which operate in the U.S. and its territories." CAREMARK RX, L.L.C. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center,

1209 Orange, Street, Wilmington, Delaware 19801. CAREMARK RX, L.L.C. is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

199.    Defendant CAREMARK, L.L.C., is a California limited liability company whose principal place of business is at the same location as CVS Health. CAREMARK, L.L.C. is registered to do business in Vermont and may be served by its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, VT 05464. CAREMARK, L.L.C. is a wholly owned subsidiary of CAREMARK RX, L.L.C.

200.    CAREMARK, L.L.C. is the direct or indirect parent of dozens of limited liability companies all over the U.S. that provide mail-order pharmacy services in the U.S. and in Vermont.[33] Many of these CAREMARK, L.L.C. entities are registered with the DEA to dispense controlled substances, including opioids. CAREMARK, L.L.C. is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

201.    CVS Health, CVS Pharmacy, Vermont CVS, CAREMARK RX, L.L.C. and CAREMARK L.L.C., in their capacities as retail and mail order pharmacies, are collectively referred to as "CVS".

202.    In 2018, CVS was the largest U.S. pharmacy by total prescription revenue.[34]

203.    CVS operates dozens of retail pharmacies in Vermont. At all relevant times, CVS has sold and continues to sell prescription opioids at its retail pharmacies in the Town of Bennington, or through its mail order pharmacies. In 2018, CVS was the largest U.S. pharmacy by total prescription revenue.[35]

---

[33] CVS Health Corporation, *Annual Report (Form 10-K)* (Feb. 14, 2018).
[34] Drug Channels Institute, *Largest 15 U.S. Pharmacies, by Total Prescription Revenues, 2018*, (last visited Mar. 12, 2018), https://www.drugchannels.net/2019/02/the-top-15-us-pharmacies-of-2018-m.html.
[35] Drug Channels Institute, *Largest 15 U.S. Pharmacies, by Total Prescription Revenues, 2018*, (last visited Mar. 12, 2018), https://www.drugchannels.net/2019/02/the-top-15-us-pharmacies-of-2018-m.html.

204.    CVS describes itself "a market leader in mail order pharmacy, retail pharmacy, specialty pharmacy, and retail clinics….**that provide unparalleled service and capabilities**."[36]

205.    According to the DEA ARCOS Database, between 2006-2012, CVS pharmacies in the Town of Bennington purchased nearly 65.7 million MME across over 2.5 million dosage units.

206.    Defendant, EXPRESS SCRIPTS HOLDING COMPANY, is a Delaware corporation with its principal place of business in St. Louis, Missouri. EXPRESS SCRIPTS HOLDING COMPANY is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

207.    Defendant ESI MAIL PHARMACY SERVICE, INC., doing business as Express Scripts or ESI Distribution Services, is a Delaware corporation with its principal place of business in St. Louis, Missouri.

208.    Defendant EXPRESS SCRIPTS PHARMACY, INC., doing business as Catamaran Home Delivery or Express Scripts, is a Delaware corporation with its principal place of business in St. Louis, Missouri.

209.    Both ESI MAIL PHARMACY SERVICE, INC. and EXPRESS SCRIPTS PHARMACY, INC. are subsidiaries of defendant EXPRESS SCRIPTS HOLDING COMPANY.

210.    EXPRESS SCRIPTS HOLDING COMPANY, in its capacity as a retail and mail order pharmacy, ESI MAIL PHARMACY SERVICE, INC., and EXPRESS SCRIPTS PHARMACY, INC. are collectively referred to as "Express Scripts Pharmacy."

211.    At all relevant times, Express Scripts Pharmacy has sold and continues to sell prescription opioids through its mail order pharmacies nationwide, serving patients nationally and

---

[36]    CVS Health, *CVS Caremark Announces PBM Succession Plan* (Mar. 30, 2012), https://cvshealth.com/newsroom/press-releases/cvs-caremark-announces-pbm-succession-plan-1 (emphasis added)

in Amherst. Even though it operates no brick and mortar stores, in 2018, Express Scripts Pharmacy was the third largest pharmacy in the U.S. by total prescription revenue.[37]

212.    Defendant, OPTUMRX, INC. ("OptumRx"), is a Delaware corporation with its principal place of business located in Irvine, California. OptumRx operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of OPTUM, INC. OptumRx has been registered to do business in Vermont since at least 2008 and may be served in Vermont through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, VT 05464. OptumRx is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

213.    OptumRx is registered with the DEA to dispense controlled substances, including opioids. At all relevant times, OptumRx has sold and continues to sell prescription opioids through its mail order pharmacies in Vermont, including in Bennington. In 2018, OptumRx was the fourth largest pharmacy in the U.S. by total prescription revenue.[38]

214.    Defendants Walgreens Boots, WALGREEN CO. and Walgreen Eastern are named as Distributor Defendants in Section C and, in their capacities as retail and mail order pharmacies, are collectively referred to as "Walgreens."

215.    In 2018, Walgreens was the second largest U.S. pharmacy by total prescription revenues.[39]

216.    Walgreens operates over a dozen retail pharmacies in Vermont. At all relevant times, Walgreens has sold and continues to sell prescription opioids at its retail pharmacies in Vermont, including in Bennington. According to the DEA ARCOS database, between 2006-2012,

---

[37] Drug Channels Institute, *Largest 15 U.S. Pharmacies, supra* note 35.

[38] *Id.*

[39] Drug Channels Institute, *Largest 15 U.S. Pharmacies, supra* note 35.

Walgreens' pharmacies in Vermont purchased over 95.6 million MME across over 3.2 million dosage units.

217.    Defendant RITE AID CORP., identified above in Section C regarding distributors, is also a pharmacy defendant.

218.    Defendant, RITE AID OF VERMONT, INC., is a Vermont limited liability company whose principal place of business is at the same location as RITE AID CORP. RITE AID OF VERMONT, INC. has been registered to do business in Vermont since at least 1974 and may be served in Vermont through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464. Upon information and belief, RITE AID OF VERMONT, INC. is a wholly owned subsidiary of RITE AID CORP.

219.    RITE AID CORP., in its capacity as a retail and mail order pharmacy, and RITE AID OF VERMONT, INC. are collectively referred to as "Rite Aid Pharmacy".

220.    Rite Aid Pharmacy operates dozens of retail pharmacies in Vermont. At all relevant times, Rite Aid Pharmacy has sold and continues to sell prescription opioids at its retail pharmacies in the Town of Bennington, or through its mail order pharmacies. According to the DEA ARCOS Database, between 2006-2012, Rite Aid pharmacies in the Town of Bennington purchased nearly 47.6 million MME across over 1.5 million dosage units.

221.    Defendant, THE PHARMACY, INC. is a Vermont corporation with its principal place of business in Bennington, Vermont. The Pharmacy, Inc. is and has been registered to do business in Vermont since at least 1968 and may be served through its registered agent: Philip J. O'Neill, 205 North Street, Bennington, Vermont 05201. The Pharmacy, Inc. is currently licensed as an Instate Pharmacy with the Vermont Department of Health Professionals.

222.    According to the DEA ARCOS Database, between 2006-2012, The Pharmacy, Inc. in the Town of Bennington purchased more than 119.2 million MME across over 3.1 million dosage units.

223.    Defendant GOLUB CORPORATION (d/b/a Price Chopper Supermarkets) is a Delaware Corporation with its principal place of business in Schenectady, New York. GOLUB CORPORATION may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Price Chopper is currently licensed as Wholesale Drug Outlet with the Vermont Department of Health Professionals.

224.    Defendant, PRICE CHOPPER OPERATING CO. OF VERMONT, INC, ("Price Chopper") is a Vermont Corporation with its principal place of business in Schenectady, New York. Price Chopper is and has been registered to do business in Vermont since at least 1975 and may be served through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464. Upon information and belief, Price Chopper is a wholly-owned subsidiary of Defendant GOLUB CORPORATION. Price Chopper is currently licensed as Wholesale Drug Outlet with the Vermont Department of Health Professionals. Price Chopper and GOLUB CORPORATION are collectively referred to as "Golub." According to the DEA ARCOS Database, between 2006-2012, Golub pharmacies in the Town of Bennington purchased more than 10.9 million MME across over 625 thousand dosage units.

225.    The pharmacy defendants listed above are all engaged in the business of retail selling opioids and other drugs. The pharmacy defendants are collectively referred to herein as the "Pharmacy Defendants."

226.    The failure of all Pharmacy Defendants to effectively monitor and report suspicious orders of prescription opioids and to implement measures to prevent filling of improper

44

prescriptions greatly contributed to the vast increase in opioid overuse and addiction.

227.    Pharmacy Defendants' conduct thus directly caused a public-health and law-enforcement crisis across this country, including in the Town of Bennington.

228.    As discussed further below, each of the Pharmacy Defendants has consistently failed to comply with its legal obligations concerning opioid diversion, and almost all have paid civil penalties to resolve government allegations regarding opioid diversion.

## E.    PHARMACY BENEFIT MANAGER DEFENDANTS

229.    The Pharmacy Benefit Manager Defendants ("PBM Defendants") are defined below. At all relevant times the PBM Defendants acted as the gatekeepers of prescription drugs including opioids. Pharmacy benefit managers ("PBMs") establish formularies which govern which drugs are reimbursed and how.  They determine MME quantity limits and pre-authorization requirements.   They negotiate with drug manufacturers to offer preferred drug formulary placement for drugs. They establish reimbursement rates for the drugs dispensed. PBMs earn revenue from at least the following sources: fees from health plans and employers, rebates and other incentives from drug manufacturers, including but not limited to administrative fees and volume bonuses, and fees from maintaining pharmacy networks.[40]

230.    At all times relevant hereto, the reimbursement of the Manufacturer Defendants' opioids was guaranteed and facilitated by the PBM defendants who constructed formularies and designed plans that made such opioids easily accessible. In many cases, the PBMs made it easier to obtain these highly-addictive products than a less-addictive pain alternative or OUD treatment medicine.  In many cases, the PBMs failed to install reasonable quantity or refill limits on these

---

[40] Health Policy Brief, *On behalf of payers, pharmacy benefit managers negotiate rebates from drug makers in exchange for preferred formulary placement*, HEALTH AFFAIRS, Sep. 14, 2017, https://www.healthaffairs.org/do/10.1377/hpb20171409.000178/full/

highly addictive drugs.  Often the PBMs imposed no pre-authorization requirements on the controlled substances at issue in this proceeding.

231.    On information and belief, the PBMs constructed their national offerings in this fashion because of their contractual arrangements with the Manufacturer Defendants. In all events, the PBMs failed to install reasonable and necessary controls on the reimbursement of opioids, consistent with medical literature and the PBMs' own expressed commitment to public health and safety.  In so doing, the PBMs provided necessary and dangerous fuel for the opioid epidemic as described herein.

232.    Only recently, and more than three years after the March 2016 CDC Guidelines were issued, have the PBM defendants prepared national offerings that make contact with the national health crisis the PBMs themselves helped to create.

233.    Defendants CVS Health, CAREMARK RX, L.L.C., and CAREMARK, L.L.C. identified above in Section D regarding retail and mail order pharmacies, are also PBM defendants.

234.    Defendant, CVS HEALTH CORPORATION ("CVS Health"), formerly known as CVS Caremark Corporation, is a Delaware corporation with its principal place of business located in Woonsocket, Rhode Island. CVS Health is registered to do business in Vermont and may be served through its registered agent: 17 G W Tatro Dr, Jeffersonville, VT, 05464.

235.    Defendant, CAREMARK, L.L.C., is a California limited liability company whose principal place of business is at the same location as CVS Health. On information and belief, CVS Health is the direct parent company of CAREMARK RX, L.L.C. According to CVS Health's 2016 Annual Report, Defendant CAREMARK RX, L.L.C. is "the parent of [CVS Health]'s pharmacy services subsidiaries, is the immediate or indirect parent of many retail pharmacies, mail-order pharmacies, a pharmacy benefit management division, infusion services, services to Medicaid and Medicare Part D beneficiaries, insurance, specialty mail and retail specialty pharmacy subsidiaries,

all of which operate in the United States and its territories." CAREMARK, L.L.C. is registered to do business in Vermont and may be served through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464.

236.    Defendant, CAREMARKPCS HEALTH, L.L.C., is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. On information and belief, CVS Health is the direct or indirect parent company of CAREMARKPCS HEALTH, L.L.C. CAREMARKPCS HEALTH, L.L.C.  is registered to do business in Vermont and may be served through its registered agent: CT Corporation System, 17 GW Tatro Drive, Jeffersonville, Vermont 05464. Defendants CAREMARK RX, L.L.C.CAREMARK, L.L.C., and CAREMARKPCS HEALTH, L.L.C. are collectively referred to as "Caremark."

237.    CVS Health describes itself in a September 3, 2014 press release as a "pharmacy innovation company helping people on their path to better health. Through our 7,700 retail pharmacies, 900 walk-in medical clinics, a leading pharmacy benefits manager with nearly 65 million plan members, and expanding specialty pharmacy services, we enable people business and communities to manage health in more affordable, effective ways. This unique integrated model increases access to care, delivers better health outcomes and lowers overall health care costs." In 2016, CVS Health reported an operating income of $10 billion.

238.    In the above-referenced September 3, 2014 press release CVS Health announced its change of name from CVS Caremark Corporation to CVS Health. CVS Health explained that it was changing its name "to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health." CVS Health explained that the newly-named company included "its pharmacy benefit management business, which is known as CVS/Caremark." In that same press release, CVS Health touted, "[f]or our patients and customers, *health is everything* and…we are advising on prescriptions [and] helping manage chronic and

47

specialty conditions." [emphasis supplied]. In December 2017, CVS made a $69 billion bid to purchase Aetna. If the companies merge, the clout of CVS will grow even more.

239.     According to the Drug Channels Institute, CVS Health (Caremark) was the highest ranking PBM in 2017 with over twenty-five percent (25%) of the industry market share.[41]

240.     Caremark says the following about its "Formulary Development and Management":

> Development and management of drug formularies is an integral component in the pharmacy benefit management (PBM) services CVS Caremark provides to health plans and plan sponsors. Formularies have two primary functions: 1) to help the PBM provide pharmacy care that is clinically sound and affordable for plans and their plan members; and 2) to help manage drug spend through the appropriate selection and use of drug therapy.[42]

241.     At all times relevant hereto, CVS Health, through Caremark, derives substantial revenue providing pharmacy benefits in Vermont through several different means including, but not limited to, providing services and its formulary to plans on Vermont Health Connect, the state's ACA exchange, including MVP Secure (Catastrophic) 2019[43], MVP VT Standard Bronze[44], and MVP VT Standard Gold[45] [46].

242.     At all times relevant hereto, CVS Health and Caremark offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used

---

[41] *Cigna-Express Scripts: Vertical Integration and PBMs' Medical-Pharmacy Future*, DRUG CHANNELS INSTITUTE, Mar. 9, 2018, https://www.drugchannels.net/2018/03/cigna-express-scripts-vertical.html

[42] CVS Caremark, *Formulary Development and Management at CVS Caremark*, Mar. 25, 2018, https://www.caremark.com/portal/asset/FormDev Mgmt.pdf, at 1

[43] Summary of Benefits and Coverage, MVP Secure VT, 2019
https://vt.checkbookhealth.org/hie/vt/2019/assets/pdfs/77566VT0040013-01.pdf
[44] Summary of Benefits and Coverage MVP VT Bronze 1 HMO Plus, 2019
https://vt.checkbookhealth.org/hie/vt/2019/assets/pdfs/77566VT0040011-01.pdf
[45] Summary of Benefits and Coverage MVP VT Gold 1 HMO, 2019
https://vt.checkbookhealth.org/hie/vt/2019/assets/pdfs/77566VT0040002-01.pdf
[46] Prescription Benefits, MVP and CVS Caremark "MVP's prescription drug coverage is provided through CVS Caremark®, MVP's Pharmacy Benefit Manager" https://www.mvphealthcare.com/members/prescription-benefits/

nationwide, including in the Town of Bennington. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Vermont, including in the Town of Bennington.

243.    Defendant, EXPRESS SCRIPTS HOLDING COMPANY ("ESHC"), identified above in Section D regarding retail and mail order pharmacies, is also a PBM defendant.

244.    Defendant, EXPRESS SCRIPTS, INC. ("ESI"), is incorporated in the State of Delaware with its principal place of business located in St. Louis, Missouri, is a pharmacy benefit management company, and is a wholly-owned subsidiary of ESHC. ESI has been registered to do business in Vermont since at least 2015 and is currently licensed as a Non-Resident Pharmacy with the Vermont Department of Health Professionals. ESI may be served in Vermont through its registered agent: Corporation Service Company, 100 North Main Street, Suite 2, Barre, VT, 05641.

245.    ESHC, in its capacity as a PBM, and ESI are collectively referred to as "Express Scripts".

246.    In 2012, ESI acquired its rival, Medco Health Solutions Inc., in a $29.1 billion deal. As a result of the merger, ESHC was formed and became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers and insurers.[47] In March of 2018, ESI made a $67 billion bid to purchase Cigna. If the companies merge, the clout of ESI will grow even more.

247.    According to the Drug Channels Institute, Express Scripts was the second highest ranking PBM in 2017 with twenty-four (24%) of the industry market share.[48]

---

[47] Peter Frost, *Express Scripts closes $29.1-billion purchase of Medco*, LOS ANGELES TIMES (Apr. 3, 2012), http://articles.latimes.com/2012/apr/03/business/la-fi-medco-20120403

[48] *Cigna-Express Scripts: Vertical Integration and PBMs' Medical-Pharmacy Future*, *supra* note 41.

248.     Express Scripts "provides pharmacy benefits to 83 million members. Of these, more than 27 million obtain their pharmacy benefit coverage through one of Express Scripts' standard formularies and more people use the [Express Scripts'] National Preferred Formulary than any other formulary in the U.S."[49]

249.     Express Scripts standard formularies are "governed by [its] National Pharmacy & Therapeutics Committee (the 'P&T Committee'), a panel of independent physicians and pharmacists in active clinical practice, representing a variety of specialties and practice settings and typically with major academic affiliations."[50] Express Scripts touts that the "the P&T Committee considers the drug's *safety and efficacy*," and the company "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of *safety and efficacy*."[51] Express Scripts "re-evaluate[s] [its] National Preferred Formulary on an annual basis. [It] looks at the formulary first from a clinical perspective to ensure that it provides access to *safe and effective* medications in all therapy classes."[52]

250.     Express Scripts derives substantial revenue managing pharmacy benefits in Vermont through several different means, including, but not limited to, providing services and its formulary to The Vermont State Employees' Retirement System (VSERS)[53], and the Burlington

---

[49] Express Scripts, *The Value of Active Pharmacy Management: Express Scripts 2018 National Preferred Formulary*, 2018, https://www.multivu.com/ players/English/81495241-express-scripts-national-preferred-formular y-2018/, at 1.

[50] Express Scripts, *Express Scripts 2017 Annual Report*, https://expressscriptsholdingco.gcs-web.com/static-files/76a9c03e-2e6b-4f6b-80de-fe80d 4ebc826, at 11.

[51] *Id.*

[52] Express Scripts, *Smart Formulary Management*, Jan. 2, 2014, http://lab.express-scripts.com/lab/insights/drug-options/smart-formulary-management, at 2 (emphasis added).

[53] State of Vermont Office of the State Treasurer, VSERS Health Insurance Information https://www.vermonttreasurer.gov/content/retirement/state/health-insurance

Vermont School District[54]. Upon information and belief, these are some of the many ways in which Express Scripts reimburses for claims in the Town of Bennington, including opioids.

251.    On information and belief, Express Scripts publishes employment vacancies related to its Vermont PBM business activities on its website.[55]

252.    At all times relevant hereto, Express Scripts offered pharmacy benefit management services, including mail-order pharmacy services, a nationwide retail pharmacy network, and maintained a national formulary or formularies that are used nationwide, including in the Town of Bennington. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Vermont, including in the Town of Bennington.

253.    Defendant, UNITEDHEALTH GROUP INCORPORATED ("UnitedHealth"), a Delaware corporation with its principal place of business located in Minnetonka, Minnesota, is a diversified managed health care company with two business platforms. UnitedHealth serves approximately 115 million individuals throughout the United States. For 2016, UnitedHealth reported an operating income of $12.9 billion.

254.    Defendant, OPTUM, INC., is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. OPTUM, INC. is a health services company managing the subsidiaries that administer UnitedHealth's pharmacy benefits, including OPTUMRX, INC. On information and belief, OPTUM, INC. is a subsidiary of UnitedHealth.

255.    UnitedHealth and OPTUM, INC. may be served through their registered agent: CT

---

[54] Burlington School District, Health Benefits 2019: https://www.bsdvt.org/employee-benefits/ "Bluecross Blueshield of Vermont has contracted with ESI for Pharmacy Benefits" http://www.bcbsvt.com/pharmacy/mail-order-pharmacy/express-scripts
[55] Express Scripts employment listings in Vermont, e.g., (i) Infusion Nurse RN – ExpressScripts, Montpelier, Vermont, (https://vermontnursingjobs.blogspot.com/2018/04/infusion-nurse-rn-position-at-express.html?utm_campaign=google_jobs_apply&utm_source=google_jobs_apply&utm_medium=organic);

Corporation System, Inc., 1010 Dale Street North, St. Paul, Minnesota 55117.

256.    Defendant OptumRx, identified above in Section D regarding retail and mail order pharmacies, is also a PBM defendant. OptumRx operates as the PBM for UnitedHealth. OptumRx is and has been registered to do business in Vermont since at least 2008 and may be served through its registered agent: CT Corporation System, 17 GW Tatro Dr, Jeffersonville, VT 05464.

257.    According to the Drug Channels Institute, OptumRx was the third highest ranking PBM in 2017 with twenty-two percent (22%) of the industry market share.[56]

258.    In one case, OptumRx, which is owned by UnitedHealth, suggested that a member taking Butrans consider switching to a "lower cost alternative," such as OxyContin or extended-release morphine, according to a letter provided by the member. Mr. Wiggin, the UnitedHealthcare spokesman, said the company's rules and preferred drug list "are designed to ensure members have access to drugs they need for acute situations, such as post-surgical care or serious injury, or ongoing cancer treatment and end of life care, as well as for long-term use after alternatives are tried."[57]

259.    "UnitedHealthcare places morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans. And it places Lyrica, a non-opioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first."[58]

260.    At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in Vermont through several different means, including, but not limited to,

---

[56] *Cigna-Express Scripts: Vertical Integration and PBMs' Medical-Pharmacy Future*, *supra* note 41.

[57] Katie Thomas and Charles Ornstein, *Amid Opioid Crisis, Insurers Restrict Pricey, Less Addictive Painkillers*, THE NEW YORK TIMES, Sep. 17, 2017, https://www.nytimes.com/2017/09/17/health/opioid-painkillers-insurance-companies.html?mwrsm=Email

[58] *Id.*

52

providing services and formulary management for  various private and public health insurance providers that operate in Vermont.

261.    At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide, including in the Town of Bennington. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Vermont, including in the Town of Bennington.

262.    The PBM Defendants managed the reimbursement for the vast majority of opioids at issue in this case. Without the PBM Defendants' reimbursement for the opioids at issue herein, the opioids likely would not have entered the marketplace and the entire scheme would have failed.

**F.    DOE DEFENDANTS**

263.    Doe DEFENDANTS 1 to 100 are sued herein under fictitious names because after diligent and good faith efforts their names, identities, and capacities, whether individual, corporate, associate, or otherwise, are presently unknown to Plaintiff. Plaintiff will make the names or identities of said Defendants known to the Court after the information has been ascertained. Plaintiff is informed and believes, and based thereupon alleges, that each of the Defendants designated herein as a DOE DEFENDANT has taken part in and participated with, and/or aided and abetted, some or all of the other Defendants in some or all of the matters referred to herein and the Plaintiff is informed and believes, and on such information and belief alleges, that each of the Defendants named as a DOE is responsible in some manner for the events and occurrences alleged in this Complaint and is liable for the relief sought herein.

<div align="center">

**IV.    FACTUAL ALLEGATIONS**

</div>

**A.    BACKGROUND ON PRESCRIPTION OPIOIDS**

264.    The term opioid includes (a) all drugs derived in whole or in part from the morphine-containing opium poppy plant such as morphine, laudanum, codeine, thebaine, hydrocodone, oxycodone, and oxymorphone, and (b) synthetic opioids like fentanyl or methadone.[59]

265.    Prior to the 1990's, doctors prescribed opioid pain relievers sparingly, and only in the short term, for cases of acute injury or illness, during surgery or end-of-life ("palliative") care.[60] Doctors' reluctance to use opioids for an extended period of time was due to the legitimate fear of causing addiction.[61]

266.    Beginning in the late 20th century, however, and continuing through today, the pharmaceutical industry acted to dramatically expand the marketplace for opioids. As set forth below, pharmaceutical actors facilitated this expansion in three ways. *First*, pharmaceutical manufacturers engaged in a misinformation campaign which altered public perception of opioids, and deceived doctors, federal regulators, and the general public about their addictive qualities. *Second*, opioid manufacturers and wholesalers/distributors flouted their federally imposed requirements to report suspicious opioid orders to the United States Drug Enforcement Administration ("DEA") and state agencies. These facilitated an explosion in the illegitimate marketplace for prescription opioids. *Third*, PBMs ensured that opioids were widely available, regularly prescribed and reimbursed, while failing in their obligation to monitor inappropriate drug utilization.

267.    As a result of Defendants' wrongful conduct, the number of prescriptions for opioids increased sharply, reaching nearly 250 million prescriptions in 2013, almost enough for

---

[59] 21 U.S.C. § 812 Schedule II (2012).
[60] Meldrum ML, *Progress in Pain Research and Management*, Vol. 25 Seattle, WA: IASP Press; 2003.
[61] *Id.*

every person in the United States to have a bottle of pills. This represents an increase of three hundred percent (300%) since 1999.

## B.    IMPACT ON VERMONT AND THE TOWN OF BENNINGTON

268.    While the Defendants have profited from the alarming rate of opioid use in the United States, communities across the country have suffered. According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that prescription opioid use contributed to 16,651 overdose deaths nationally in 2010; 16,917 in 2011; and 16,007 in 2012. Based on the latest data, nearly two million Americans met criteria for prescription opioid abuse and dependence in 2013.  Aggregate costs for prescription opioid overdose, abuse, and dependence were estimated at over $78.5 billion (in 2013 dollars).

269.    While Defendants were reaping billions of dollars in profits from their wrongful conduct, Plaintiff has been required to allocate substantial public monies and resources to combat the opioid crisis in Bennington and deal with its fallout.

270.    Plaintiff has incurred and continues to incur substantial costs because of Defendants' conduct as described herein, including, but not limited to, costs of increased services with respect to law enforcement and first responders, such as emergency medical services; detention centers and jails;  courts, including drug courts; diversion programs; prevention and treatment centers; community outreach programs; equipment and supplies; victim services supports; drug abuse prevention programs in schools; inmate services including housing, health and support staff; intervention programs; and increased costs associated with its own employee benefits plan, together with general societal and lost productivity costs.

271.    Between 2010 and 2018, opioid related fatalities nearly tripled in Vermont.[62] In 2016, Vermont's opioid related overdose death rate was 38% higher than the national average (18.4 per 100,000 residents versus 13.3).[63] In 2010 and 2011, more than 5% of all Vermonters-roughly 30,000 people-had misused prescription opioids within the prior twelve months.

272.    The relationship between the use of prescription opioids and the use of heroin and fentanyl is well documented. Opioids have become the most common gateway drug leading to the use and abuse of heroin, fentanyl and carfentanil, with often deadly consequences. Prescription opioid addicts are 40 times more likely to also be addicted to heroin and almost half (45%) of heroin users are also addicted to opioids.[64] As noted above, a 2015 study found that four out of five heroin users reported that their addiction started with opioid pain relievers.[65]

273.    Dangerous physical and mental comorbidities from heroin and fentanyl addiction have also become widespread in Vermont. Conditions such as bacterial infections of blood, heart valves and lungs are common among addicts. These conditions have placed additional strain on Vermont's health care system. Mental health conditions like depression, anxiety and PTSD are also tied to opiate addiction. Widespread opiate abuse also increases the risk of outbreaks of HIV and Hepatitis B and C. As a result of the opioid crisis, in 2016 the CDC placed Essex County and Windham County, Vermont in the top 5% of counties nationwide at greatest risk for HIV and Hepatitis C outbreaks.[66]

---

[62] Vermont Department of Health, Opioid-Re!ated  Fatalities Among Vermonters (updated 2019), http://www healthvermont.gov/sites/ default/files/documents/pdf/ ADAP Data_ Brief_ Opioid Related Fatalities.pdf.
[63] National Institute on Drug Abuse, Vermont Opioid Summary (March 20 18),
https://www.drugabuse.govIdrugsab use/opioids/opioid-summaries-by -state/vermont-opioid-summary.
[64] Centers for Disease Control and Prevention,  *Today's Heroin Epidemic,* https://www.cdc.gov/vitalsigns/heroin.

[65] Nat'l Safety Council, Prescription Nation 2016: Addressing America's Drug Epidemic 9 (2016), http://www.nsc.org/RxDrugOverdoseDocuments/Prescription-Nation-2016-American-Drug-Epidemic.pdf.
[66] Centers for Disease Control and Prevention, *Vulnerable Counties and Jurisdictions Experiencing or At-Risk of Outbreaks* https://www.cdc.gov/pwid/vulnerable-counties-data.html

274.    Vermont's opioid crisis has had a ruinous effect on its mothers and children. The number of expectant mothers diagnosed with opioid use disorder prior to delivery has skyrocketed. In 2001, the occurrence rate was 0.5 per 1,000 deliveries. By 2014, the rate had increased to 48.6 per 1,000 deliveries. Vermont's 2014 rate was the highest amongst 30 other states who track this data and is over seven times higher than the national average.[67] Unsurprisingly, Vermont's rate of infants born with Neonatal Abstinence Syndrome—a medical condition that afflicts newborns who are born addicted to opioids—increased from 17 per 1,000 births in 2008 to 35.3 per 1,000 births in 2014.[68] Further, the Vermont Department of Health estimated the 2012 NAS rate was five times higher than the national average.[69]

275.    Sadly, the opioid crisis has disrupted or destroyed many of Vermont's families. In 2018, over 50% of children under five years of age that were removed from their homes were removed due to issues related to opioids.[70]

## C.    PARTICULARS REGARDING EACH DEFENDANT GROUP'S ROLE IN THE OPIOID EPIDEMIC

### 1.    The Manufacturer Defendants' Campaign of Deception

#### a.    The Manufacturer Defendants' Campaign to Normalize Widespread Opioid Use

276.    Unsatisfied with the market for opioid use in the context of acute and palliative care, the Manufacturer Defendants introduced new opioid drugs during the 1980s and 1990s and

---

[67] *Opioid Use Disorder Documented at Delivery Hospitalization-United States, 1999-2014,* CDC Morbidity and Mortality Weekly Report (August 10, 20 18),
https://www.cdc.gov/mmwr/volumes/67/wr/mm6731a!htm?s_cid=mm6731al_e, at 847.
[68] *Opioid Use Disorder Documented at Delivery Hospitalization-United States, 1999-2014.* CDC Morbidity and Mortality Weekly Report (August  10,20 18),
https://www.cdc.gov/mmwr/volumes/67/wr/mm6731a1 htm?s_cid=mm6731a1_e, at 847.
[69] *Id.* at 845.
[70] Vermont  Department of Health, *People Treated for Opiate Use in Vermont by Fiscal Year,*
http://www.healthvermont.gov/sites/default/files/documents/20 16/12/adapTotalOpiatebyFY.pdf.

began promoting their use for chronic pain therapy in an effort to increase the number of people taking opioids.

277.    Those new drugs included, but were not limited to: Purdue's MS Contin (introduced 1987) and OxyContin (1995); Janssen's Duragesic (1990), Nucynta (2008), and Nucynta ER (2011); Cephalon's Actiq (1998) and Fentora (2006); and Endo's Opana and Opana ER (2006).

278.    By 1994, certain manufacturers were able to anticipate the demand for oxycodone and other opioid APIs. That year, Janssen's scientists at Tasmanian Alkaloids began a project in order to develop a high thebaine poppy variety to meet the anticipated demand. The result of Janssen's research project was the creation of a high thebaine poppy, called the Norman Poppy, which Janssen internally described as a transformational technology that enabled the growth of oxycodone.

279.    Through Noramco, Janssen met the anticipated opioid demand by selling API to other opioid manufacturers, including Purdue and Teva. Noramco sold the majority of its API via long-term agreements and had such agreements with all seven of the top U.S. generic opioid manufacturers.

280.    Janssen, through its subsidiaries, supplied the following opioid APIs to other drug manufacturers in the U.S., including Purdue and Teva: oxycodone, hydrocodone, morphine, codeine, fentanyl, sufentanil, buprenorphine, hydromorphone, and naloxone.

281.    Recognizing the enormous financial possibilities associated with expanding the opioid market, the Manufacturer Defendants rolled out a massive and concerted campaign to misrepresent the addictive qualities of their product, and to push opioids as safe, effective drugs for the treatment of pain associated with conditions such as everyday back pain, tooth aches, sprains, headaches and the like.

282.     In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or minimize the risks of opioids while overstating the benefit of using them for chronic non-cancer related pain. As just one example, on information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

283.     Further, each Defendant promoted the use of opioids for pain through sales representatives who visited individual doctors and medical staff in their offices and through the implementation of small group speaker programs. Defendants devoted massive resources to direct such sales contacts with doctors. In 2014 alone, Defendants spent $168 million on detailing branded opioids to doctors, including $108 million by Purdue, $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Allergan. These amount to twice as much as Defendants spent on detailing in 2000.

284.     The deceptive marketing schemes included, among others, (a) the hiring of certain physicians, "hired guns," to pollute the marketplace with false information regarding the efficacy and risks of opioids for chronic pain treatment; (b) false or misleading materials, speaker programs, webinars, and brochures by purportedly neutral third parties that were really designed and distributed by the Manufacturer Defendants; (c) false or misleading direct, branded advertisements and marketing materials; and (d) the misuse of treatment guidelines.

285.     The Manufacturer Defendants' misinformation campaign worked as intended. Across the country, demand for prescription opioids exploded, including in The Town of Bennington. Doctors and medical professionals, swayed by the Manufacturer Defendants' sophisticated propaganda machine, began prescribing prescription opioids for ailments ranging from headaches to neck pain to fibromyalgia. That unleashed a wave of addiction—further increasing the demand for opioids. The Manufacturer Defendants' profits soared.

b.        **The Manufacturer Defendants' Hired Guns**

i.    **Dr. Portenoy and Webster**

286.    The Manufacturer Defendants' campaign of deception to downplay the addictive

nature of opioids was rooted in two pieces of purportedly "scientific" evidence. The first piece of

evidence was a five-sentence letter to the editor published in 1980 in the New England Journal of

Medicine. The letter was drafted by Hershel Jick, a doctor at Boston University Medical Center,

with the help of a graduate student, Jane Porter. It noted, anecdotally, that a review of "current

files" did not indicate high levels of addiction among hospitalized medical patients who received

narcotic preparation treatment. In full, the letter reads:

> Recently, we examined our current files to determine the incidence of
> narcotic addiction in 39,946 hospitalized medical patients who were
> monitored consecutively. Although there were 11,882 patients who
> received at least one narcotic preparation, there were only four cases of
> reasonably well-documented addiction in patients who had no history of
> addiction. The addiction was considered major in only one instance. The
> drugs implicated were meperidine in two patients, Percodan in one, and
> hydromorphone in one. We conclude that despite widespread use of
> narcotic drugs in hospitals, the development of addiction is rare in medical
> patients with no history of addiction.[71]

287.    The second major piece of "evidence" used by Manufacturer Defendants was a

1986 study by Dr. Russell Portenoy in the medical journal Pain. The study, which had a patient

cohort of merely 38 patients, claimed that opioids could be used for long periods of time to treat

non-cancer related pain without any risk of addiction. The rationale behind the study was that

patients in pain would not become addicted to opioids because their pain drowned out the euphoria

associated with opioids. As such, the study concluded that opioids should be freely administered

to patients with fibromyalgia, headaches, finicky backs, and a host of other issues. According to

Portenoy and his co-author, Dr. Kathleen Foley, "opioid maintenance therapy can be a safe,

---

[71] *Addiction rare in patients treated with narcotics*, 302(2) New Eng. J. Med. 123 (Jan. 10, 1980).

salutary and more humane alternative … in those patients with intractable non-malignant pain and no history of drug abuse."[72]  Portenoy's study also cited Jick's one-paragraph letter to the New England Journal of Medicine.

288.    Dr. Portenoy's study dovetailed perfectly with Manufacturer Defendants' marketing strategy and, within a decade, Dr. Portenoy was financed by "at least a dozen companies, most of which produced prescription opioids."[73]

289.    Dr. Portenoy went on to serve as one of the pharmaceutical industry's most vocal advocates, regularly appearing at conferences and gatherings of medical professionals to promote the use of opioids for chronic, long-term pain.

290.    The Manufacturer Defendants disseminated fraudulent and misleading messages to reverse the popular and medical understanding of opioids and their associated risks. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, through unbranded marketing and through industry-funded front groups.

291.    These statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from the FDA and CDC based on that same evidence.

292.    Hired guns like Dr. Portenoy promoted opioid analgesics and the myth that opioids could be liberally prescribed for non-cancer related pain, without any risk of addiction.

293.    Others like Dr. Portenoy would speak at academic conferences to primary care physicians in an effort to destigmatize opioids and encouraged liberal prescription of narcotics for

---

[72] Portenoy RK, Foley KM, *Chronic use of opioid analgesics in non-malignant pain: report of 38 cases*, 25 Pain 171 (1986).
[73] Meier B., Pain Killer: A Wonder Drug's Trail of Addiction and Death, New York, NY: St. Martin's Press; 2003.

the treatment of non-cancer related pain. They claimed that opioid analgesics have no "ceiling dosage" in that prescribing physicians should increase dosages for patients as high as necessary to treat non-cancer chronic pain. Invariably, the key piece of "data" cited in support of the proposition that opioids could be safely used to treat pain was the New England Journal of Medicine article.

294.    The Manufacturer Defendants also paid Dr. Lynn Webster, the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah, to promote opioids. Dr. Webster was President of the American Academy of Pain Medicine ("AAPM") in 2013. He is a Senior Editor of Pain Medicine, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous continuing medical education programs ("CMEs") sponsored by Cephalon, Endo and Purdue. At the same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants (including nearly $2 million from Cephalon).

295.    In the years that have followed, both the New England Journal of Medicine letter and Dr. Portenoy's 1986 study have been expressly disavowed. Neither article actually demonstrates that opioids can be safely prescribed for long-term, non-cancer related pain.

296.    In a taped interview in 2011, Dr. Portenoy admitted that the information the Manufacturer Defendants were pushing was false. "I gave innumerable lectures in the late 1980s and '90s about addiction that weren't true," Dr. Portenoy told a fellow doctor in 2010. "It was the wrong thing to do."[74]

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite. I would cite 6 to 7 maybe 10 different avenues of thought or evidence, *none of which represents real evidence*. And yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in total and feel more comfortable about opioids in a way

---

[74] Thomas Catan and Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, The Wall Street Journal (Dec. 17, 2012).

they hadn't before … Because the primary goal was to de-stigmatize, *we often left evidence behind*.

*It was clearly the wrong thing to do* and to the extent that some of the adverse outcomes now are as bad as they have become in terms of endemic occurrences of addiction and unintentional overdose death, it's quite scary to think about how the growth in that prescribing driven by people like me led, in part, to that occurring.[75]

297.    As to the New England Journal of Medicine letter, Dr. Jick, in an interview with Sam Quinones decades after the letter was published, stated: "[t]hat particular letter, for me, is very near the bottom of a long list of studies that I've done. It's useful as it stands because there's nothing else like it on hospitalized patients. But if you read it carefully, it does not speak to the level of addiction in outpatients who take these drugs for chronic pain."[76]

298.    The New England Journal of Medicine itself has since disavowed the letter, stating, "[the letter] was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy."[77] "We believe," the journal provided, "that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy."[78]

### c.    Defendant-Funded Organizations

299.    Manufacturer Defendants also funded multiple organizations to advocate for the use of opioids to treat chronic pain. The names of the organizations suggest neutrality, but they were anything but. They included the American Pain Foundation ("APF"); the American Academy of Pain Management (which received funding from Manufacturer Defendants Endo, Janssens, and

---

[75] Live interview with Dr. Russell Portenoy. Physicians Responsible for Opioid Prescribing. https://www.youtube.com/watch?v=DgyuBWN9D4w. Accessed December 3, 2017 (emphases added).
[76] Harrison Jacobs, *This one-paragraph letter may have launched the opioid epidemic*, BUSINESS INSIDER, Mar. 26, 2016, http://www.businessinsider.com/porter-and-jick-letter-launched-the-opioid-epidemic-2016-5
[77] 376 New Eng. J. Med. 2194, 2194–95 (2017).
[78] *Id.*

Purdue); the American Pain Society ("APS"), the American Geriatrics Society ("AGS"), and the Pain Care Forum ("PCF").

i. **The American Pain Foundation**

300.     The most prominent nonparty advocate for opioids, funded by Defendants, was the American Pain Foundation ("APF"). APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo alone provided more than half that funding; Purdue was next, at $1.7 million.

301.     APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign — through radio, television, and the internet — to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Vermont consumers, physicians, patients, and third-party payers.

302.     Dr. Perry Fine (an opioid advocate from the University of Utah who received funding from Janssen, Cephalon, Endo, and Purdue), Dr. Portenoy, and Dr. Scott Fishman (an advocate the University of California who authored *Responsible Opioid Prescribing*, a publication sponsored by Cephalon and Purdue), all served on APF's board and reviewed its publications. Another board member, Lisa Weiss, was an employee of a public relations firm that worked for both Purdue and APF.

303.     In 2009 and 2010, more than eighty percent (80%) of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in

2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of a total income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from Defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.

304.    APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. It was often called upon to provide "patient representatives" for Defendants' promotional activities, including for Purdue's "Partners Against Pain" and Janssen's "Let's Talk Pain." But in reality, APF functioned as an advocate for the interests of the Manufacturer Defendants, not patients. Indeed, as early as 2011, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

305.    APF caught the attention of the United States Senate Finance Committee in May 2012 as the Committee sought to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation raised red flags as to APF's credibility as an objective and neutral third party; the Manufacturer Defendants stopped funding it. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[79]

### ii.    The American Academy of Pain Medicine

306.    The American Academy of Pain Medicine ("AAPM"), with the assistance, prompting, involvement, and funding of the Manufacturer Defendants, issued treatment guidelines

---

[79] Charles Ornstein and Tracy Weber, *Senate Panel Investigates Drug Companies' Ties to Pain Groups*, WASH. POST, May 8, 2012, https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html

and sponsored and hosted CME programs for doctors essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

307. AAPM has received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate in activities and conferences. Defendants Endo, Purdue, Cephalon, and Allergan were members of the council.

308. AAPM was viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its corporate events, and distributed its publications. The conferences sponsored by AAPM promoted opioids – 37 out of roughly 40 sessions at one conference alone were opioid-focused.

309. AAPM's presidents have included the same opioid advocates mentioned above, *i.e.* Drs. Fine, Portenoy, Webster and Fishman. Dr. Fishman, a past AAPM president, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are ... small and can be managed."[80]

310. AAPM's staff understood that they and their industry funders were engaged in a common task. The Manufacturer Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid advocates within the organization.

### iii. **The Pain Care Forum**

311. On information and belief, the Manufacturer Defendants also combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project with the stated goals of offering "a setting where multiple organizations can share information" and "promote and support taking collaborative action regarding federal pain policy issues." APF

[80] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), available at http://www.medscape.org/viewarticle/500829

President Will Rowe described the forum as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

312.    PCF is comprised of representatives from opioid manufacturers and distributors (including Cephalon, Endo, Janssen, and Purdue); doctors and nurses in the field of pain care; professional organizations (including AAPM, APS, and American Society of Pain Educators); patient advocacy groups (including APF and American Chronic Pain Association ("ACPA")); and other like-minded organizations, almost all of which received substantial funding from the Manufacturer Defendants.

313.    PCF, for example, developed and disseminated "consensus recommendations" for a Risk Evaluation and Mitigation Strategy ("REMS") for long-acting opioids that the FDA mandated in 2009 to communicate the risks of opioids to prescribers and patients. This was critical because a REMS that went too far in narrowing the uses or benefits or highlighting the risks of chronic opioid therapy would undermine the Manufacturer Defendants' marketing efforts. On information and belief, the recommendations claimed that opioids were "essential" to the management of pain, and that the REMS "should acknowledge the importance of opioids in the management of pain and should not introduce new barriers."  The Manufacturer Defendants worked with PCF members to limit the reach and manage the message of the REMS, which enabled them to maintain, not undermine, their deceptive marketing of opioids for chronic pain.

314.    All of these purportedly neutral, industry-funded organizations took aggressive stances to convince doctors and medical professionals that America was suffering from an epidemic of untreated pain — and that opioids were the solution. Their efforts were successful nationwide, including in The Town of Bennington.

d.     **The Manufacturer Defendants' False and Misleading Direct Advertising and Marketing of Opioids**

315.    The Manufacturer Defendants have intentionally made false and misleading statements regarding opioids in their advertising and marketing materials disseminated nationwide, including in The Town of Bennington. They have, among other things, (1) downplayed the serious risk of addiction; (2) created and promoted the imaginary concept of "pseudoaddiction," advocating that when signs of actual addiction begin to appear, the patient should be treated with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher dosages; (6) described their opioid products as "steady state" – falsely implying that these products are less likely to produce the high and lows that fuel addiction – or as less likely to be abused or result in addiction; (7) touted the effectiveness of screening or monitoring patients as a strategy for managing opioid abuse and addiction; (8) stated that patients would not experience withdrawal if they stopped using their opioid products; (9) stated that their opioid products are effective for chronic pain without disclosing the lack of evidence for the effectiveness of long-term opioid use; and (10) stated that abuse-deterrent formulations were are safer,   tamper- or crush-resistant  less divertible and less abusable than other opioids or treatment drugs.

316.    The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Manufacturer Defendants' claims.

317.    The Manufacturer Defendants engaged in deceptive direct-to-physician marketing, promoting the use of opioids for chronic pain through controlled and trained sales representatives who visited individual doctors and medical staff in their offices and small group speaker programs.

318.    On information and belief, throughout the relevant time period these sales representatives have spread (and may continue to spread) misinformation regarding the risks and benefits of opioids to hundreds of thousands of doctors.

319.    Allergan was notified by the FDA in 2010 that certain brochures were "false or misleading because they omit and minimize the serious risks associated with the drug, broaden and fail to present the limitations to the approved indication of the drug, and present unsubstantiated superiority and effectiveness claims." The FDA also found that "[t]hese violations are a concern from a public health perspective because they suggest that the product is safer and more effective than has been demonstrated."[81]

320.    Through these means, and likely others still concealed, the Manufacturer Defendants collaborated to spread deceptive messages about the risks and benefits of long-term opioid use in patient education brochures and pamphlets, websites, ads and other marketing materials

321.    For example:

(a)    Allergan's predecessor caused a patient education brochure, *Managing Chronic Back Pain*, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Allergan's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Allergan continued to use this brochure in 2009 and beyond.

(b)    Cephalon and Purdue sponsored *APF's Treatment Options: A Guide for People Living with Pain* (2007), which suggests that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative prescriptions, or theft. This publication is available today.[82]

(c)    Endo sponsored a website, "*PainKnowledge*," which, upon information and belief,  claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become

---

[81] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), available at http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf
[82] Available at https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf

addicted."  Upon information and belief, another  Endo website, PainAction.com, stated "Did you know?  Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."  Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

(d)     Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem."

(e)     Janssen reviewed and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

(f)     Janssen currently runs a website, *Prescriberesponsibly.com* (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated."[83]

(g)     Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]." This publication is still available online.[84]

(h)     Consistent with the Manufacturer Defendants' published marketing materials, upon information and belief, detailers for the Manufacturer Defendants in Vermont have minimized or omitted and continue to minimize or omit any discussion with doctors or their medical staff in Vermont about the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

(i)     Endo, on information and belief, has distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker and chef, misleadingly implying that the drug would provide long-term pain-relief and functional improvement

(j)     On information and belief, Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

---

[83] Available at, http://www.prescriberesponsibly.com/articles/opioid-pain-management
[84] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers- guide.pdf

(k)     The New York Attorney General found in its settlement with Purdue that through March 2015, the Purdue website *In the Face of Pain* failed to disclose that doctors who provided testimonials on the site were paid by Purdue,[85] and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.[86]

322.     The Manufacturer Defendants falsely instructed doctors and patients that the signs of addiction should not be seen as warnings but are actually signs of undertreated pain and should be treated by prescribing more opioids. The Manufacturer Defendants called this phenomenon "pseudoaddiction" and falsely claimed that pseudoaddiction is substantiated by scientific evidence. Dr. Webster was a leading proponent of this notion, stating that the only way to differentiate the two was to increase a patient's dose of opioids.[87]

323.     Other examples of the Manufacturer Defendants' advocacy for the fictional concept of "pseudoaddiction" include, but are not limited to:

(a)     Cephalon and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. The 2012 edition of *Responsible Opioid Prescribing* remains for sale online.[88]

(b)     On information and belief, Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain *is under-treated*....Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

---

[85] *See New York State Office of the Attorney General, A.G. Schneiderman Announces Settlement with Purdue Pharma That Ensures Responsible and Transparent Marketing Of Prescription Opioid Drugs By The Manufacturer* (August 20, 2015), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-purdue-pharma-ensures-responsible-and-transparent (last accessed December 20, 2017)
[86] The New York Attorney General, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the New York Attorney General found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Upon information and belief, Endo continues to make these false statements elsewhere.
[87] Lynn Webster & Beth Dove, Avoiding Opioid Abuse While Managing Pain (2007).
[88] *See* Scott M. Fishman, M.D., Responsible Opioid Prescribing: A Physician's Guide (2d ed. 2012).

(c)     Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

(d)     Purdue published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which, upon information and belief, described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug- seeking behaviors] in patients who have pain that has not been effectively treated."

(e)     Upon information and belief, Purdue sponsored a CME program titled "*Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*." In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long acting opioid.

324.     However, Defendants' own hired gun has now conceded that pseudoaddiction is fictional.  Dr. Webster has acknowledged that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[89]

325.     The 2016 CDC Guidelines also reject the concept of pseudoaddiction. The Guidelines explain that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer-term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."[90]

---

[89] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc. J. Sentinel, Feb. 18, 2012
[90] *CDC Guidelines for Prescribing Opioids for Chronic Pain,* available at https://www.cdc.gov/drugoverdose/prescribing/guideline.html

326.    The Manufacturer Defendants also falsely claimed that there were addiction risk screening tools – such as patient contracts, urine drug screens, and other similar strategies – that allowed them to reliably identify and safely prescribe opioids to patients predisposed to addiction.

327.    In addition, the Manufacturer Defendants widely spread misleading information about the risks of addiction associated with increasing dosages of opioids over time, and downplayed the risks created by the tolerance for opioids that patients would develop after consuming the drugs over a period of time.

328.    For example,

(a)    On information and belief, Allergan's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction."

(b)    Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available online.[91]

(c)    Endo sponsored a website, "*PainKnowledge*," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

(d)    Endo distributed a pamphlet edited by an opioid advocate entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . .You won't 'run out' of pain relief."[92]

(e)    Janssen, on information and belief, sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

---

[91] Available at, https://assets.documentcloud.org/documents/277605/apf- treatmentoptions.pdf
[92] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

(f)     On information and belief, Purdue's *In the Face of Pain* website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

(g)     Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages. This publication is still available online.[93]

(h)     In 2007, Purdue sponsored a CME entitled *Overview of Management Options* that was available for CME credit and available until at least 2012. It taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

(i)     Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, APF and others argued to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[94]

329.    These claims conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guidelines, "[t]here is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[95]

330.    The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients nationwide, and in The Town of Bennington, would look to opioids first for the treatment of chronic pain. The Manufacturer Defendants deceptively describe the risks from NSAIDs while failing to disclose the risks from opioids.[96]

331.    The Manufacturer Defendants also promoted their products with a disregard for the truth about their safety and despite known risks of diversion and abuse.  For example, Indivior developed Suboxone Film around 2007 as a patent-protected alternative to the tablet form of

---

[93] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers- guide.pdf
[94] Brief of the American Pain Foundation (APF), the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz*, No. 05-4474 (4th Cir. Sept. 8, 2005) at 9
[95] 2016 CDC Guidelines *supra* note 83.
[96] *See, e.g.*, Case Challenges in Pain Management: Opioid Therapy for Chronic Pain (Endo) (describing massive gastrointestinal bleeds from long-term use of NSAIDs and recommending opioids), http://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf (last accessed December 19, 2017).

Suboxone, which was then about to face generic drug competition.  The primary ingredient in both Suboxone Film and tablets is buprenorphine, a highly potent opioid.  According to the USDOJ indictment, Indivior promoted Suboxone Film as safer and less-divertible than its tablet form, even though the company lacked any scientific evidence to support those claims.  In particular, Indivior aggressively marketed Suboxone Film, without an established basis, as having a "lower risk of child exposure" and "less divertible/abusable formulation".  The indictment alleges Indivior made these and other false and misleading claims in marketing materials and through representations throughout the country.  The indictment also alleges that, to further its scheme, Indivior announced a "discontinuance" of its tablet form of Suboxone based on supposed "concerns regarding pediatric exposure to" tablets, when in fact Indivior executives knew the primary reason for the discontinuance was to delay the Food and Drug Administration's approval of generic tablet forms of the drug.

332.    Indivior's scheme, as alleged in the indictment, was highly successful, converting thousands of opioid-addicted patients over to Suboxone Film and causing substantially increased utilization for the product.  In addition, until earlier in 2019, when Suboxone Film became subject to generic competition, Indivior retained a high portion of the opioid- addiction treatment market.

333.    The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The Manufacturer Defendants and their PBM allies had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering

from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on actual medical evidence that conclusively expose the known falsity of the Manufacturer Defendants' misrepresentations.

334.    Notwithstanding their knowledge, in order to maximize profits, the Manufacturer Defendants continued to advocate in the false and deceptive manners described herein with the goal of increasing opioid use, purposefully ignoring the foreseeable consequences of their activity in terms of addiction and public health throughout the United States, and in The Town of Bennington.

335.    The Manufacturer Defendants intentionally used these false and deceptive representations to maximize profits and utilization of opioids.

336.    According to the US DOJ indictment, Defendant Indivior additionally used its "Here to Help" internet and telephone program as part of its scheme to induce physicians to write prescriptions for Suboxone Film.  Touted as a resource for opioid- addicted patients, Indivior used the program in part to connect patients to doctors it knew were prescribing Suboxone and other opioids to more patients than allowed by federal law, at high doses, and in suspect circumstances. The indictment alleges that Indivior executives and employees knew from statistic and numerous firsthand reports that some doctors in the Here to Help referral system were issuing prescriptions in a careless and clinically unwarranted manner.

337.    A very recent study in the Journal of the American Medical Association has further confirmed the falsity of defendants' representations.  This study followed patients with chronic back, hip or knee pain who were treated with opioids and non-opioids over a 12-month period.  The study concluded that there was no significant difference in pain control, but that pain intensity was significantly better for non-opioid users, while adverse medication-related side effects were

significantly more common for opioid users.  The Study recommended against initiation of opioid therapy for moderate to severe chronic osteoarthritis pain.[97]

### e.    Manufacturer Defendants' Misuse of Treatment Guidelines

338.    In addition, treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy. They are relied upon by doctors, especially the general practitioners and family doctors targeted by the Manufacturer Defendants, who are neither experts nor trained in the treatment of chronic pain. Treatment guidelines not only directly inform doctors' prescribing practices, but are cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Allergan, and Purdue discussed treatment guidelines with doctors during individual sales visits including visits throughout Vermont and the Town of Bennington.

### i.    Federation of State Medical Boards (FSMB)

339.    The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians. The FSMB finances opioid- and pain-specific programs through grants from Defendants.

340.    Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with

---

[97] Erin E. Krebs, MD, MPH; Amy Gravely, MA; Sean Nugent, BA; et al, *Effect of Opioid vs Nonopioid Medications on Pain-Related Function in Patients With Chronic Back Pain or Hip or Knee Osteoarthritis Pain*, JAMA, March 6, 2018

pharmaceutical companies" and taught not that opioids could be appropriate in limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

341.    A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including in The Town of Bennington.

342.    The publication of *Responsible Opioid Prescribing* was backed largely by drug manufacturers. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards (and through the boards, to practicing doctors). The FSMB website describes the book as the "leading continuing medication (CME) activity for prescribers of opioid medications."[98]

343.    Defendants relied on 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

ii.    **AAPM/APS Guidelines**

344.    American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from

---

[98] Scott M. Fishman, *Responsible Opioid Prescribing*, Scott M. Fishman published by Waterford Life Services (2007)

Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement, *The Use of Opioids for the Treatment of Chronic Pain*, that endorsed opioids to treat chronic pain and claimed that the there was little risk of addiction or overdose in pain patients. [99] The Chair of the committee that issued the statement, Dr. J. David Haddox, was at the time a paid speaker for Purdue. The sole consultant to the committee was Dr. Portenoy. The consensus statement, which also formed the foundation of the 1998 Guidelines, was published on the AAPM's website and remained until 2011; it was taken down only after a doctor complained, though it lingers on the internet elsewhere.

345.    AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines") and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the 2009 Guidelines, including Dr. Portenoy and Dr. Fine, received support from Defendants Janssen, Cephalon, Endo, and Purdue.

346.    The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache and Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated nationwide and in The Town of Bennington during the relevant time period, were reprinted in the *Journal of Pain* and are still available online.

---

[99] The Use of Opioids for the Treatment of Chronic Pain, APS & AAPM (1997). Available at http://opi.areastematicas.com/generalidades/OPIOIDES.DOLORCRONICO.pdf (as viewed 3/31/2016).

347.     The Manufacturer Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions.

348.     The extent of the Manufacturer Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines – the authors of which did not accept drug company funding – reached very different conclusions.

349.     The 2012 Guidelines for *Responsible Opioid Prescribing* in Chronic Non- Cancer Pain, issued by the American Society of Interventional Pain Physicians ("ASIPP"), warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it." ASIPP's Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommends long-acting opioids in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence monitoring, in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvements in physical and functional status and minimal adverse effects."[100]

350.     Similarly, the 2011 Guidelines for the *Chronic Use of Opioids*, issued by the American College of Occupational and Environmental Medicine, recommend against the "routine

---

[100] Laxmaiah Manchikanti, et al., American Society of Interventional Pain Physicians (ASIPP) *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part 1, Evidence Assessment*, 15 Pain Physician (Special Issue) S1-S66; *Part 2 – Guidance*, 15 Pain Physician (Special Issue) S67-S116 (2012).

use of opioids in the management of patients with chronic pain," finding "at least moderate evidence that harms and costs exceed benefits based on limited evidence."[101]

351.    The Clinical Guidelines on Management of Opioid Therapy for Chronic Pain, issued by the United States Department of Veterans Affairs ("VA") and Department of Defense ("DOD") in 2010, notes that their review revealed a lack of solid evidence-based research on the efficacy of long-term opioid therapy.[102]

**2.    Manufacturer, Distributor, and Pharmacy Defendants Violated their Requirements to Prevent Diversion and Report Suspicious Orders under Vermont and Federal Law.**

352.    In addition to their common law duties, Manufacturer, Distributor, and Pharmacy Defendants are subject to statutory and regulatory requirements under Vermont law. Vermont imposes numerous substantive requirements on parties involved in the distribution chain of opioids and other controlled substances. These requirements include providing adequate inventory control and security of opioids to prevent diversion, and reporting suspicious orders of opioids to the Vermont Board of Pharmacy. Vermont law also explicitly requires parties involved in the distribution chain of controlled substances such as opioids to comply with the requirements of the Controlled Substances Act, 21 U.S.C. § 801 et seq. (the "CSA"), and its implementing regulations. Vermont, in adopting the requirements of the CSA and its implementing regulations, indicated that it, like Congress when it passed the CSA, had concerns about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572.

---

[101] *American College of Occupational and Environmental Medicine's Guidelines for the Chronic Use of Opioids* (2011).
[102] Management of Opioid Therapy for Chronic Pain Working Group, VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (May 2010). Available at http://www.healthquality.va.gov/guidelines/Pain/cot/COT_312_Full- er.pdf (accessed March 31, 2016).

353.    The opioid epidemic was further fueled by Defendants' failure to follow the specific mandates in Vermont law and the CSA requiring them to help ensure that highly addictive drugs are not diverted to illegal use. The brunt of the opioid epidemic could have been, and should have been, prevented if Defendants had fulfilled their duties set by statute, regulation, and common law. Defendants, who operate at every level of the opioid supply chain, had an obligation and duty to act. They did not—and the country, including the Town of Bennington, paid the price.

354.    Recognizing that highly addictive drugs like opioids can be easily abused and diverted to the black market, , and Congress enacted the CSA.

355.    First, the DEA sets limits on the quantity of Schedule II controlled substances – such as opioids – that may be produced in the United States in any given year. *See* 21 U.S.C. § 826(a); 28 C.F.R. § 0.100. The DEA determines these quotas based on a variety of data including sales, production, inventories, and exports. The DEA can and does lower quotas as a means of addressing abuse and diversion.

356.    Second, Congress anticipated that highly addictive prescription drugs like opioids could be abused and diverted to the black market. The CSA thus sought to combat diversion of prescription narcotics by providing for a closed system of drug distribution in which manufacturers, wholesalers/distributors, and retail pharmacies must register with the DEA. Every registrant, in turn, is charged with being vigilant in deciding whether a customer, be it a pharmacy, wholesaler, or end customer, can be trusted to deliver or use controlled prescription narcotics only for lawful purposes. 21 U.S.C. § 823(e). Specifically, every registrant is required to "maintain effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1).

82

357. In particular, the CSA and its implementing regulations require all registrants to (1) report suspicious orders of prescription opioids to the DEA, and (2) perform required due diligence prior to filling any suspicious orders. See 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.74(b).

358. In addition, the Code of Federal Regulations requires all registrants—including defendant manufacturers and wholesalers/distributors—to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21. C.F.R. § 1301.74(b).

359. On information and belief, Manufacturer and Distributor Defendants knowingly, recklessly, and/or negligently supplied suspicious quantities of prescription opioids to obviously suspicious physicians and pharmacies in and around the Town of Bennington, without disclosing suspicious orders as required by regulations and otherwise circumventing their statutory obligations under Vermont and Federal law.

360. Similarly, on information and belief, the Pharmacy Defendants knowingly, recklessly, and/or negligently dispensed suspicious prescriptions and suspicious quantities of prescriptions to customers who showed obvious indicators of opioid addiction and/or who received prescriptions that were manifestly not written pursuant to a bona fide patient-prescriber relationship.

361. Defendants' refusal to report and investigate suspicious orders had far-reaching effects. The DEA is required to annually set production quotas for regulated drugs. In the context of opioids, however, the DEA has cited the difficulty of determining an appropriate production level to ensure that adequate quantities are available for legitimate medical use. That is because there are no direct measures available to establish legitimate medical need. The DEA's difficulty in setting production quotas was compounded by the fact that the Manufacturer and Distributor Defendants failed to report suspicious orders of opioids and failed to maintain effective controls

against diversion. The Defendants' deliberate failures thus prevented the DEA from realizing the full extent of opioid diversion for years.

362.    As a direct result of Defendants' failures, excess amounts of Defendants' opioids were shipped into Vermont, causing a public-health and law-enforcement crisis in the Town of Bennington.

363.    The Defendants could have (and should have) reported and stopped the flow of prescription opioids into the black market. But Defendants intentionally, recklessly, and/or negligently failed to investigate, report, and halt suspicious orders. Accordingly, as a direct result of the Defendants' misconduct, substantial and dangerous quantities of prescription opioids were illegally diverted to and overprescribed in the Town of Bennington.

### a.    MANUFACTURER DEFENDANTS

364.    The Manufacturer Defendants are required to design and operate a system to detect suspicious orders, and to report such orders to law enforcement. *See* 21 C.F.R. § 1301.74(b); 21 U.S.C. § 823. They have not done so.

365.    Upon information and belief, the Manufacturer Defendants collected, tracked, and monitored extensive data concerning suspicious physicians and pharmacies, obtained from the Distributor Defendants who supplied the Manufacturer Defendants with distribution data in exchange for rebates or other incentives so Manufacturer Defendants could better drive sales.

366.    In return for these incentives, the distributor identified to the manufacturer the product, volume and the pharmacy to which it sold the product.

367.    For example, IMS Health furnished Purdue and other Manufacturer Defendants with detailed information about the prescribing habits of individual doctors and the ordering habits of individual pharmacies.

368.    The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion, but instead they utilized the data to understand which regions and which doctors to target through their sales force.

369.    With the knowledge of improper diversion, the Manufacturer Defendants could have but failed to report each instance of diversion to the DEA, as they were required to do, instead rolling out marketing campaigns to churn its prescription opioid sales.

370.    Indeed, upon information and belief, the Manufacturer Defendants withheld from the DEA information about suspicious orders – and induced others to do the same – to obfuscate the extent of the opioid epidemic. Upon information and belief, the Manufacturer Defendants knew that if they or the other defendants disclosed suspicious orders, the DEA would become aware that many opioids were being diverted to illegal channels, and would refuse to increase the production quotas for opioids.

371.    The Department of Justice has confirmed the suspicious order obligations clearly imposed by law, fining Mallinckrodt $35 million in 2017 for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.[103] Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report suspicious orders for controlled substances – orders that are unusual in their frequency, size, or other patterns. . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an

---

[103] *See* U.S. Dep't of Justice, *Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations*, Jul. 11, 2017, https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders

increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[104]  Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."[105]

372.    Indeed, the DEA ARCOS database shows that between 2003 and 2011 Mallinckrodt sold 53 million orders of opioids.  Yet, only 33 were halted and reported as suspicious.

373.    Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Through its extensive network of sales representatives, Purdue had and continues to have knowledge of the prescribing practices of thousands of doctors and could identify doctors who displayed red flags for diversion, such as those whose waiting rooms were overcrowded, whose parking lots had numerous out-of-state vehicles, and whose patients seemed young and healthy or homeless. Using this information, Purdue has maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs.[106] Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the

---

[104]  *Id.* (internal quotation omitted).
[105]  2017 Settlement Agreement between the United States of America and Mallinckrodt, plc,  at p. 2-3, https://www.justice.gov/usao-edmi/press-release/file/986021/download.

[106]  *See* Scott Glover and Lisa Girion, *OxyContin maker closely guards its list of suspect doctors*, LOS ANGELES TIMES, Aug. 11, 2013,  http://articles.latimes.com/2013/aug/11/local/la-me-rx-purdue-20130811

*Los Angeles Times*,[107] Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described internally as "an organized drug ring" until years after law enforcement shut it down.  In doing so, Purdue protected its own profits at the expense of public health and safety.

374.    In 2016, the New York Attorney General found that, between January 1, 2008 and March 7, 2015, Purdue's sales representatives, at various times, failed to timely report suspicious prescribing and continued to detail those prescribers even after they were placed on a "no-call" list.[108]

375.    As Dr. Mitchell Katz, director of the Los Angeles County Department of Health Services, said in a *Los Angeles Times* article, "Any drug company that has information about physicians potentially engaged in illegal prescribing or prescribing that is endangering people's lives has a responsibility to report it."[109] The New York Attorney General's settlement with Purdue specifically cited the company for failing to adequately address suspicious prescribing. Yet, on information and belief, Purdue continues to profit from the prescriptions of such prolific prescribers.

376.    Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the New York Attorney General found that Endo failed to require sales representatives to report signs of

---

[107]  *See* Harriet Ryan et al., *More than 1 million OxyContin pills ended up in the hands of criminal and addicts. What the drugmaker knew*, LOS ANGELES TIMES, Jul. 10, 2016, http://www.latimes.com/projects/la-me-oxycontin-part2/
[108]  *See* NY Purdue Settlement, at 6-7, available at https://ag.ny.gov/pdfs/Purdue- AOD-Executed.pdf
[109]  Glover and Girion, *supra* note 109.

abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

377.   The New York Attorney General also found that, in certain cases where Endo's sales representatives detailed prescribers who were convicted of illegal prescribing of opioids, those representatives could have recognized potential signs of diversion and reported those prescribers but failed to do so.

378.   On information and belief, the other Manufacturer Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion. They used faulty algorithms to flag questionable orders and frequently handed oversight to customer service employees and account managers, whose pay was tied to drug sales. For example, Teva's suspicious order program was called "DefOps", short for "Defensible Operations".   A Teva representative has testified that the program was designed to keep Teva out of trouble and because it "sounded good."   Mallinckrodt's suspicious orders were investigated by national account managers whose compensation was linked to sales.  Defendant manufacturer emails reveal that the companies were aware that assigning sales staff to monitor suspicious orders created a conflict of interest.  The practice nevertheless continued.

379.   The Manufacturer Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders caused excess shipments of the Manufacturer Defendants' opioids into The Town of Bennington and have enabled the excess opioids to be unlawfully diverted. As a result, The Town of Bennington suffered substantial harm and damages.

### b.     DISTRIBUTOR DEFENDANTS

380.    The Manufacturer Defendants realized early on that the cooperation of the Distributor Defendants was necessary to ensure the success of efforts to flood the market with addictive opioids – specifically, to move opioids from the manufacturers to pharmacies (retail and mail order) and patients, the Manufacturer Defendants needed the Distributor Defendants, a necessary link in the chain of supply.

381.    As early as 1996, Purdue recognized that over 80 percent of the distribution drug market was controlled by four players (McKesson, Bergen, Cardinal and Amerisource), and that Purdue would need to build relationships with these "wholesaler trading partners" to ensure that OxyContin was available across the country.

382.    The Distributor Defendants were willing participants in the scheme to flood the country with opioids, and the relationship was an instant success.  The Manufacturer and Distributor Defendants' supply chain partnership enabled a meteoric rise in the number of opioid prescriptions – for example, total prescriptions for OxyContin increased from about 316,000 in 1996 to approximately 14 million in 2001-02.  Translated into dollars, OxyContin sales rose from $44 million in 1996 to combined sales of nearly $3 billion in 2001-02.

383.    The Distributor Defendants partnered with the Manufacturer Defendants both directly and through industry associations.  Each of the Distributor Defendants was a member of the Healthcare Distribution Alliance, or HDA, and most were also members of the National Association of Chain Drug Stores, or NACDS.  These industry associations were valuable tools in efforts to accomplish the Manufacturer and Distributor Defendants' shared objectives.

384.    For example, the HDA was a member of the Pain Care Forum, or PCF, which as discussed above was one of the Manufacturer Defendants' primary vehicles to grow the opioid market.

385.    The industry associations also played a key role by enabling the Distributor Defendants to efficiently coordinate their efforts to fight back against regulation of the supply of opioids.

386.    Indeed, while the Manufacturer and Distributor Defendants' objective to flood the country with opioids was extremely successful, by 2005 the supply chain faced an endemic threat, a braking mechanism that threatened to slow or potentially halt the widespread distribution of prescription opioids – namely, the legal duties to prevent diversion and to monitor, report, and prevent suspicious orders of prescription opioids under Vermont and federal law, and the accompanying oversight and regulatory authority of the DEA.

387.    All opioid distributors are required to maintain effective controls against opioid diversion, generally referred to as Suspicious Order Monitoring, or SOM.  The SOM requirements obligate distributors to create and use a system to identify and report to law enforcement downstream suspicious orders of controlled substances, such as orders of unusually large size, orders that are disproportionate, orders that deviate from a normal pattern, and/or orders of unusual frequency. To comply with these requirements, distributors must know their customers, must conduct due diligence, must report suspicious orders, and must terminate orders if there are indications of diversion.

388.    Under Vermont law and the CSA, anyone authorized to handle controlled substances must track their shipments. The DEA's ARCOS is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from the point of manufacture through distribution to the point of sale. ARCOS accumulates data on distributors 'controlled substances and transactions, which are then used to identify diversion. Each person or entity that is registered to distribute controlled substances such as opioids must report each acquisition and distribution transaction to the DEA. See 21 U.S.C. § 827; 21 C.F.R. § 1304.33.

Each registrant must also maintain a complete, accurate and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of.

389.    Each registrant must also comply with the security requirements to prevent diversion set forth in 21 C.F.R. § 1301.71 and in Vermont law.

390.    In 2005, concerned that these obligations were not being met, the DEA launched "the Distributor Initiative," an effort to warn distributors (and other partners in the supply chain) about SOM requirements.  In 2006 and 2007, these warnings were communicated to distributors and others in a series of letters from the DEA.

391.    The DEA then began cracking down in 2007, suspending AmerisourceBergen's registration to distribute from its Lakeland, Florida distribution center, and following up with suspensions of the registrations of McKesson and Cardinal Health in 2008.

392.    The Manufacturer and Distributor Defendants orchestrated a joint response to this existential threat to the supply chain and opioid profits, both directly and through their trade association fronts.

393.    While not intended to be a complete recitation of every negligent, unlawful or conspiratorial act of each Distributor Defendant, the conduct at issue includes at least the following.

394.    Manufacturer Defendants, including Purdue, Teva and Mallinckrodt, took affirmative steps to support their distributor partners directly.  Communications during this time period show that the Manufacturer Defendants were committed to keeping the supply chain open, regardless of the consequences.

395.    Purdue explained that its "primary focus" was helping a distributor facing suspension "protect its registration and its business in general and especially in distributing our products."  Purdue explained that the "responsibility for making the decision to ship rests with the

supplier … that is why we must collaborate. " Purdue observed that, "[w]e need to convince [distributors that] they should talk to us when our product is involved and make it a joint decision, etc. just as we need to consult with them from our end." Purdue made clear that it wanted "no interruption in the supply chain."

396.    In 2008, Purdue met with AmerisourceBergen to discuss communication and cooperation in relation to Suspicious Order Monitoring.  Purdue met with Cardinal Health "to collaborate and support [Cardinal] on any accounts that we feel might require further assessment, etc."  Purdue met with McKesson in 2009 and proposed a "collaborative effort" regarding Suspicious Order Monitoring.

397.    In August of 2009 a Purdue employee communicated with Cardinal Health and another drug distributor and said "[w]e should gang up on DEA in Portland, OR," a reference to a pharmaceutical industry conference on DEA diversion.

398.    In 2012, Cardinal Health's registration was suspended and more discussions were held with Purdue and others in furtherance of their "mutual support" objectives – in their own words, "…we are all in this together – manufacturers and wholesalers/distributors – as well as retail customers, of course."

399.    As noted, these efforts were not limited to Purdue.  Teva released held orders because "we need to supply our customer with product" because they would not be able to fill their customer's demand without it.

400.    Mallinckrodt received an email from a distributor who had received an overnight shipment of 1200 bottles of oxycodone and wrote, "Keep 'em comin'! Flyin' out of here.  It's like people are addicted to these things or something.  Oh, wait, people are …"  A Mallinckrodt employee responded, "Just like Doritos keep eating.  We'll make more."

401.    Endo and Teva communicated with Distributor Defendants about suspicious order

monitoring programs, both in person and through questionnaires about their programs.

402.    The net goal of these communications and efforts was to protect the supply chain at all costs.  McKesson even advised Purdue that it did not use the word "suspicious" because that term of art could trigger legal obligations on the part of a distributor.  Instead, McKesson used terms like "questionable" or "noteworthy."  McKesson had even directly advised its employees to "refrain from using the word 'suspicious' in communications.  Once we deem an order and/or customer suspicious, McKesson is required to act."

403.    At one point, Mallinckrodt noted that half of the orders identified as "peculiar" in its system were from McKesson, AmerisourceBergen and Cardinal, and that many were from CVS, Walgreens and Walmart.  But Mallinckrodt did not elevate the orders from "peculiar" to "suspicious."

404.    And these were just the efforts that were (incorrectly) cast as efforts to comply with SOM requirements.  The fact was that many distributors had no compliance program at all, or programs that for all practical purposes were ineffective, notwithstanding the clear requirements of Vermont and federal law.

405.    Purdue documents showed that any review was well after shipment because the only data received by their program was a month old.  In April of 2019, Purdue's vice president and chief security officer was questioned under oath and could only recall one instance in which an order was cut or blocked due to size, frequency or pattern.  A 2016 audit of Purdue's monitoring program identified critical deficiencies, including that it used arbitrary thresholds and put review of pending orders in the hands of entities that had sales and marketing as their core mission.

406.    Mallinckrodt had no suspicious order program in place in 2008-09 (aside from verifying that the customer had DEA 222 forms), and no mechanism in place to halt suspicious orders.

407.    As of September 2012, Teva had never had a written monitoring program in place and had never reported a suspicious order to the DEA.

408.    An outside audit determined that in 2010 Endo Defendant Par had no SOM program at all.

409.    Janssen's SOM algorithm only compared orders to previous orders of the same product at the same strength, a critical deficiency.

410.    McKesson acknowledged to the DEA that from 2009-17 it did not "identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious …."

411.    Cardinal faced numerous DEA enforcement actions and did not have any policy to stop shipment of suspicious orders at all before 2008.

412.    Cardinal Health, Amerisource Bergen and McKesson all had early warning systems in place to alert their pharmacy customers when thresholds were being reached so that orders could be adjusted and manipulated to avoid triggering SOM obligations and the attendant "supply chain disruption."  In certain instances, a pharmacy could request threshold increases or delays to the next cycle, which were granted.

413.    This was critical to the Distributor Defendants, since at various relevant times the national pharmacies provided a huge percentage of the Distributor Defendants' revenue. Currently, CVS provides 25 percent of Cardinal's revenue, over $34 billion.  From 2006-12, Walgreens accounted for approximately 21 percent of Cardinal's revenue.  From 2008-18, CVS was McKesson's largest customer, accounting for almost 20 percent of McKesson's revenues, over $41 billion, in 2018 alone.

414.    The failure to implement appropriate SOM procedures was not limited to Cardinal, McKesson and AmerisourceBergen.

415.    From 2006 through August 2010, CVS had no written DEA Standard Operating Procedures to identify suspicious orders.  Even after that period its procedures were critically deficient.  During a DEA investigation commenced in 2013, CVS admitted that it had reported only seven suspicious orders in the entire country.  Also during 2013, a CVS employee highlighted the under-staffing on the monitoring program, advising fellow employees that "I do NOT have any backup … If something happens to me via act of nature or illness, the current daily SOM process would come to a complete halt."

416.    Even though Walmart operated licensed distribution centers supplying its pharmacies with controlled substances from 2000 until 2018, before 2011 Walmart had no formal system in place to identify suspicious orders.  Walmart and its representatives have stated that, prior to 2011, hourly associates responsible for filling orders at distribution centers would monitor orders, which consisted of letting a supervisor know if an order looked like "it was kind of high," based on the associates' memories.  Upon information and belief, there is no evidence of Walmart reporting any suspicious order prior to 2011.

417.    After allegedly introducing an SOM system in 2011, in 2014 Walmart acknowledged that it had no "process in place" to comply with government obligations and that this deficiency represented a "severe" risk to the company.  During this time, and until approximately 2015, Walmart simply flagged orders of 5000 dosage units or more, or more than 2000 dosage units per week if those orders were 30 percent higher than a rolling 4-week average. But orders were not held; instead there were simply cut to the thresholds and shipped.  These cut orders were not reported to the DEA.  After 2015, the same system remained in place, but Walmart simply added store-specific thresholds – the limits remained high, and pharmacies could still order up to 2000 dosage units per week (or nearly 8000 per month) without triggering the system.

418.    Until 2012, Walgreens took the approach of shipping suspicious orders and then

95

sending an after-shipment report to the DEA, even though it was advised that this approach was not in compliance with the law.  The failures did not end after 2012.  In 2013, a Walgreens employee observed that most suspicious orders identified under the new program had already shipped.  In 2014, Walgreens ended its own direct distribution efforts and instead entered into a new arrangement with Amerisource Bergen whereby Walgreens acquired enough of AmerisourceBergen's stock to be deemed a "related party" by the SEC and AmerisourceBergen became Walgreens' exclusive distributor.  The question of whether this new arrangement solved Walgreens' SOM deficiencies is answered by an AmerisourceBergen employee's comment during the transition: "I'm trying to think of everything we can do to prevent having a bunch of orders reported to the DEA and held."

419.    Rite-Aid reported zero suspicious orders, nationwide, from 1995-2014.

420.    Manufacturer and Distributor Defendants Purdue, Mallinckrodt, Cardinal, McKesson, CVS, and Walgreens have each admitted to breaking the law and violating their CSA duties.

421.    In fact, the DEA initiated 178 registrant actions between 2008 and 2012, 76 orders to show cause were issued by the Office of Administrative Law Judges, and 41 actions involved immediate suspension orders.

422.    The specifics of the Distributor Defendants' wrongful conduct and inaction include, but are not limited to, at least the following:

423.    In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the Country, resulting in millions of doses of controlled substances being diverted. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional

that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer.

424.    In a 2017 Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150,000,000.

425.    On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion.

426.    On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

427.    On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion.

428.    On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion.

429.    In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States.

430.    On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

431.    In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states.

432.    In December 2016, the Department of Justice announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act.  On information and belief, in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year.

433.    In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center in Florida amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies.

434.    In 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.

435.    Rather than comply with the law, the Distributor Defendants and their manufacturing partners have focused on diverting the attention and focus of the DEA or, in one key instance, simply working to change the law to remove the regulatory burden.

436.    When the DEA's crackdown began, the Distributor Defendants worked with their trade association, the HDA, to publish Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances."  These ICGs emphasized the critical role of each member of the supply chain in distributing controlled substances, stating "[a]t the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their

98

customers."

437.    But the ICGs were not binding on the industry or HDA members.  The evidence supports a conclusion that they actually were drafted primarily with the purpose of convincing the DEA that the Distributor Defendants were trying to address the problem and distracting the DEA from its crackdown on violations of the CSA and failure to adopt compliant SOM programs. Indeed, HDA knew that large member entities such as AmerisourceBergen and Cardinal Health would not implement the Guidelines and yet did not reveal that to the DEA during the many discussions it held with the enforcement agency.

438.    The HDA ultimately admitted that the ICGs were never intended to constitute an industry standard and even removed them from the trade association's website.

439.    The ICGs were just the first step, however.  The Distributor Defendants decided that the best option to remove the threat of penalties for failure to comply with SOM requirements was simply to change the law.

440.    On February 19, 2014, acting at the behest of industry lobbyists, U.S. Representative Tom Marino introduced the "Ensuring Patient Access and Effective Drug Enforcement Act" as a supposed effort to define "imminent danger" in the 1970 act. A DEA memo noted that this bill would essentially destroy the agency's power to file an immediate suspension order of any suspicious drug shipments.

441.    This bill required that the DEA show the company's actions had demonstrated a "substantial likelihood of an immediate threat," whether in death, serious bodily harm or drug abuse before a suspension order could be sought. It also gave drug companies the ability to submit "corrective action" plans before any penalties could be issued. The law essentially makes it impossible for the DEA to halt any suspicious narcotic shipments before opioids are diverted to the illegal black market.

442.    Whereas prior to passage of the Marino Act the DEA had the power to issue an immediate suspension order against a manufacturer or distributor whose unlawful conduct posed an imminent danger to the community, the Marino Act effectively stripped the DEA of this power.

443.    At the same time, via the HDA, the Distributor Defendants retained public relations consultants to help polish the public image of the companies responsible for flooding the country with addictive opioids.

444.    The HDA exercised strict supervision over consultants to ensure the messaging matched the objectives of the Distributor Defendants.  When a consultant refused to give HDA editorial control over a study related to drug diversion and regulation, the project was terminated.

445.    The HDA, along with the NACDS, was also instrumental in pushing back against stricter controls and enforcement on a number of additional fronts, including challenging the reclassification of hydrocodone combination products, or HCPs, from Schedule III to the more strictly-controlled Schedule II.   In sum, the HDA worked hard at its goal of "help[ing] ease DEA pressure on our members for SO monitoring."

446.    Ironically, these events occurred even as opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion.

447.    McKesson has admitted that the opioid epidemic is a significant interference with public health.  In a corporate presentation, McKesson described the opioid epidemic as the "deadliest drug epidemic on record in our nation's history."  McKesson stated, "[t]he drug problems of the past decades pale when compared to the current opioid epidemic which has killed 165,000 Americans from 2000 to 2014."

448.    In that same presentation, McKesson described how on an average day more than 650,000 opioid prescriptions are dispensed; 3,900 people initiate non-medical use of prescription

opioids and—at that time—78 people died from an opioid-related overdose.

449.  McKesson has acknowledged to its own employees that abuse of prescription drugs has risen 66% since 2000.

450.  McKesson witnesses have testified as to their awareness that opioid abuse and addiction are gateways to heroin use and addiction.

451.  A McKesson representative has testified that it "gives you pause" to be selling opioids in the midst of an opioid epidemic.

452.  ABC similarly has acknowledged "some 7.4 million people- almost 3% of the U.S. Population-aged 12 or over had an illicit drug use disorder" and that "the most commonly misused products were hydrocodone products."   ABC has also acknowledged that "Oxycodone was misused by almost 4 million Americans."

453.  Cardinal likewise has admitted that prescription drug abuse is "an unparalleled epidemic and public health crisis."  It has told its employees that "[i]t's an epidemic that affects all of us, professional and personally" and "a public health crisis".

454.  Cardinal's website calls the opioid epidemic a "national public health crisis" and recognizes the "devastation opioid misuse has caused American families and communities".

455.  Henry Schein's website acknowledges that "the statistics for opioid addiction are alarming" and acknowledges that "between 21-29% of patients prescribed opioids for chronic pain misuse them".  It recounts that "more than 2 million Americans have become dependent on or abused prescription pills and street drugs."

456.  Distributor defendants have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

457.  Cardinal Health has expressly stated the epidemic is "one that our company is deeply committed to help solve."  It has told its employees, "[a]s front line employees, you are an

integral part of our ability to deliver on this commitment." It has described its "responsibility and [its]obligations to society around this national challenge."

458.    Cardinal has acknowledged, "[w]e are part of a complex healthcare system and everyone in that chain, including us, must help stem the crisis.

459.    In these same PR materials, Cardinal has boasted, "[w]e are a leader in implementing anti-diversion controls and prevention programs."

460.    On their face, these assurances – of identifying and eliminating criminal activity and curbing the opioid epidemic – create a duty for the Distributor Defendants to take reasonable measures to do just that.

461.    Yet the Distributor Defendants failed to take necessary steps to prevent the damage caused by addictive opioids and instead took affirmative steps to increase and maintain the flow of opioids to the end users.

462.    Given the addictive powers of opioids and the corresponding risks of misuse, addiction and death, the Distributor Defendants' actions in the distribution and sale of opioids as part of the closed supply chain breached their duties to the Plaintiff, created and maintained an ongoing public nuisance, and were at the very least negligent and unlawful, as further alleged below in Counts I - XII.  These actions damaged Plaintiff.

463.    The additional failure to maintain appropriate SOM programs, to comply with Vermont and federal law regarding the regulation of addictive opioids, is a further basis for liability.

464.    Moreover, the Distributor Defendants' failure to prevent the foreseeable injuries from opioid diversion and misuse created an enormous black market for prescription opioids, which extended to The Town of Bennington. Each Distributor Defendant knew or should have known that the opioids reaching The Town of Bennington were not being consumed for medical

purposes alone and that the amount of opioids flowing to The Town of Bennington was far in excess of what could be consumed for medical purposes.

465.    The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around the Town of Bennington; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies, and using a little bit of common sense.

466.    It was reasonably foreseeable that the Distributor Defendants' conduct in flooding the market in and around the Town of Bennington with highly addictive opioids would allow opioids to fall into the hands of children, addicts, and other unintended users.

467.    It is reasonably foreseeable that when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death.

468.    The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic faced by the Town of Bennington, and would create access to opioids for inappropriate uses, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

469.    The Distributor Defendants were aware of widespread prescription opioid abuse in and around the Town of Bennington, but, on information and belief, they nevertheless persisted in

a pattern of distributing commonly abused and diverted opioids in geographic areas and in such quantities, and with such frequency that they knew or should have known these commonly abused controlled substances were being consumed in gross excess.

470.     The use of opioids by the Town of Bennington's citizens who were addicted could not occur without the knowing cooperation and assistance of the Distributor Defendants. If the Distributor Defendants adhered to effective controls to guard against diversion, the Town of Bennington would have avoided significant injury.

471.     The Distributor Defendants made enormous profits over the years based on the diversion of opioids into The Town of Bennington.

472.     The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to the Town of Bennington showed an intentional or reckless disregard for the safety of the Town of Bennington and its citizens. Their conduct poses a continuing threat to the health, safety, and welfare of the Town of Bennington.

### 3.     The Retail and PBM Mail-Order Pharmacy Defendants

473.     Pharmacy Defendants (retail and mail order) earned profits by flooding the country with prescription opioids. They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries. Yet, instead of taking any meaningful action to stem the flow of opioids into the communities, they continued to participate in the oversupply and profit from it.

474.     Each of the Pharmacy Defendants does substantial business throughout the U.S., including in Vermont. This business includes the distribution and dispensing of prescription opioids.

475.     The Pharmacy Defendants developed and maintained extensive data on the opioids

they distributed and dispensed. Though this data, Pharmacy Defendants had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country, and in Bennington. They used the data to evaluate their own sales activities and workforce. On information and belief, the Pharmacy Defendants also provided Manufacturer Defendants with data regarding, *inter alia*, individual doctors in exchange for rebates or other forms of consideration. The Pharmacy Defendants' data is a valuable resource that they could have used to help stop diversion, but failed to do so.

### a.    The Pharmacy Defendants Have a Duty to Prevent Diversion

476.    Each participant in the supply chain of opioid distribution, including the Pharmacy Defendants, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity.

477.    The Pharmacy Defendants, including PBM mail-order pharmacies and retail pharmacies, like manufacturers and other distributors, are registrants under the CSA. 21 C.F.R. § 1301.11. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[110] In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Because pharmacies themselves are registrants under the CSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

478.    The Pharmacy Defendants owe a duty under both federal law[111] and Vermont Law,

---

[110] *See* 21 C.F.R. § 1301.71(a).

[111] 21 U.S.C. § 823; 21 CFR 1301.74

to monitor, detect, investigate, refuse to fill, and report suspicious orders which the Pharmacy Defendants knew or should have known were likely to be diverted in and around the Town of Bennington.

479.    Specifically, pharmacy retailers are required to ensure that controlled substances are dispensed only pursuant to valid prescriptions and for legitimate medicinal or therapeutic purposes.[112] Before dispensing an opioid prescription, a pharmacist or healthcare practitioner is required to confirm that the prescription is bona fide and that it was issued pursuant to a bona fide prescriber-patient relationship.[113]

480.    Further, in order to prevent the abuse of invalid or illegitimate prescriptions, and to generally prevent diversion of opioids, pharmacy retailers are required to keep and maintain thorough records of their receipt and dispensation of all opioids, and of the persons to whom they dispense opioids and certain other drugs.[114]

481.    The DEA, among others, has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies how to identify suspicious orders and other evidence of diversion.

482.    Pharmacies have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose.

483.    Suspicious pharmacy orders include orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and duration, among others.

---

[112]  20-4 Vt. Code R. § 1400:10.2
[113] *Id.*
[114] 20-4 Vt. Code R. §§ 1400:10.8; 1400:10.25

484.    Additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; and (8) prescriptions containing different handwriting. Typically, these attributes are easy to detect and easily recognizable by pharmacies.

485.    The industry guidance tells pharmacists how to recognize: (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other similar red flags.

486.    Suspicious pharmacy orders are red flags for if not direct evidence of diversion.

487.    Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the Pharmacy Defendants themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, or oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

488.    According to industry standards, federal and state law, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

489.    Pharmacy Defendants, through their words or actions set forth in news reports and other public documents, have acknowledged these risks and assured the public that issues affecting public health and safety are their highest priority.

107

490.    In 2015, CVS publicly stated that, that abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities.

491.    Similarly, in 2016, Walgreens issued a press release captioned "Walgreens Leads Fights against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Death."

492.    Despite knowing and even warning of these risks, Pharmacy Defendants recklessly or negligently permitted diversion to occur. In failing to take adequate measures to prevent substantial opioid-related injuries to the nation, Pharmacy Defendants have breached their duties under federal [confirm for VT] and state statute and regulations, under the reasonable care standard of Vermont common law (including violating a voluntarily-undertaken duty to the public which they have assumed by their own words and actions), and professional duties under the relevant standards of professional practice.

493.    For example, one official at Walgreens tasked with monitoring suspicious orders said his department was "not equipped" for that work.  Walgreens created lists of suspicious orders that ran thousands of pages but, startlingly and against all statutory obligations, then merely shipped the suspicious orders without further review.

494.    An official at CVS who was listed as the company's DEA compliance coordinator admitted that it was not her real job.  CVS compliance was relegated to "pickers and packers", i.e. the warehouse workers at distribution centers who appeared to have no formal training in monitoring and rarely held up orders.  In the CVS distribution center, approximately two orders per year were flagged as suspicious between 2006-2014.

495.    Upon information and belief, Walmart had no real system to monitor suspicious orders before 2011.  Walmart explains that it relied on its hourly employees for this work but there

is no evidence of training or a suspicious order policy. Walmart installed a suspicious order monitoring system in 2015 but it was so forgiving that a store could order 10 dosages of 10 milligrams of oxycodone in one month and 7,999 dosages the next without raising red flags.

496. Pharmacy Defendants were on notice of their ongoing negligence or reckless misconduct towards the nation in part because of their history of being penalized for violating their duties in other jurisdictions.

497. Despite their legal obligations in common law, and as registrants under the CSA, the Pharmacy Defendants failed to meet their obligations and allowed widespread diversion to occur – and they did so knowingly. They knew they made money by filling prescriptions. They knew they made money by making it easy for doctors to refer patients to them to fill drug prescriptions, not by making it difficult for doctors to refer patients to them to fill prescriptions.

498. Upon information and belief, performance metrics and prescription quotas adopted by the Pharmacy Defendants for their retail stores contributed to their failure. For instance, under CVS's Metrics System, pharmacists are directed to meet high goals that make it difficult, if not impossible, to comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or customer safety. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. The result is predictable: opioids flowed out of Pharmacy Defendants and into communities throughout the country. The Pharmacy Defendants had no incentive to stop the outflow, and every financial incentive to further it. Their policies and practices remained in place even as the epidemic raged.

499. Upon information and belief, Plaintiff alleges that the Pharmacy Defendants also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that were

illegally diverted or otherwise contributed to the opioid crisis.

500.    Upon information and belief, Plaintiff alleges that the Pharmacy Defendants failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

501.    Upon information and belief, Plaintiff alleges that the Pharmacy Defendants also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they failed to take any meaningful action as a result.

502.    Upon information and belief, Plaintiff alleges that the Pharmacy Defendants also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

503.    The Pharmacy Defendants were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

504.    In failing to take adequate measures to prevent substantial opioid-related injuries that have affected Bennington, Pharmacy Defendants have breached their duties under the "reasonable care" standard and their professional duties under the relevant standards of professional practice.

505.    It was reasonably foreseeable to Pharmacy Defendants that filling invalid or suspicious prescriptions for opioids would cause harm to the Town of Bennington.

506.    It was reasonably foreseeable to Pharmacy Defendants that, when unintended users

gain access to opioids, tragic yet preventable harm will result, including the type of harm for which Bennington seeks redress.

507.    At all relevant times, Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing full well they could take measures to substantially eliminate their complicity in opioid diversion

508.    At all relevant times, Pharmacy Defendants engaged in these activities, and continue to do so, knowing full well that Bennington would be harmed thereby and would be constrained to provide essential County services in response, including paying for additional law enforcement services, social services, and emergency services.

509.    It was foreseeable to Pharmacy Defendants that the Town of Bennington would be forced to bear substantial expenses and suffer serious socio-economic harm as a result of Pharmacy Defendants' acts.

510.    Pharmacy Defendants were on notice of their ongoing negligence or intentional misconduct, in part because of their history of being penalized for violating their duties and legal requirements in other jurisdictions.

511.    The Pharmacy Defendants each have one or more pharmacies that fill prescriptions for opioids which are operating within or in close proximity to the Town of Bennington, or are sending prescriptions to the Town of Bennington via their mail service.

> **b.    Multiple Enforcement Actions against the Retail Pharmacy Defendants Confirms Their Compliance Failures.**

512.    The Pharmacy Defendants have long been on notice of their failures to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Several of the Pharmacy Defendants have been repeatedly penalized for their illegal prescription opioid practices. In consideration of a reasonable opportunity for further investigation

111

and discovery, Plaintiff alleges that based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, national policies and inadequate control practices of the Pharmacy Defendants.

i. **CVS**

513. CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. CVS manages medications for more than 92 million lives at over 9,900 retail locations. CVS could be a force for good in connection with the opioid crisis, but like other Defendants and contrary to its public pronouncements, CVS sought profits over patient safety.

514. CVS is a repeat offender; the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the DOJ. It nonetheless appears to have treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

515. As recently as July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.[115]

516. This fine was preceded by numerous others throughout the country.

517. In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA by filling prescriptions with no legitimate medical purpose.[116]

---

[115] Press Release, U.S. Attorney's Office E. Dist. of Cal., *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act*, U.S. DEP'T OF JUST. (July 11, 2017), https://justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violationscontrolled-substance-act.

[116] Press Release, U.S. Attorney's Office Dist. of Md., *United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. DEP'T OF JUST. (Feb. 12, 2016),

518.     In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.[117]

519.     In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.[118]

520.     In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances – mostly addictive painkillers – more than 500 times between 2011 and 2014.[119]

521.     In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The U.S. alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe

---

https://www.justice.gov/usao-md/pr/united-states-reaches-8-millionsettlement-agreement-cvs-unlawful-distribution-controlled.

[117] Press Release, U.S. Attorney's Office Dist. of Conn., *CVS Pharmacy Pays $600,000 to Settle Controlled Substances Act Allegations*, U.S. DEP'T OF JUST. (Oct. 20, 2016), https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlled-substances-actallegations.

[118] Dialynn Dwyer, *CVS will pay $795,000, strengthen policies around dispensing opioids in agreement with state*, BOSTON.COM (Sept. 1, 2016), https://www.boston.com/news/localnews/2016/09/01/cvs-will-pay-795000-strengthen-policies-around-dispensing-opioids-inagreement-with-state.

[119] Press Release, U.S. Attorney's Office Dist. of Mass., *CVS to Pay $3.5 Million to Resolve Allegations that Pharmacies Filled Fake Prescriptions*, U.S. DEP'T OF JUST. (June 30, 2016), https://www.justice.gove/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filledfake-prescriptions.

that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.[120]

522.   In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purpose by a health care provider acting in the usual course of professional practice." CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need.[121]

523.   In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations that in the State of Texas it had filled 153 prescriptions written by a doctor whose controlled-substances registration within the Texas Department of Public Safety had expired.[122] The alleged violations of the Comprehensive Drug Abuse Prevention and Control Act occurred in the spring and summer of 2012.

524.   In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.[123]

525.   Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA

---

[120] Press Release, U.S. Attorney's Office Dist. of R.I., *Drug Diversion Claims Against CVS Health Corp. Resolved with $450,000 Civil Settlement*, U.S. DEP'T OF JUST. (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

[121] Press Release, U.S. Attorney's Office M. Dist. of Fla., *United States Reaches $22 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. DEP'T OF JUST. (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution.

[122] Patrick Danner, *H-E-B, CVS Fined Over Prescriptions*, SAN ANTONIO EXPRESS-NEWS (Sept. 5, 2014), http://www.expressnews.com/business/local/article/H-E-BCVSfined-over-prescriptions-5736554.php.

[123] Andrew Knittle, *Oklahoma pharmacy board stays busy, hands out massive fines at time*, NEWSOK (May 3, 2015), http://newsok.com/article/5415840.

registration numbers.[124]

## ii. **Walgreens**

526.     Walgreens is the second-largest retail pharmacy store chain in the U.S. behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,000 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

527.     Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history -- $80 million – to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black market sales.[125]

528.     As part of the settlement, Walgreens admitted that it failed to uphold its obligations as a DEA registrant regarding the above-described conduct.[126]

529.     The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

530.     Walgreens' Florida operations highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one

---

[124] Press Release, U.S. Attorney's Office W. Dist. of Okla, *CVS to Pay $11 Million to Settle Civil Penalty Claims Involving Violations of Controlled Substances Act*, U.S. DEP'T OF JUST. (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penaltyclaims-involving-violations-controlled.

[125] Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties Under the Controlled Substances Act*, U.S. DEP'T OF JUST. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-recordsettlement-80-million-civil-penalties-under-controlled.

[126] *Id.*

million dosage units of oxycodone in 2011 – more than ten times the average amount.[127]

531.    The subject pharmacies increased their orders over time, in some cases as much as 60% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet, Walgreens corporate officers not only turned a blind eye, but provided pharmacists with incentives through a bonus program that compensated them based on the number of prescriptions filled at the pharmacy. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not document our own potential noncompliance," underscoring Walgreen's attitude that profit outweighed compliance with the CSA or the health of communities.[128]

532.    Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on the number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.[129]

---

[127] Order to Show Cause and Immediate Suspension of Registration, *In the Matter of Walgreens Co.* (Drug Enf'd Admin. Sept. 13, 2012).

[128] *Id.*

[129] *Id.*

533.    The six retail pharmacies in Florida that received the suspicious drug shipments from the Jupiter Distribution Center, in turn, filled customer prescriptions that they knew or should have known were not for legitimate use.[130]

534.    Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).[131]

535.    The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk. As a result, Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.[132]

### iii.    Rite Aid

536.    On January 11, 2009 Rite Aid entered into an agreement to pay $5 Million in civil penalties for CSA violations and to enter into a Compliance Plan to ensure compliance with all requirements of the CSA and applicable DEA regulations and to prevent diversion of controlled substances.  This action was based on systemic violations of Rite Aid's obligation to prevent diversion across 53 Rite Aid locations.

537.    On  March 9, 2017 Rite Aid entered into an agreement to pay $834, 200 in civil fines for CSA violations.

---

[130] *Id.*

[131] *Walgreens to pay $200,000 settlement for lapses with opioids*, APHA (Jan. 25, 2017), https://www.pharmacist.com/article/walgreens-pay-200000-settlement-lapses-opioids.

[132] *Id*

117

      c.     **PBM Mail Order Pharmacies**

538.    Each of the PBM Defendants operate lucrative mail order pharmacies that have purchased, dispensed and profited from the movement of the brand and generic opioids at issue in this litigation.

539.    During the 2006-2012 time period, PBM mail order pharmacies purchased more than 38 billion MMEs, spread over more than 2.1 billion dosage units.



540.    The DEA Arcos Database reveals that over 51% of the 45+ billion MMEs moved through the mail order channel were purchased by Express Scripts Mail Order pharmacies. Specifically, during the 2006-2012 time period, Express Scripts mail order pharmacies bought 19,674,412 MMEs spread over 993 million opioid dosage units.

541.    Not surprising given their lengthy collaboration with regard to OxyContin, nearly 26% of Express Scripts Mail Order MME purchases were for Purdue opioids.

542.    26.59% of Express Scripts' mail order opioid purchases were for Teva generics; 13.55% were for Mallinckrodt generics; 6.62% were for Endo generics; 5.1% were for Indivior generics; and 4.84% were for Mylan generics.  Express Scripts dispensed these opioid products by mail to patients nationwide, including in Bennington.



543.    The publicly available ARCOS data also reveals that nearly 20% of the 38+ billion mail order MMEs were purchased by Caremark's mail order pharmacy.  Specifically, during the 2006-2012 time period, Caremark mail order pharmacies bought 7,666,788,043 MMEs spread over 447,097,994 opioid dosage units.

544.    19.54% of Caremark's Mail Order opioid purchases were for Mylan generics; 18.08% were for Mallinckrodt generics; 16.67% were for Mylan generics; 12.73% were for Purdue products; 11.23% were for Teva generics;10.32% were for Endo generics; and 5.37% were for Indivior products.  Caremark dispensed these opioid products by mail to patients nationwide, including in Bennington.



545.    The publicly available ARCOS data also reveals that 4.39% of the 45+ billion mail order MMEs were purchased by Optum's  mail order pharmacy.  Specifically, during the 2006-2012 time period, Optum mail order pharmacies bought and sold 1,685,881,413 MMEs spread over 142,490,200 opioid  dosage units.

546.    25.29%  of Optum's Mail Order opioid purchases were for Mallinckrodt generics; 20.78% were for Teva generics; 17.02%  were for Endo generics; 10.76% were for Purdue

products; and 1.25% were Indivior products. Optum dispensed these opioid products by mail to patients nationwide, including in Bennington.



547.    PBM Mail Order pharmacies earn particularly large profits from their purchase and dispensing of generic drugs, including the generic opioids at issue in this litigation.

548.    They earn these profits in assorted ways including but not limited to manipulation of maximum allowable cost (MAC) pricing lists; spread pricing practices; repackaging; and negotiating discounts for generic purchases that are not shared with their customers.

549.    As a general proposition, drugs dispensed from mail order pharmacies account for a minority of PBM's prescriptions but more than half of their per-prescription profits.

4.      **The PBM Defendants Ensured that Opioids Were Regularly Prescribed and Flooded the Market.**

550.    PBMs are the middlemen between the defendant drug manufacturers and the availability of opioids. The PBM plan designs determine what drugs (a) will be available (or not available) to patients; (b) for what diagnosis, efficacious or otherwise; (c) in what quantities; (d) at what co-pay; (e) what level of authorization will be required; and (f) what beneficial drugs or treatments will not be available.

551.    PBMs not only control the majority of this country's prescriptions through their benefit plan design and formulary management, they generate massive profits from that work. PBMs are paid by drug companies to move product. "[N]early one third of all expenditures on branded drugs in 2015 were eventually rebated back. And, most of these rebates directly benefited the PBM."

552.    In addition to rebates, PBMs negotiate the payment of administrative fees, volume bonuses and other forms of consideration from manufacturers. The PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary development and plan design.

553.    PBMs have incentives to move both brand and generic opioids.  On the brand side, as stated above, PBMs collude with manufacturers who pay fees in the form of rebates, administrative fees and other incentives in exchange for favorable formulary placement.  The more favorable the formulary placement, the greater the utilization.  Utilization inures to the financial benefit of the PBMs and manufacturers. It also leads to more prescriptions and more pills available to the general public, many of which find their way to the black market. PBMs make additional profits through imprecise definitions of what constitutes a brand drug, particularly one facing generic competition, as in this case.  PBMs treat such brand drugs as "true brands" for purpose of

122

pricing through their mail order facilities (thereby earning additional profit at the higher AWP benchmark reimbursement); they treat such brands as generics when called upon to make a reimbursement payment themselves to an unaffiliated retailer.

554. On the generic side, PBMs make substantial profits through their interactions with, and operation of, mail order and retail pharmacies. At all times relevant hereto, the PBM Defendants were operating both and dispensing or reimbursing generic opioids through both. PBMs routinely pocket the spreads between the reimbursement it receives for generics from its clients as compared with the price the PBM pays the pharmacy for that same drug (including when that pharmacy is the PBM's own captive mail order pharmacy). In this way the PBM profits from every generic it sells or reimburses.

555. PBMs also pay retail pharmacies based upon maximum allowable costs (MACs) but pay their own captive mail order pharmacies based on AWP- for the very same NDC. AWPs are higher than MACs; through this disparate reimbursement the PBM enhances what it earns on any opioid subject to this pernicious practice. The gamesmanship creates an incentive for the PBM to drive customers towards its own mail order delivery system.

556. The ARCOS data confirms that the PBMs were moving opioids through their national mail order pharmacies.

557. PBMs also escape the pricing constraints imposed by MAC lists by repackaging certain drugs.

558. At all times relevant hereto, PBMs have had the ability to limit the number of opioid pills, refills and daily MME made available. PBMs were well aware of their influence over utilization as a result of benefit plan design, formulary placement, and drug utilization management. They knew and understood that through their self-dealing, more addictive opioids-brand and generic- would enter the marketplace and more addicts would be created. Indeed, PBMS

have now expressly acknowledged that they are "uniquely positioned to help address the opioid epidemic". Yet, for over a decade they elected to construct national offerings designed to maximize access to the most dangerous, addictive, overused and oversupplied drugs at issue in this national epidemic.

559. The power of the PBMs has evolved over time. Originally mere claims processors, PBMs now play a major role in managing pharmaceutical spending and enhancing health benefits for end-users. Drug manufacturers recognize the power of the PBMs to drive utilization.

560. PBMs quietly became an integral part of the pharmaceutical supply chain – that is, the path a drug takes from the manufacturing facility to a bathroom medicine cabinet – following the passage of the Medicare Modernization Act in 2003.

561. Today, the big three PBMs manage the drug benefits for nearly 95% of the population.[133] They drive what drugs are covered by virtually all health insurance providers for over 260 million people. PBMs made almost $260 billion last year.[134] In 2015 they covered most of the 4 billion retail prescriptions that were covered in the United States.[135] They are key participants and play a crucial role in the administration and reimbursement of prescription drugs.[136]

562. PBM influence results from the lack of competition in the PBM space. Market concentration is an important indicator of a company's ability to earn extraordinary returns, and

---

[133] Hoffman-Eubanks, *supra* note 16.
[134] John Breslin, *Health care experts call for more transparency into PBMs*, PATIENTDAILY, Dec. 20, 2017, https://patientdaily.com/stories/511298841-health-care-experts-call-for-more-transparency-into-pbms
[135] Lydia Ramsey and Skye Gould, *A huge pharma middleman just lost its biggest customer — and it shows how drug pricing really works*, BUSINESS INSIDER, Apr. 25, 2017, http://www.businessinsider.com/express-scripts-esrx-anthem-not-renewing-pbm-2017-4
[136] Health Policy Brief, *supra* note 29.

several segments in the United States pharmaceutical distribution system are highly concentrated.[137]

563.    In this environment, the top three PBMs have substantial if not exclusive control over the dissemination of opioids. In concert with drug manufacturers who provide them with assorted complicated payments as incentives,[138] PBMs design benefit plans determining which drugs will be paid for, reimbursed, or covered by public and private pharmacy benefit plans, allowing the drugs to enter the marketplace to be abused.

564.    For example, notwithstanding its express assurance to its customers that it "agrees to act as a fiduciary in good faith, with candor and due diligence in connection with the performance of [its PBM contract] and any negotiations related thereto,"[139] OptumRx proceeds to define its formulary as follows:

> "A list of prescription drugs administered by PBM that has been evaluated by the PBM for inclusion on its formulary ('Formulary')… [T]he drugs included on the PBM's Formulary may be modified by PBM . . . from time-to-time as a result of factors including, but not limited to, medical appropriateness, *manufacturer rebate arrangements* and patent expirations.[140][emphasis added]

565.    Notably, OptumRx does not explain how "manufacturer rebate arrangements" impact its formulary design.

566.    Express Scripts likewise is paid by drug manufacturers based on formulary design:

> Express Scripts contracts for its own account with pharmaceutical manufacturers to obtain rebates attributable to the utilization of certain prescription products by individuals who receive benefits from clients for

---

[137] Neeraj Sood, Tiffany Shih, Karen Van Nuys, Dana Goldman, *Follow the Money: The Flow of Funds In the Pharmaceutical Distribution System*, HEALTH AFFAIRS, Jun. 13, 2017, https://www.healthaffairs.org/do/10.1377/hblog20170613.060557/full/
[138] Health Policy Brief, *supra* note 37.
[139] United Healthcare Services, Inc. and Employees Retirement System of Texas, *Pharmacy Benefit Management Services Executed Contract*, Section 2.3 (2016), https://ers.texas.gov/Doing-Business-with-ERS/PDFs/Contract-for-Pharmacy-Benefit-Management-Services-for-the-HealthSelect-Prescription-Drug-Program.pdf
[140] *Id.* at Section 4.1(h)(i).f

whom we provide PBM services. *Rebate amounts vary based on the volume of utilization as well as the benefit design and formulary position applicable to utilization of a product.* Express Scripts often pays all or a portion of the rebates it receives to a client based on the client's PBM services agreement. Express Scripts retains the financial benefit of the use of any funds held until payment is made to a client. In connection with our maintenance and operation of the systems and other infrastructure necessary for managing and administering the rebate process, *Express Scripts also receives administrative fees* from pharmaceutical manufacturers participating in the rebate program discussed above. *The services provided to participating manufacturers include* making certain drug utilization data available, as allowed by law, for purposes of verifying and evaluating the rebate payments. The administrative fees paid to Express Scripts by manufacturers for participation in the rebate program do not exceed 3.5% of the AWP of the rebated products.[141]

567.    It is notable that Express Scripts does not commit to share all of the rebates it receives from drug manufacturers with its clients, nor does it commit to share any of the administrative fees.  Nor does it explain all of the services for which it receives the administrative fees.  Nor does it explain how any of these payments actually influence its formulary design. Also noteworthy is that Express Scripts pegs its administrative fees to Average Wholesale Price (AWP), which is a reported price higher than any Express Scripts customer pays for any drug.

568.    Express Scripts' standard contract language contemplates that it will derive even further revenue from drug manufacturers in other vaguely described arrangements, none of which are shared with its customers:

> [I]f any, ESI and ESI's wholly-owned subsidiaries derive margin from fees and revenue in one or more of the ways as further described [herein] ESI and ESI's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for [its customers]. *ESI and ESI's wholly-owned subsidiaries retain all proprietary rights and beneficial interest in such fees*

---

[141] Express Scripts, Inc. and Oklahoma City Municipal Facility Authority, Pharmacy Benefit Management Agreement, pg. 30, Exhibit E (2008),  http://nationalprescriptioncoveragecoalition.com/wp-content/uploads/2017/07/WebPage-2.pdf

*and revenues* described in the Financial Disclosure and, accordingly, *[customer] acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such fees or revenues*"[142]

569.    A standard Caremark PBM Contract reflects similar perverse incentives. It explains that "'Manufacturer' means a pharmaceutical company that has contracted with Caremark (or its affiliate or agent) *to offer discounts for pharmaceutical products in connection with Caremark's Formulary Service*s."[143][emphasis added]

570.    And, "Manufacturer Payments" include revenues received by Caremark,

[F]rom each of the following sources: 1) payments received in accordance with agreements with pharmaceutical manufacturers for formulary placement and, if applicable, drug utilization; 2) rebates, regardless of how categorized; 3) market share incentives; 4) commissions; 5) any fees received for the sale of utilization data to a pharmaceutical manufacturer; 6) educational grants; 7) administrative management fees; and 8) all compensation from manufacturers including rebates paid by a manufacturer as a result of product inflation caps and/or guarantees negotiated by the Service Provider.[144]

571.    Caremark's standard PBM contract further explains:

[T]hat, in lieu of billing Member County a 'per Claim' fee for Services, Caremark shall retain 100% of the Rebates as reasonable compensation for the Services. Customer and Member County understand and agree that neither they nor any Participant will share in the Rebate monies collected from Manufacturers by Caremark.[145]

572.    Caremark also explains that it will encourage the use of its "Preferred Drugs" (those where it has the most lucrative arrangement with a drug manufacturer) over "non-Preferred" drugs.

---

[142] *Id*. at pp. 8-9, Section 6.4.
[143] CaremarkPCS Health, L.P. and the National Association of Counties, Managed Pharmacy Benefit Service Agreement, pg. 10, Section 10(f) (2006), http://www.nassauclerk.com/agendaindex/Ordinances/other/CS-08-125.pdf
[144] CaremarkPCS Health, L.L.C. and Florida Department of Management Services, *Pharmacy Benefit Management Services contract,* pg. 7, Section 1.1 (2015), https://www.dms.myflorida.com/content/download/107930/607791/2015_PBM_Contract_REDACTED_FINAL.pdf

[145] CaremarkPCS Health, L.P. and the National Association of Counties, Managed Pharmacy Benefit Service Agreement, pg. 4, Section 2.1 (2006), http://www.nassauclerk.com/agendaindex/Ordinances/other/CS-08-125.pdf

Its standard contract language states that Caremark will encourage the use of "Preferred Drugs" by:

> (i) identifying appropriate opportunities for converting a prescription from a non-Preferred Drug to a Preferred Drug, and (ii) contacting the Participant and the prescriber to request that the prescription be changed to the Preferred Drug. A Preferred Drug is one on the Performance Drug List, which has been developed by Caremark as a clinically appropriate *and economically advantageous subset of the Caremark Formulary*, as revised by Caremark from time to time.[146] [emphasis added]

573.    The harm caused by the PBMs is not just monetary: "The PBMs and insurers are harming the health of patients with chronic and rare diseases by limiting access and charging them retail for drugs they buy at deep discounts."[147]   PBMs also fail to control quantities, or numbers of refills for highly addictive drugs and ignore or neglect their duties to ensure patient wellness.

574.    PBMs also provide discount drug cards so individuals can directly purchase medications without going through insurance companies. This allows individuals to fill multiple prescriptions while avoiding the oversight that insurance coverage brings, thus fueling the epidemic. PBMs allow this loophole because they are paid for every prescription filled in this manner.

575.    MedPageToday, a source for clinical and policy coverage that directly affects the lives and practices of health care professionals, describes the PBMs' complicity in the opioid crisis this way:

> We live in a world where payers -- not physicians -- determine what drugs and treatments patients receive.  If patients have a life-threatening condition, it is not unusual for a payer to demand that a physician first prescribe a cheaper and less effective alternative. Physicians know that the drugs they are allowed to use may not work very well, but frequently, payers demand that they be tried first anyway.

---

[146] CaremarkPCS Health, L.P. and the National Association of Counties, *Managed Pharmacy Benefit Service Agreement*, pg. 3, Section 1.11 (2006), http://www.nassauclerk.com/agendaindex/Ordinances/other/CS-08-125.pdf

[147] Jonathan Wilcox, *PBMs Must Put Patients First*, HUFFINGTON POST, Feb. 28, 2017, https://www.huffingtonpost.com/entry/pbms-must-put-patients-first_us_58b60bd8e4b02f3f81e44dcc

What happens if the patient doesn't respond to the cheap drug?  Often, the physician continues to prescribe it, because -- to gain access to the more effective drug -- physicians need to go through a painful process of preauthorization. For many practitioners, it isn't worth it.

So we spend more for healthcare than any other country in the world, but Americans do not get the care they need. There is a simple reason. Treatment decisions are not being driven based on a physician's knowledge or judgment. They are being driven by what payers are willing to pay for.[148]

576.    Thus, people with chronic pain are at the mercy of PBMs,  yet PBMs make it easier to get opioids than to get other pain medication that is less addictive, because opioids are generally cheaper than non-opioid alternatives and opioid manufacturers have provided rich incentives, as described above. According to a study by the New York Times and ProPublica, of 35.7 million people on Medicare prescription drug plans, in the second quarter of 2017 only one-third of them had access to pain medication less addictive than opioids.[149]

577.    Even when they were asked to limit accessibility to opioids, PBMs refused. The seeds of the opioid epidemic were sown with early over prescription of OxyContin. In 2001, when officials in the West Virginia state employee health plan tried to get Purdue, which manufactured OxyContin, to require pre-authorization, Purdue refused.[150] Using the financial quid pro quo it had with the West Virginia PBM, it paid Merck Medco (now Express Scripts) to prevent insurers from limiting access to the drug. This practice was consistent nationwide.

The strategy to pay Merck Medco extended to other big pharmacy benefit managers and to many other states, according to a former Purdue official responsible for ensuring favorable treatment for OxyContin. The payments were in the form of "rebates" paid by Purdue to the companies. In return,

[148] Milton Packer MD, *Are Payers the Leading Cause of Death in the United States?,* MEDPAGETODAY, Nov. 1, 2017, https://www.medpagetoday.com/blogs/revolutionandrevelation/68935
[149] Thomas and Ornstein, *supra* note 49.
[150] David Armstrong, *Drug maker thwarted plan to limit OxyContin prescriptions at dawn of opioid epidemic*, STAT, Oct. 26, 2016, https://www.statnews.com/2016/10/26/oxycontin-maker-thwarted-limits/

the pharmacy benefit managers agreed to make the drug available without prior authorization and with low copayments.

"That was a national contract," Bernadette Katsur, the former Purdue official, who negotiated contracts with pharmacy benefit managers, said in an interview. "We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior authorization. We like to keep prior authorization off of any drug."[151]

578.    PBMs are "driving patients to opioids, away from abuse-deterrent form (ADF) and less addictive forms of opiates through formulary and pricing strategies."[152]

579.    Not only do PBMs place roadblocks in the way of limiting excessive opioid prescriptions, they also make it more difficult to obtain ADF opioids. These pills are more difficult to physically alter (crushing to snort or dissolving to inject) and therefore are less prone to abuse.[153] The three major PBMs carry at most 3 of the 10 FDA approved ADF opioids, while CVS Caremark, which has nearly 90 million members, carries none.[154] A study by Tufts CSSD found that ninety-six percent (96%) of all prescription opioids were non-ADF in 2015.[155]

580.    Making matters worse, in addition to making it easy to obtain generic highly addictive opioids, PBMs make it **harder** to obtain **treatment**. The NY Times/ProPublica study found that insurers have erected more hurdles to approving addiction treatments than for the addictive substances themselves.[156] Only after being subject to much public pressure and congressional investigations did some insurers remove the barriers to addiction treatment.

---

[151] *Id.*
[152] Charles L. Bennett MD PhD MPP, *Do you have pain, cancer, or diabetes? Your PBM may now be your doctor for these illnesses,* COLLABRX, Dec. 27, 2017, http://www.collabrx.com/pain-cancer-diabetes-pbm-may-now-doctor-illnesses/
[153] Pitts, *supra* note 17.
[154] Bennett, *supra* note 104.
[155] Pitts, *supra* note 17.
[156] Thomas and Ornstein, *supra* note 16.

581. A 2008 study by the Mayo Clinic[157] found that patients who were weaned off opioids and followed a non-drug treatment experienced less pain than when they were on opioids and had improved functioning. Some plans cover these costs but other do not.[158]

582. In addition to their role designing prescription drug benefit programs, one responsibility of all PBMs and their employed pharmacists is to properly monitor and control the distribution of prescription opioids. PBMs market their abilities to ensure that the medications they dispense are appropriately dosed, and monitored for drug interactions, therapeutic duplications, and possible misuse or abuse.

583. PBMs also market their ability to manage and oversee the quality of the retail pharmacies that are contracted to be in their network. At critical times, PBMs were – at best – asleep at the switch when it came to auditing pharmacies that were dispensing huge quantities of opioids. The fact that very few if any "pill-mill" pharmacies or over-prescribing physicians were reported by PBMs to the State Boards of Pharmacies or State Medical Boards is testament to the PBMs' lack of oversight of opioids.

584. In fact, OptumRx has recently been transparent with its knowledge that 45% of 'first fill' opioid prescriptions nationwide are not in compliance with CDC guidelines.[159]

585. There are steps the PBMs could take. They could make it easier to access other non-addictive forms of pain relief. They could require doctors to start treating pain first with non-opioid pain medications as recommended by the CDC and turn to opioids as a last resort. They could cover alternative, non-medication treatments for pain. They could make addiction treatment more

---

[157] Available at https://www.ncbi.nlm.nih.gov/pubmed/18804915
[158] Barry Meier and Abby Goodnough, *New Ways To Treat Pain Meet Resistance*, THE NEW YORK TIMES, Jun. 22, 2016, https://www.nytimes.com/2016/06/23/business/new-ways-to-treat-pain-without-opioids-meet-resistance.html ?mcubz=1,
[159] OptumRx, *OptumRx Opioid Risk Management*, 2018, https://www.optum.com/resources/library/opioid-risk-management0.html, at 3.

accessible. They could monitor prescriptions. They could forbid 90-day supplies of opioids. They could audit pharmacies. They could require doctors and pharmacies in their networks to use PDMPs.  They could make their pricing more transparent so everyone could see if they were being improperly influenced by manufacturers to make choices for financial, not medical reasons.

586.    The PBM defendants expressly recognize that they have the ability to abate the opioid epidemic. OptumRx admits that PBMs are "uniquely positioned to help address the opioid epidemic."[160] Express Scripts admits that "we have the ability to make a significant impact."[161]

587.    Yet PBMs are still not doing all they (easily) can to halt the improper dispensing of opioids and expand access to treatments for opioid overdose and addiction.

588.    Each of the PBM Defendants recently have begun offering opioid management programs for certain customers that they claim (falsely) are consistent with the March 2016 U.S. Centers for Disease Control and Prevention, CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016, 65 Morbidity and Mortality Weekly Report 1 (2016) ("CDC Guideline").

589.    In truth, even these new opioid management programs do not apply across the board to all customers and still fall woefully short of the CDC Guideline and all current medical literature regarding the highly dangerous properties of opioids.

590.     None of the big three PBMs' new opioid management programs are consistent with the CDC Guideline – they still permit the largely unchecked prescribing of opioids for chronic pain (the CDC says opioids are not proven effective for chronic pain); still provide seven-day

---

[160]  OptumRx, *Confronting the Opioid Epidemic*, 2018,  https://www.optum.com/resources/library/opioid-e-book.html?s3=rxopioid, at 9.

[161] Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients,* Jan. 11, 2018, http://lab.express-scripts.com/lab/insights/drug-safety-and-abuse/reducing-inappropriate-selection-and-excessive-dispensing-of-opioids, at 2.

quantity limits for acute pain (when the CDC says "three days or less will often be sufficient" and the PBMs themselves acknowledge that "a few days" can make a difference in whether one becomes addicted); still permit opioid prescriptions to be delivered through mail-order pharmacies for conditions outside of active cancer, end-of-life or palliative care (which typically supply maintenance drugs for chronic conditions; it is well-established that except for active cancer, end-of-life or palliative care, opioids should not be dispensed for chronic pain); do not adhere to CDC MME/day recommendations; do not cover high dosage nonopioid alternatives; do not require step therapies; and do not require prior authorizations for the most commonly prescribed immediate-release opioids.

591.    At the same time, the PBMs also continue to impose unnecessary restrictions on access to treatments for opioid overdose and addiction.

592.    These failures have contributed mightily to the roots of the opioid epidemic and its ongoing impact today.

593.    The PBMs own documents confirm the important role PBMs play in implementing the CDC Guideline.

594.    Nearly one year after the CDC Guideline was issued, Caremark publicly acknowledged that, "[p]harmacy benefit managers (PBMs) play an important role in implementing the CDC [G]uideline, and helping ensure access and patient safety" and assured its customers that it had "taken a thoughtful, evidence-based approach to implementing the CDC guideline into our utilization management (UM) criteria with consideration of the needs of those with chronic pain, as well as the potential for harm from these powerful medications."[162]

---

[162] CVS Health, *The Balancing Act, Helping Ensure Appropriate Access to Opioids While Minimizing Risk*, INSIGHTS FEATURE, Feb. 28, 2017, https://payorsolutions.cvshealth.com/insights/balancing-act, at 1 (emphasis added).

595.    Caremark also assured the public that its "UM criteria reinforce [the CDC] principles and encourage appropriate use of opioids by patients and prescribers. They provide coverage that fosters safe use of opioids, consistent with the … CDC [G]uideline, to support plans helping members on their path to better health."[163]

596.    Express Scripts similarly boasts that its Advanced Opioid Management program "is based on CDC prescribing guidelines" and "promot[es] greater compliance with CDC guidelines."[164]

597.    OptumRx likewise claims that its "utilization management edits are tightly aligned with Centers for Disease Control (CDC) prescribing guidelines."[165]

598.    The foregoing assurances of fostering "safe use of opioids" consistent with the CDC Guideline are false. The PBM Defendants' utilization management criteria – to this day and despite all their talk – fall far short of meeting the CDC Guideline. As one news outlet described it, "[o]ne overlooked culprit worsening the epidemic, however, comes straight from our health care system: pharmacy benefit managers, or PBMs. To improve their bottom line, they're blocking access to prescriptions that can help prevent overdoses."[166]

599.    In sum, because PBMs are the intermediary between drug manufacturers, pharmacies, and ultimately patients, these companies influence everything from pharmacy reimbursements, to what drugs are covered under formularies.  In these ways, the PBMs drive which drugs enter the marketplace. Their fingerprints are on nearly every opioid prescription filled and they profit in myriad ways on every pill.

---

[163] *Id.* at 5 (emphasis added).

[164] Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients, supra* note 161 at 1.

[165] *OptumRx Opioid Risk Management, supra* note **Error! Bookmark not defined.**.

[166] Pitts, *supra* note 153.

600.    PBMs' complicity in the overall fraudulent scheme is knowing and purposeful. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements and other hurdles that would slow down flow. A review of the defendant PBM formularies confirms that they include all of the opioids at issue in this case, often in preferred tiers, without quantity limits or prior authorization requirements.

601.    Caremark has three basic formularies: Standard Control, Advanced Control, and Value.[167]

602.    A wholly owned Caremark subsidiary (SilverScript) also manages two basic formularies for Medicare Prescription Drug Plans ("PDPs"), Choice and Plus.[168] Each of Caremark's basic formularies include opioids.

603.    Caremark's Standard Control formulary contains no step therapies, prior authorization requirements or quantity limits for opioids on its face.[169]

604.     It imposes no three-day limitations for acute pain.[170]

605.    It does not limit the use of opioids for chronic pain outside active cancer, end-of-life and palliative care.[171]

---

[167] CVS Health, *Formulary Management*, https://payorsolutions.cvshealth.com/programs-and-services/cost-management/formulary-management (last visited Sept. 10, 2018)

[168] SilverScript, *Compare 2018 Plans – SilverScript,* https://www.silverscript.com/plan/compare-module.aspx (last visited Sept. 10, 2018)

[169] *See* CVS Caremark, *Performance Drug List – Standard Control*, July 2018, https://www.caremark.com/portal/asset/caremark_recaprxclaimsdruglist.pdf (last visited Sept. 10, 2018) at 1;

[170] *Id.*

[171] *Id.*

606.     The prescribing guide for the Standard Control formulary refers clinicians to 2017 prescribing guidelines, but even those do not require nonopioid step therapies for treatment of chronic pain or three-day limits for acute pain.[172]

607.     As late as 2018, although Caremark's Standard Control formulary covers methadone, and multiple buprenorphine and naloxone treatments, it did not cover any naltrexone treatments and it is unclear what utilization management or cost-sharing requirements may apply.[173]

608.     Caremark's Standard Control formulary does not cover the higher strength prescription dosages of the following nonopioid pharmacological options, useful in many step therapies: ibuprofen, topical lidocaine, amitriptyline, doxepin, desipramine, diflunisal, choline magnesium trisalicylate, salsalate, etodolac, sulindac, indomethacin, celecoxib, meclofenamate, and nabumetone.[174]

609.     Caremark's Advanced Control formulary contains no step therapies, prior authorization requirements or quantity limits for opioids on its face.[175]

610.     The Advanced Control formulary does not include many of the following prescription nonopioid pain treatment alternatives: capsaicin, diflunisal, choline magnesium trisalicylate, salsalate, etodolac, sulindac, indomethacin, meclofenamate, and nabumetone.[176]

---

[172] *See* CVS Caremark, *Prescribing Guide – Standard Control 2018,* https://www.caremark.com/portal/asset/Prescribing_Guide_Un-Authenticated.pdf (last visited Sept. 10, 2018) at 11.

[173] *See* CVS Caremark, *Performance Drug List – Standard Control, supra* note 169 at 1, 3.

[174] *Id.*

[175] *See* CVS Caremark, *Advanced Control Formulary*, July 2018, https://www.caremark.com/portal/asset/Advanced_Control_Formulary.pdf, at 1.

[176] *Id.*

611.    Caremark's Value Formulary contains no step therapies for any immediate release opioids.[177]

612.    It has prior authorization requirements for some opioids, but not the most widely abused: hydrocodone-acetaminophen, oxycodone-acetaminophen and codeine-acetaminophen.[178]

613.    The Value Formulary points to the same lax 2017 opioid prescribing guidelines.[179]

614.    Caremark's Value Formulary imposes both prior authorization and/or quantity limits on the majority of pharmacologic treatments for opioid addiction and overdose.[180]

615.    This Value formulary (like Caremark's other commercial offerings) excludes an array of nonopioid pain relief options including: topical lidocaine, choline magnesium trisalicylate, salsalate, indomethacin, celecoxib, and meclofenamate.[181]

616.    Even with its new Opioid Utilization Management Program, Caremark does not require step therapy as a pre-condition for coverage of immediate-release opioids.[182]

617.    Caremark does not impose three-day limits on opioids prescribed for acute pain.[183]

618.    Caremark does not require prior authorization when opioids are prescribed for chronic pain.[184]

---

[177] *See* CVS Caremark, *CVS Caremark® Value Formulary Effective as of 07/01/2018*, https://www.caremark.com/portal/asset/Value_Formulary.pdf, at 9-10.

[178] *Id.*

[179] *Id.* at 9.

[180] *Id.* at 10, 22-23.

[181] *Id.*

[182] *See* CVS Caremark, *CVS Caremark Opioid Quantity Limits Pharmacy Reference Guide*, Jan. 2018, https://www.caremark.com/portal/asset/Opioid_Reference_Guide.pdf.

[183] *Id.*

[184] *Id.*

619.    Caremark limits the quantity of opioids prescribed per day, but only to 90 MME/day,[185] a quantity the CDC says should be avoided.[186]

620.    Caremark does not require prior authorization prior to dispensing immediate-release opioids, *i.e.*, hydrocodone-acetaminophen, oxycodone-acetaminophen, codeine-acetaminophen.[187]

621.    Caremark merely allows for an "emergency supply" of buprenorphine-naloxone products while it processes prior authorization, rather than broadly waiving such requirements.[188]

622.    The standard commercial Express Scripts formulary contains no restrictions whatsoever on the majority of opioids covered – no quantity limits, no step therapies, no prior authorization requirements.

623.    Express Scripts recently updated its National Preferred Formulary to exclude coverage for two long-acting opioid oral analgesics (Opana ER and Oxycodone ER) and two narcotic analgesics (Buprenorphine Patches and Butrans) but, even there, Express Scripts presents no fewer than six "preferred alternatives," each of which are highly addictive opioids available in extended-release forms.[189]

---

[185] *Id.*

[186] *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 MORBIDITY AND MORTALITY WEEKLY REPORT 1 (2016) at 16, 22, 23.

[187] *See Performance Drug List – Standard Control*, *supra* note 169; *Prescribing Guide – Standard Control 2018*, *supra* note 172; *Advanced Control Formulary, supra* note 175; *CVS Caremark® Value Formulary Effective as of 07/01/2018, supra* note 177; *SilverScript Choice Formulary, supra* note **Error! Bookmark not defined.**; *SilverScript Choice Formulary, supra* note **Error! Bookmark not defined.**.

[188] *See* CVS Health, *The Balancing Act, Helping Ensure Appropriate Access to Opioids While Minimizing Risk*, INSIGHTS FEATURE, Feb. 28, 2017, https://payorsolutions.cvshealth.com/insights/balancing-act, at 6.

[189] *See* Express Scripts, *2018 National Preferred Formulary Exclusions*, https://www.express-scripts.com/art/pdf/Preferred_Drug_List_Exclusions2018.pdf (last viewed Sept. 10, 2018) at 1.

624.    The National Preferred Formulary indicates that certain naloxone (Narcan nasal spray) and buprenorphine Suboxone Sublingual Film and Zubsolv sublingual tablets) treatments are available, but does not list any methadone or naltrexone treatments.[190]

625.    The Express Scripts National Preferred formulary does not cover numerous highly effective prescription nonopioids including: doxepin, desipramine, diflunisal, choline magnesium trisalicylate, etodolac, sulindac, indomethacin, and meclofenamate.[191]

626.    For an additional fee, Express Scripts now offers customers its Advanced Opioid Management Program.

627.    Even in this program, Express Scripts does not impose a three-day limit for first-time users dealing with acute pain; does not require step therapy prior to dispensing immediate-release opioids; and does not require prior authorization for immediate-release opioids.[192]

628.    Express Scripts limits the dosage of opioids prescribed per day, but only to 200 MME/day, more than double the dosage which the CDC Guideline says should be avoided.[193]

629.    Nowhere does any Express Scripts formulary advise that opioids are inappropriate for chronic pain treatment outside active cancer, end-of-life or palliative care.[194] To the contrary,

---

[190] *See* Express Scripts, *2018 Express Scripts National Preferred Formulary*, https://www.express-scripts.com/art/open_enrollment/INTEL_NPFList.pdf (last viewed Sept. 10, 2018).

[191] *Id.*

[192] *See* Express Scripts, *Putting the brakes on the opioid epidemic*, https://my.express-scripts.com/opioids.html; Express Scripts, *A Comprehensive Solution to Reduce Opioid Abuse*, June 7, 2017, http://lab.express-scripts.com/lab/insights/industry-updates/a-comprehensive-solution-to-reduce-opioid-abuse; Nicholas Hamm, *Express Scripts Limits Opioid Prescriptions*, DRUG TOPICS, Aug. 17, 2017, http://www.drugtopics.com/clinical-news/express-scripts-limits-opioid-prescriptions; and Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients, supra* note 161.

[193] Nicholas Hamm, *Express Scripts Limits Opioid Prescriptions*, DRUG TOPICS, Aug. 17, 2017, http://www.drugtopics.com/clinical-news/express-scripts-limits-opioid-prescriptions, at 1.

[194] *See 2018 National Preferred Formulary Exclusions, supra* note 189; *2018 Express Scripts National Preferred Formulary*, *supra* note 190; Saver Plan Formulary, Value Plan Formulary and Choice Plan Formulary, *supra* note **Error! Bookmark not defined.**.

virtually every opioid analgesic on every Express Scripts formulary (commercial or Medicare) is available through its mail order pharmacy.[195]

630.    OptumRx offers five basic formularies, each of which includes opioids.[196]

631.    OptumRx's 2018 Generic Centric Formulary appears to have no limits whatsoever surrounding the dispensing of opioids.[197]

632.    OptumRx's other commercial formularies require prior authorization only on some opioids, not including the most popular immediate-release drugs.[198]

633.    They do not appear to require step therapy for immediate-release opioids or a three-day limit for acute pain treatment.[199]

634.    They do not advise against the dispensing of opioids for chronic pain.[200]

635.    OptumRx currently limits immediate-release opioids for patients new to opioid therapy to 49 MME a day. However, patients not new to opioid therapy may receive 90 MME per day, a limit the CDC Guideline recommends should avoided.

636.    These formularies have very few quantity limits, as well, including no apparent limits on the popular opioids identified above.[201]

637.    OptumRx offers its OptumRx Opioid Risk Management program for an additional fee. Only through enrollment in that program, for extra money, will its commercial customers

---

[195] *Id.*

[196] *See* OptumRx, *Formulary and drug lists*, https://professionals.optumrx.com/resources/formulary-drug-lists.html (last visited Sept. 10, 2018)

[197] OptumRx, *2018 Generic Centric Formulary*, July 1, 2018, https://professionals.optumrx.com/content/dam/optum3/professional-optumrx/resources/forms/Generic-Centric%20Formulary.pdf, at 7-9.

[198] *See* OptumRx, *Formulary and drug lists, supra* note 196.

[199] *Id.*

[200] *Id.*

[201] *Id.*

receive services that OptumRx's falsely claims are compliant with the CDC Guideline. Even in its

Opioid Risk Management Program, OptumRx does not appear to limit acute treatment to three-

days and does not require step therapy for opioid treatment of chronic pain.[202]

638.    As with the manufacturer, distributor, and pharmacy defendants, PBMs must

contribute to rectify the damage their intentional and purposeful conduct in the context of

pharmacy benefit management has foreseeably caused plaintiff.

<div align="center">

## V.    CAUSES OF ACTION

**COUNT I**
**PUBLIC NUISANCE**
**VIOLATION OF**
**24 V.S.A. § 2121**
**(AGAINST ALL DEFENDANTS)**

</div>

639.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

640.    This action is brought by Plaintiff pursuant to 24 V.S.A. § 2121 to abate the public

nuisance created by Defendants, and to recover costs Plaintiff has already incurred and future costs

the Plaintiff expects to incur in its provision of emergency services that are reasonably required to

abate the public nuisance created by Defendants.

641.    Each Defendant, acting alone or with one or more co-defendants, created a

condition that was and continues to be dangerous to the public and has injured those inhabitants

of the Town of Bennington who have come within its influence.  By causing dangerously addictive

drugs to flood the community, and to be diverted for illicit purposes, in contravention of federal

and state law, each Defendant has injuriously affected rights common to the general public,

specifically including Plaintiffs Community, to public health, public safety, public peace, public

---

[202] *OptumRx Opioid Risk Management*, *supra* note **Error! Bookmark not defined.**.

comfort, and public convenience. The public nuisance caused by Defendants' diversion of dangerous drugs has caused substantial annoyance, inconvenience, and injury to the public. Each Defendant, acting alone or in concert, injured the property of the Town of Bennington.

642.    The Manufacturer Defendants knew or should have known that their promotion of opioid use would create a public nuisance:

(a)    The Manufacturer Defendants have engaged in massive production, promotion, and distribution of opioids for use by the residents of the Town of Bennington;

(b)    The Manufacturer Defendants' actions created and expanded the market for opioids, promoting their wide use for pain management;

(c)    The Manufacturer Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs; and

(d)    The Manufacturer Defendants knew or should have known that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

643.    The Manufacturer Defendants' actions were a substantial factor in making opioids widely available and widely used. The Manufacturer Defendants' actions were a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain. The Manufacturer Defendants' actions caused excess opioids to be shipped to the Town of Bennington, and these excess opioids were diverted into the black market. Without the Manufacturer Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

644.    The Manufacturer Defendants also knowingly, intentionally, recklessly, and/or negligently funneled massive quantities of prescription opioids to physicians and other prescribers who they knew or should have known wrote suspicious prescriptions and/or wrote prescriptions for known abusers of prescription opioids.

645.    The Manufacturer Defendants knowingly, intentionally, recklessly, and/or negligently disseminated prescription opioids to distributors who they knew or should have known failed to implement effective controls and procedures to guard against theft, diversion, and abuse of prescription opioids.

646.    The Manufacturer Defendants also knowingly enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

647.    The Manufacturer Defendants knowingly and intentionally financially incentivized the PBM Defendants to place their opioids on the PBMs formularies irrespective of medical necessity, resulting in widespread and unnecessary overuse.

648.    The Distributor and Pharmacy Defendants' nuisance-causing activities include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of prescription opioids, and failing to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

649.    The Distributor and Pharmacy Defendants also knowingly and intentionally enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

650.    The PBM Defendants knowingly and intentionally designed benefit plans that would maximize the number of opioids in the marketplace.

651.    The PBM Defendants knowingly, intentionally, recklessly and/or negligently failed to manage and/or monitor these plans to minimize the use and abuse of opioids.

652. The PBM Defendants knowingly and intentionally chose to include opioids on their formularies that were more addictive to users. This led directly to the increased likelihood of addiction.

653. The PBM Defendants knowingly and intentionally chose to include opioids that were easier to misuse (for example, by crushing them into powder and mixing them with liquid in order to inject them) instead of ADFs which tended to be more expensive. This choice directly led to the ease with which the pills could be misused.

654. The PBM Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain. This led directly to the increased sale and use of opioids.

655. The PBM Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

656. The PBM Defendants chose not to cover or provide less coverage for drug treatment.

657. The PBM Defendants knowingly and intentionally created their formularies to ensure that an excessive number of pills were made available to users for use and abuse.

658. The Purdue Individual Defendants, who are officers, directors and/or equity holders of Purdue and affiliates, directed and participated in the tortious conduct of Purdue and are individually liable.

659. The public nuisance created by the Defendants endangers the life, health and safety of the town of Bennington's residents.

660. The public nuisance created by Defendants interferes with the reasonable and comfortable use of The Town of Bennington's property and resources.

661.    The public nuisance created by Defendants' actions has caused and continues to cause significant harm to the community that includes but is not limited to:

(a)    Opioid-related drug overdose deaths;

(b)    The disease of opioid addiction and other diseases related to long-term opioid use;

(c)    Infants born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

(d)    Other child abuse and neglect resulting from opioid abuse;

(e)    Crime associated with illegal drug use and opioid sales;

(f)    Unemployment resulting from an inability to work while addicted to opioids;

(g)    Blight, vagrancy, property damage, and property crime.

662.    Defendants controlled the creation and supply of a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' actions is not only an explosion of prescription opioids on the black market, but also a marked increase in the availability of heroin and synthetic opioids.

663.    The diversion of opioids into the secondary, criminal market by Defendants and the increase in the number of individuals who abuse or are addicted to opioids has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of the Town of Bennington Adults and children in the Town of Bennington who have never taken opioids have also suffered the costs of the Defendants' public nuisance. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

664.    Public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which could be used to benefit the public at large in The Town of Bennington.

665.    The public nuisance created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

666.    the Town of Bennington has incurred significant costs to date in its efforts to provide services that were reasonably necessary to abate the public nuisance created, perpetuated, and maintained by Defendants.  the Town of Bennington expects to incur significant costs going forward to ameliorate the harm caused by Defendants.

667.    As a direct and proximate result of the public nuisance, The Town of Bennington has sustained (and continues to sustain) harm by spending a substantial amount of money trying to fix the societal harms caused by the Defendants' nuisance-causing activity, including, but not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of the Town of Bennington's limited and diverted resources as set forth more fully above.

## COUNT II
## COMMON LAW PUBLIC NUISANCE
## (AGAINST ALL DEFENDANTS)

668.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

669.    This action is brought by Plaintiff to abate the public nuisance created by Defendants, and to recover costs Plaintiff has already incurred and future costs the Plaintiff expects to incur in its provision of emergency services that are reasonably required to abate the public nuisance created by Defendants.

670.    Under common law, a public nuisance is a condition that is dangerous to the public.

A public nuisance adversely impacts an entire community or significant portion of the public. Therefore, a cause of action for public nuisance exists where a defendant's conduct negatively affects the community at large.  The public nuisance complained of herein includes the oversaturation, unlawful availability, and abuse of opioids in The Town of Bennington as well as the adverse social and environmental outcomes associated with widespread and/or illegal opioid use.

671.    Each Defendant, acting alone or with one or more co-defendants, knowingly, intentionally, recklessly, and/or negligently created a condition of a grossly excessive amount of opioids in circulation that was and continues to be dangerous to the public and has injured those inhabitants of the Town of Bennington who have come within its influence.  By causing dangerously addictive drugs to flood into the community, and to be diverted for illicit purposes, in contravention of federal and state law, each Defendant has injuriously affected rights common to the general public, including the Town of Bennington public health, public safety, public peace, public comfort, and public convenience. The public nuisance caused by Defendants' diversion of dangerous drugs has caused substantial annoyance, inconvenience, and injury to the public. The Manufacturer Defendants knew or should have known that their promotion of opioid use would create a public nuisance:

    (a)    The Manufacturer Defendants have engaged in massive production, promotion, and distribution of opioids for use by the residents of Bennington;

    (b)    The Manufacturer Defendants' actions created and expanded the market for opioids, promoting their wide use for pain management;

    (c)    The Manufacturer Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs; and

    (d)    The Manufacturer Defendants knew or should have known that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

147

672.     The Manufacturer Defendants' actions were a substantial factor in making opioids widely available and widely used. The Manufacturer Defendants' actions were a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain. The Manufacturer Defendants' actions caused excess opioids to be shipped to the Town of Bennington, and these excess opioids were diverted into the black market. Without the Manufacturer Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

673.     The Manufacturer Defendants also knowingly, intentionally, recklessly, and/or negligently funneled massive quantities of prescription opioids to physicians and other prescribers who they knew or should have known wrote suspicious prescriptions and/or wrote prescriptions for known abusers of prescription opioids.

674.     The Manufacturer Defendants knowingly, intentionally, recklessly, and/or negligently disseminated prescription opioids to distributors who they knew or should have known failed to implement effective controls and procedures to guard against theft, diversion, and abuse of prescription opioids.

675.     The Manufacturer Defendants also knowingly enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

676.     The Manufacturer Defendants knowingly and intentionally incentivized the PBM Defendants to place their opioids on the PBMs' formularies irrespective of medical necessity, resulting in widespread and unnecessary overuse.

677.    The Distributor and Pharmacy Defendants' nuisance-causing activities include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of prescription opioids, and failing to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

678.    The Distributor and Pharmacy Defendants also knowingly and intentionally enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

679.    The PBM Defendants knowingly and intentionally designed benefit plans that would maximize the number of opioids in the marketplace.

680.    The PBM Defendants knowingly, intentionally, recklessly and/or negligently failed to manage and/or monitor these plans to minimize the use and abuse of opioids.

681.    The PBM Defendants knowingly and intentionally chose to include opioids on their formularies that were more addictive to users. This led directly to the increased likelihood of addiction.

682.    The PBM Defendants knowingly and intentionally chose to include opioids that were easier to misuse (for example, by crushing them into powder and mixing them with liquid in order to inject them) instead of ADFs which tended to be more expensive.  This choice directly led to the ease with which the pills could be misused.

683.    The PBM Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain.  This led directly to the increased sale and use of opioids.

149

684. The PBM Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

685. The PBM Defendants chose not to cover or provide less coverage for drug treatment.

686. The PBM Defendants knowingly and intentionally created their formularies to ensure that an excessive number of pills were made available to users for use and abuse.

687. The public nuisance created by the Defendants endangers the life, health and safety of the Town of Bennington's residents.

688. The public nuisance created by Defendants interferes with the reasonable and comfortable use of The Town of Bennington's property and resources.

689. The public nuisance created by Defendants' actions has caused and continues to cause significant harm to the community that includes but is not limited to:

        (a)     Opioid-related drug overdose deaths;

        (b)     The disease of opioid addiction and other diseases related to long-term opioid use;

        (c)     Infants born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

        (d)     Other child abuse and neglect resulting from opioid abuse;

        (e)     Crime associated with illegal drug use and opioid sales;

        (f)     Unemployment resulting from an inability to work while addicted to opioids;

        (g)     Blight, vagrancy, property damage, and property crime.

690. Defendants' controlled the creation and supply of a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them.

The result of Defendants' actions is not only an explosion of prescription opioids on the black market, but also a marked increase in the availability of heroin and synthetic opioids.

691.    The diversion of opioids into the secondary, criminal market by Defendants and the increase in the number of individuals who abuse or are addicted to opioids has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of the Town of Bennington.

692.    Adults and children in the Town of Bennington who have never taken opioids have also suffered the costs of the Defendants' public nuisance. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

693.    Public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which could be used to benefit the public at large in Bennington.

694.    The public nuisance created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

695.    The Town of Bennington has incurred significant costs to date in its efforts to provide services that were reasonably necessary to abate the public nuisance created, perpetuated, and maintained by Defendants.  The Town of Bennington expects to incur significant costs going forward to ameliorate the harm caused by Defendants.

696.    As a direct and proximate result of the public nuisance, the Town of Bennington has sustained (and continues to sustain) harm by spending a substantial amount of money trying to fix the societal harms caused by the Defendants' nuisance-causing activity, including, but not

limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of The Town of Bennington's limited and diverted resources as set forth more fully above.

## COUNT III
## FRAUD
## (AGAINST MANUFACTURER DEFENDANTS)

697.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

698.    Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and omissions of facts material to Plaintiff and its residents to induce them to purchase, administer, and consume opioids as set forth herein.

699.    Defendants' representations and assertions to Plaintiff, healthcare providers, and consumers contained intentional misrepresentations and material omissions as to the risks associated with opioids.

700.    Defendants intentionally made inaccurate representations regarding the adverse medical conditions associated with the use of opioids and such false representations were made with the intent to mislead.

701.    Defendants knew or reasonably should have known that the representations made to Plaintiff and the public-at large regarding the risks of opioids were false or incomplete and misrepresented material facts regarding the use of opioids for chronic pain.

702.    Defendants had a duty to provide accurate information regarding the risks and side effects associated with opioids to consumers, including healthcare providers and the Plaintiff.

703.    Defendants willfully, knowingly, and deceptively withheld material facts regarding the risks and side effects associated with opioids from Plaintiff, healthcare providers, and consumers.

152

704.    Plaintiff and its residents reasonably relied on the representations made by Defendants, which caused excess opioids to flood into The Town of Bennington and be diverted into the black market. Plaintiff, through its programs, departments, and agencies, to incurred increased costs attempting to stop the flow of excess opioids into the Town of Bennington and bearing the costs of cleaning them up, including, but not limited to the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of the Town of Bennington's limited and diverted resources as set forth more fully above.

705.    Plaintiff, healthcare providers, and consumers were justified in their reliance on Defendants to educate them as to the risks and dangerous and potentially life-threatening side effects associated with opioid use.

706.    Defendants' conduct was willful, wanton, and malicious and was directed at Plaintiff and their residents.

707.    The reprehensible nature of the Defendants' conduct further entitles Plaintiff to an award of punitive damages.

708.    As a proximate and legal result of Defendants' fraudulent misrepresentations, Plaintiff has suffered and will continue to suffer damages and is therefore entitled to recover for those damages.

### COUNT IV
### NEGLIGENCE PER SE
### (AGAINST MANUFACTURER AND DISTRIBUTOR DEFENDANTS)

709.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

710.    The Manufacturer and Distributor Defendants failed to perform their statutory and regulatory obligations under 20-4 Vt. Code R.§ 1400:17.1 *et seq.,* 26 V.S.A. § 2068 *et seq.,* and

the CSA, which were enacted to promote safety and to prevent exactly the type of harm that occurred as a result of Defendants' failures.

711.    The Manufacturer and Distributor Defendants had a duty under 20-4 Vt. Code R.§ 1400:17.1 *et seq* and 26 V.S.A. § 2068 *et seq*., and the CSA to maintain effective controls against diversion of prescription opioids and to guard against, prevent, and report suspicious orders of opioids.

712.    The Manufacturer and Distributor Defendants failed to maintain effective controls against diversion, failed to report suspicious orders to law enforcement and perform due diligence prior to filling orders, and failed to design and operate a system to disclose suspicious orders of controlled substances, as required by Vermont law and the CSA. As a result, excess opioids were shipped into the Town of Bennington and diverted into the black market, causing The Town of Bennington to incur substantial costs.

713.    20-4 Vt. Code R.§ 1400:17.1 *et seq* and 26 V.S.A. § 2068 *et seq*., and the CSA were enacted, at least in part, to prevent the harms that can arise as a result of the Manufacturer and Distributor Defendants' failures to comply with Vermont law and the CSA, as described herein.

714.    Plaintiff is among the persons and entities intended to benefit from the protections of 20-4 Vt. Code R.§ 1400:17.1 *et seq* and 26 V.S.A. § 2068 *et seq*., and the CSA, and the harm that has occurred as a result of the Manufacturer and Distributor Defendants' violations are among the types of harm that the statutes and regulations were intended to prevent.

715.    Therefore, as a proximate result of their violations of Vermont law and the CSA, the Manufacturer and Distributor Defendants have caused Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include, but are not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost

communal benefits of The Town of Bennington's limited and diverted resources as set forth more fully above.

<div align="center">

**COUNT V**
**NEGLIGENCE PER SE**
**(AGAINST PHARMACY DEFENDANTS)**

</div>

716.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

717.    The Pharmacy Defendants failed to perform their statutory and regulatory obligations under Vermont law and the CSA, all of which were enacted to promote safety and to prevent exactly the type of harm that occurred as a result of Defendants' failures.

718.    Pharmacy Defendants are to dispense prescriptions for controlled substances only for legitimate medicinal or therapeutic purposes. 20-4 Vt. Code R. § 1400:10.2.

719.    Furthermore, Pharmacy Defendants are required to keep and maintain thorough records of their receipt and dispensation of all opioids, and of the persons to whom they dispense opioids and certain other drugs. 20-4 Vt. Code R. §§ 1400:10.8; 1400:10.25.

720.    These statutes and regulations are designed for Pharmacist Defendants to identify persons who could use the prescriptions for non-legitimate, medical purposes and stop pharmacists from dispensing opioids to patients at risk for abuse.

721.    Pharmacy Defendants were negligent in failing to take any action to prevent or reduce the unnecessary, non-medical, or criminal use of opioids. Each Pharmacy Defendant sold opioids with the knowledge that the purchased opioids were likely being used for non-medical purposes, and therefore failed to meet their duties under Vermont Law.

722.    The laws and regulations that require Pharmacy Defendants to ensure that they dispense opioids only for legitimate medical and therapeutic purposes, and the laws and regulations that require Pharmacy Defendants to carefully monitor and record their dispensation of opioids were enacted, at least in part, to prevent the harms that can arise as a result of an

<div align="center">155</div>

overabundance of opioids being made available in communities.

723.    Plaintiff is among the persons and entities intended to benefit from the protections of the laws and regulations described above.  The harms that have occurred as a result of the Pharmacy Defendants' failure to abide by their legal obligations are among the types of harm that these laws and regulations were intended to prevent.

724.    As a proximate result of their failure to exercise their professional judgement and/or their failure to keep records, as required by the statute, in the continual dispensation of opioids, the Pharmacy Defendants have caused Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include, but are not limited to, increased policing, medical, fire, and court services, lost tax revenues, and lost communal benefits of the County's limited and diverted resources.

<div align="center">

**COUNT VI**
**NEGLIGENCE**
**(AGAINST ALL DEFENDANTS)**

</div>

725.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

726.    Defendants have a duty to Plaintiff to employ a reasonable standard of care in the sale, distribution, dispensing, reimbursement and promotion of prescription opioids, as required to protect Bennington's citizens and property.  This includes a duty to not create a foreseeable risk of harm to others.

727.    Defendants breached this duty by failing to take any action to prevent or reduce the unnecessary, non-medical, or criminal use of opioids. Collectively, and individually, Defendants made prescription opioids available to the marketplace with the knowledge that they were likely being used for unnecessary, non-medical, or criminal purposes and/or posed an inherent danger to patients who were using them for other than short-term acute pain or palliative care.

728.    Specifically, the PBMs have a duty to Plaintiff to employ a reasonable standard of

care in their role as the intermediary between the drug manufacturers, pharmacies, and patients, as required to protect Bennington's citizens and property. This duty is independent of the PBMs' contractual obligations.

729.    The PBMs breached their duty to employ reasonable care, causing injuries to Bennington beyond any contractual expectancy. In doing so, the PBMs caused foreseeable harm to Bennington's citizens and property.

730.    The Purdue Individual Defendants, who are officers, directors and/or equity holders of Purdue and affiliates, directed and participated in the tortious conduct of Purdue and are individually liable.

731.    Defendants were negligent in failing to monitor and guard against third-party misconduct and participated and enabled such misconduct. This third-party misconduct, including criminal acts, were the foreseeable consequences of Defendants' negligence.

732.    Defendants placed their profit motives above their legal duty and enabled, encouraged and caused the over-prescribing and distribution of opioids.

733.    All Defendants knew of the highly addictive nature of prescription opioids and knew of the high likelihood of foreseeable harm to patients and communities from prescription opioid addiction and diversion.  Defendants should have anticipated an injury to Bennington as a probable result of flooding the market with opioids. Where there is a flood of highly addictive drugs into a community, it is foreseeable – to the point of being a foregone conclusion – that there will be a secondary, 'black' market created for those drugs. It was further foreseeable that Bennington would be responsible for combatting the creation of that market and mitigating its effects. Defendants breached their duties when they failed to act with reasonable care to prevent the diversion of prescription opioids.

734.    A negligent and/or intentional violation of the Defendants' duties poses distinctive

157

and significant dangers to the Plaintiff and its residents, including epidemic levels of addiction and the grossly excessive prescription and distribution of opioids.

735.    As a proximate result of the failure to prevent the over prescription and excessive distribution of opioids, the Defendants have caused the Plaintiff to incur excessive costs related to responding to the opioid crisis. These costs include but are not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of The Town of Bennington's limited and diverted resources as set forth more fully above.

**COUNT VII**
**UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

736.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

737.    As an intended result of their intentional wrongful conduct as set forth in this Complaint, Defendants have knowingly profited and benefited from opioid purchases made by Plaintiff and its residents.

738.    In exchange for opioid purchases, and at the time Plaintiff and its residents made these payments, Plaintiff and its residents expected that Defendants had not misrepresented any material facts regarding opioids, and had complied with their legal obligations in the manufacture, marketing, distribution, dispensation, and reimbursement of opioids.

739.    Defendants have been unjustly enriched in the form of profits because of their wrongful conduct, and as a matter of equity, Defendants should be required to disgorge their unjustly obtained profits from purchases of opioids made by the County.

**COUNT VIII**
**COMMON LAW CIVIL CONSPIRACY**
**(AGAINST ALL DEFENDANTS)**

740.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

741.     The Defendants acted in concert for the purpose of increasing the use of opioids and fraudulently selling and distributing as many opioids as possible, causing significant harm to the Town of Bennington.

742.     The Manufacturer and Distributor Defendants violated Vermont law and the CSA by, *inter alia*:

> (a)     fraudulently making false or misleading statements, falsely marketing opioids as safe for treatment of chronic pain; falsely representing that their opioids were less likely to be abused or were safer; suppressing evidence to the contrary, and improperly inducing physicians to prescribe opioids for chronic pain;

> (b)     evading controls on opioid diversion, increasing opioid quotas; and

> (c)     failing to design and operate a system to disclose suspicious orders of controlled substances, failing to provide and maintain appropriate inventory controls.

743.     The conspiracy would not have succeeded absent the PBM's control of the flow of opioids from manufacturer to the end user.  The PBM's plan design, including formulary placement, controlled which opioids were paid for, reimbursed, and covered by public and private pharmacy benefit plans.  The PBMs exacerbated the opioid crisis by (a) intentionally designing benefit plans that would maximize the number of opioids in the marketplace, (b) failing to manage and/or monitor these plans to minimize the use and abuse of opioids, and (c) choosing drugs to put on their formularies that provided the largest profit to themselves, regardless of the addictive quality of the drug and whether there was an alternative available and limiting access to competing less-additive alternatives.

744.     The PBM and Manufacturer Defendants coordinated to ensure that the maximum number of Manufacturers' opioids were prescribed and sold, and the PBM Defendants got the maximum profit at the expense of patients.

159

745.    The conspiracy also would not have succeeded absent the Pharmacy Defendants, which coordinated with the Distributor Defendants to enable the theft, diversion and misuse of prescription opioids.

746.    Each of the participants in the conspiracy received revenue, directly or indirectly, and/or otherwise benefitted from the scheme to promote opioids as safe and non-addictive.

747.    At all relevant times, each Defendant was a knowing and willing participant in the conspiracy, and reaped profits from the conspiracy in the form of increased sales, distributions, rebates and kick-backs.  Distributor Defendants received kick-backs from Manufacturer Defendants if they reached particular monthly goals. PBM Defendants received rebates, chargebacks, kickbacks, administrative fees, and other financial incentives to promote the Manufacturer Defendants' drugs.  Manufacturer and Pharmacy Defendants received profits from increased sales of the Manufacturer Defendants' drugs.

748.    All participants of the enterprise described herein were aware of Defendants' control over the activities of the conspiracy in promoting opioids for use in every situation in which a patient is in pain and selling a grossly excessive amount of opioids.  Each part of the conspiracy benefited from the existence of the other parts.

749.    The persons engaged in the conspiracy are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

750.    The Defendants' concerted actions caused excess opioids to enter The Town of Bennington, which were diverted into the black market.

751.    The Town of Bennington has been injured by reason of these violations in that it has incurred increased costs attempting to stop the flow of excess opioids into the Town of Bennington and bearing the costs of clean up, including, but not limited to the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement,

lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Town of Bennington's limited and diverted resources as set forth more fully above. The Town of Bennington would not have incurred these costs had Defendants not conspired together.  The injuries suffered by the Town of Bennington were directly and proximately caused by Defendants' actions and inactions.

752.    Plaintiff was directly and proximately harmed by the Defendants' civil conspiracy.

**COUNT IX**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT ("RICO") 18 U.S.C § 1962(C) - RICO**
**(AGAINST ALL DEFENDANTS)**

753.    Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

754.     This claim is brought against each Defendant for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. §§ 1961 et seq.

755.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . …" 18 U.S.C. § 1962(c).

756.    Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, Defendants were "person[s]" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, a legal or beneficial interest in property.

757.    The Defendants conducted and participated in the conduct of the RICO enterprise described herein through a pattern of racketeering activity as defined in 18 U.S.C. §1961(b), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343); 18 U.S.C. § 1961(d)

"fraud connected with … the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance … as defined in section 102 of the Controlled Substances Act"; and 19 U.S.C. § 1952 (entering goods into commerce using a statement or omission that is materially false).

758.    The RICO enterprise described herein was created and organized to effectuate a pattern of racketeering activity, and maintained systematic links for a common purpose: to increase the use of opioids and fraudulently sell, distribute and authorize for third-party reimbursement as many opioids as possible by falsely marketing them as safe for treatment of chronic pain outside active cancer, ern-of-life or palliative care, suppressing evidence to the contrary, maintaining their placement on formularies to ensure reimbursement, limiting access to competing less-additive alternatives and improperly inducing physicians to prescribe opioids for chronic pain.

759.    The RICO enterprise described herein engaged in and affected interstate commerce because, *inter alia*, it marketed, promoted, sold, provided or reimbursed for opioids to thousands of individuals and entities throughout the U.S.

760.    Each of the Defendants either actively participated and/or aided and abetted in the pursuance of this common purpose. Each of the participants in the RICO enterprise described herein received substantial revenue from the scheme, in the form of sales for Manufacturer Defendants, sales and kickbacks for Distributor and Pharmacy Defendants who reached particular monthly goals, and rebates or other financial incentives for PBM Defendants who placed opioids in a preferred place on a formulary or otherwise made opioids readily available for improper use – all in an effort to maximize profits.

761.    Under the present facts, each co-conspirator either (a) agreed to operate or manage  the enterprise that did and does feloniously deal in controlled substances, an offense punishable under the laws of the United States, or (b) if a co-conspirator did not agree to operate

or manage  the enterprise, each co-conspirator knowingly agreed to facilitate others who did and do operate or manage the enterprise of felonious dealing in controlled substances, an offense punishable  under the laws of the U.S.

762.    The Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues while benefitting from, encouraging, indirectly creating, contributing to, and maintaining an illegal secondary market for highly addictive and dangerous drugs. The predicate acts are not isolated events.

763.    While Defendants participated in, and are members of, the enterprise described herein, they have an existence separate from the enterprise, including distinct legal statuses, affairs, offices and roles, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

764.    In addition, finding it impossible to achieve their increasing sales ambitions through legal means, the Defendants systematically and fraudulently violated their statutory duties to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the  DEA of suspicious orders, allowing hundreds of millions of  pills to enter the  illicit market, which allowed the Defendants to derive and be unjustly  enriched by enormous profits.

765.    An association-in-fact enterprise existed between the Defendants, the purpose of which was to engage in the sale of opioids while deceiving the public and regulators into believing that the Defendants were faithfully fulfilling their obligations.

766.    The Defendants operated as an association-in-fact to unlawfully increase sales and revenues in order to unlawfully increase the quotas set by the DEA, which in turn allowed them to collectively profit from distributing a greater pool of opioids each year. Each member of the RICO

enterprise described herein participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding profits generated by the scheme.

767.    The Defendants also engaged in lobbying efforts against the DEA's authority to investigate and hold responsible those who failed in their duty to prevent diversion. The Ensuring Patient Access and Effective Drug Enforcement Act was the result of an effort by the Defendants to reduce the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations.

768.    In order to achieve this goal, Defendants thwarted the ability of federal and state regulators to prevent diversion. As set forth herein, this unified scheme was furthered by (1) habitual noncompliance with federal and state law; (2) intensive lobbying of federal and state official to evade further regulation; and (3) increasing and/or maintaining high production quotas for their prescription opioids from which Defendants could profit for as long as possible.

769.    The RICO enterprise described herein functioned by selling prescription opioids in interstate commerce in violation of the Defendants' legal obligations to maintain effective controls against opioid diversion.

770.    Each Defendant communicated with other Defendants, shared information on a regular basis, and participated in joint lobbying efforts, trade industry organizations, contractual relationships, and other coordination of activities to effect the RICO Scheme. The contractual relationships included, on information and belief, rebates, chargebacks, kickbacks, administrative fees, and other financial incentives on opioid sales and security arrangements.

771.    The Defendants refused to identify, investigate, or report suspicious orders despite their actual knowledge of drug diversion rings.

772.    The Defendants worked together to ensure that opioid production quotas continued to increase, allowing them to generate more and more profits from the RICO enterprise described

herein.

773.    In addition to violating their statutory requirement to minimize diversion of opioids, as set forth herein, Defendants and their co-conspirators engaged in a coordinated conspiracy to deceive the American public and the medical profession about the efficacy and safety of opioids, including by minimizing the addictive qualities of opioids.

774.    To effectuate their goal of maximizing the number of opioid users and their profits at all costs, Defendants engaged in a sophisticated, well-developed, and fraudulent marketing scheme designed to increase the prescription rate for the sale and distribution of the Defendants' opioids and to popularize the misunderstanding that opioids are effective for chronic pain outside active cancer, end-of-life and palliative care and that the risk of addiction is low.

775.    The formation, existence, and actions of the enterprise described herein were essential to the success of Defendants' campaign to increase and maintain profits from unlawful sales of opioids. The constituent members of the enterprise were aware that, unless they agreed to act and acted as an enterprise, their sales of prescription opioids would substantially decrease, and accordingly, the profits would substantially diminish.

776.    Each of the Defendants, in concert with co-conspirators, created and maintained systematic links for a common purpose, *i.e.*, to aid in marketing opioids as effective and safe for use by patients in moderate pain, while suppressing evidence to the contrary. Each of the participants in the enterprise described herein received revenue, directly or indirectly, and/or otherwise benefitted from the scheme to promote opioids as safe and non-addictive.

777.    At all relevant times, each Defendant was aware of the enterprise's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form of increased sales, distributions, and reimbursement of opioids. In fact, Distributor and Pharmacy Defendants received kick-backs from Manufacturer Defendants if they reached particular monthly

goals and PBM Defendants received rebates and other financial incentives to promote the Manufacturer Defendants' drugs.

778.    Such revenue was exponentially greater than it would have been had opioids been marketed appropriately, had the true efficacy and safety risks of prescription opioids disclosed, had formularies properly provided access to less addictive alternatives or installed appropriate controls on the drugs which created this public health crisis.

779.    The Manufacturer and PBM Defendants and their co-conspirators engaged in a conspiracy to increase the use of the least expensive, most addictive opioids by controlling the drugs' availability for utilization through the formulary and the plan design. The enterprise would not have succeeded absent the PBMs controlling the flow of opioids from manufacturer to the end user.

780.    The PBM and Manufacturer Defendants coordinated to ensure that the PBM Defendants got the maximum profit at the expense of patient health and communities nationwide who are now forced to address the foreseeable consequences of the scheme.

781.    The persons engaged in the enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

782.    Taken together, the interaction and length of the relationships between and among the Defendants reflects a deep level of interaction, data sharing and cooperation between four groups in a tightly knit industry. The Manufacturer, Distributor, Pharmacy and PBM Defendants were not four separate groups operating in isolation or four groups forced to work together in a closed system. The Defendants operated together as a united entity, working together as an ongoing and continuous organization on multiple fronts to engage in the unlawful sale of prescription opioids.

783.    All participants of the enterprise described herein were aware of Defendants'

control over the activities of the enterprise in promoting opioids for use in every situation in which a patient is in pain. Furthermore, each part of the enterprise benefited from the existence of the other parts.

784. The enterprise described herein is engaged in interstate commerce, or its activities affect interstate commerce, because Defendants marketed, promoted, sold, provided or arranged for the reimbursement of opioids to thousands of individuals and entities throughout the U.S., including promotion of opioid sales between or among residents of different states, and/or physically transporting drugs or promotional materials across state lines.

785. The Defendants used, directed the use of, and caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions regarding (a) the safety and efficacy of opioids for the treatment of chronic pain and (b) their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

786. The Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1) include, but are not limited to:

(a) Mail Fraud: Defendants violated 18 U.S.C. §1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to deceptively market, sell, promote, distribute and reimburse the opioids by means of false pretenses, misrepresentations, promises, omissions and the operation of the PBM plan design; and

(b) Wire Fraud: Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to deceptively market, sell, promote, reimburse, distribute the opioids by means of false pretenses, misrepresentations, promises, omissions and the operation of the PBM plan design.

787. The Defendants' use of the mails and wires include, but are not limited to:

(a)     representations that they would comply with their duty to (1) design and operate a system to disclose to the registrant suspicious orders of controlled substances, and (2) disclose the results of such a program to resolve concerns about overprescription and diversion of opioids;

(b)     communications with and among the enterprise participants that misrepresented the safety and risks of opioid drugs amongst themselves and others;

(c)     communications with Plaintiff, inducing payments for opioids by misrepresenting the safety and risks of opioids;

(d)     receiving the proceeds in the course of and resulting from Defendants' improper scheme;

(e)     transmittal and receipt of payments in exchange for, directly or indirectly, activities in furtherance of the RICO enterprise;

(f)     suppressed and destroyed records of suspicious orders to hide evidence of overprescription and diversion; and

(g)     negotiations concerning opioid formulary placement, opioid alternatives, quantity limits, refill limits, prior authorization requirements, rebates and other financial incentives and arrangements between Manufacturer and PBM Defendants.

788.    The Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme, and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing, promoting, and distributing prescription opioids.

789.    Many of the precise dates of the Defendants' criminal actions are not known and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the unified scheme alleged herein depended upon secrecy and, towards that end, Defendants took deliberate steps to conceal their wrongdoing. However, given the massive scope of the illegal and scheme, Defendants likely committed thousands, if not millions, of predicate acts of racketeering activity. All of the data necessary to prove these allegations resides on Defendants' databases, and is shared between them routinely and for the purpose inter alia, of perpetuating the epidemic.

790.    The multiple acts of racketeering activity that the Defendants committed, or

aided and abetted in the commission of, were related to each other, had a similar purpose, involved the same or similar participants and methods of commission, and have similar results affecting similar victims, including Plaintiff. These acts pose a threat of  continued racketeering activity and constitute a "pattern of racketeering activity" within the  meaning of 18 U.S.C. § 1961(5).

791.    These acts were conducted pursuant to an understanding and agreement, whether explicit  or implicit, that each member would participate to facilitate and further the  purpose of the Defendants' enterprise, which was to maximize profits by manufacturing, distributing, and selling as many opioid pills as possible.

792.    As a result of Defendants' racketeering activity, the Town of Bennington has been injured in their business and/or property in multiple ways, including but not limited to increased costs of providing necessary county services, increased human services and resource costs, costs related to dealing with opioid-related crimes and emergencies, and other public safety costs. But for the conduct of the enterprise's affairs, the Town of Bennington would not have sustained damages.

793.    The RICO enterprise described herein largely created, encouraged, contributed to, and maintained an illegal secondary market for opioids.

794.    The pattern of racketeering activity alleged herein is continuing as of the date of this  Complaint and, upon information and belief, will continue into the future unless enjoined by this  Court.

795.    Defendants' violations of 18 U.S.C. §1962(c) have directly and proximately caused injuries and damages to the Town of Bennington who is entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs, and reasonable attorney's fees pursuant to 18 U.S.C. §1964(c).

**COUNT X**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT 18 U.S.C § 1962(D) - RICO CONSPIRACY**
**(AGAINST ALL DEFENDANTS)**

796.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth.

797.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

798.     Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the RICO enterprise described herein through a pattern of racketeering activity.

799.     Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff of money.

800.     The nature of the above-described Defendants' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § l962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

801.     As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § l962(c), Jefferson County has been and continues to be injured in its business or property as set forth more fully above.

802.     Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

       (a)      Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342; and

       (b)      Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

803.    Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and, upon information and belief, will continue into the future unless enjoined by this Court.

804.    The Town of Bennington has been injured in its property by reason of these violations in that Bennington has been constrained to provide essential county services, and in effect, "clean up" the harm Defendants have recklessly and intentionally caused. Jefferson County must abate the societal harms resulting from Defendants conduct, a significant and ongoing cost Bennington would not have paid, or be paying, had Defendants not conspired to violate 18 U.S.C. § 1962(c).

805.    Injuries suffered by Plaintiff were directly and proximately caused by Defendants' racketeering activity as described above.

806.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff for compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

## PUNITIVE DAMAGES

807.    Plaintiff incorporates all preceding and subsequent paragraphs by reference.

808.    Defendants' scheme to optimize profits regardless of the effect on The Town of Bennington was undertaken and executed intentionally. Defendants' intentional actions were malicious, wanton, and oppressive.

809.    Defendants' failure to take any action to prevent or reduce the unnecessary, non-medical, or criminal use of opioids was willful and wanton, and in conscious disregard of the rights

of The Town of Bennington and its residents and/or with reckless indifference to the consequences of their actions.

810.    At all relevant times, Defendants were aware, from their knowledge of existing circumstances and conditions, that their conduct would probably cause injury to The Town of Bennington and its residents. Defendants' intentional and negligent actions described above were wanton, oppressive, and undertaken with such malice as to evince a spirit of malice or criminal indifference to their legal obligations.

811.    Defendants should be held liable for punitive damages to the Town of Bennington because their actions were wanton, oppressive, and undertaken with actual malice, such that an award of punitive damages is appropriate as punishment and deterrence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Town of Bennington, prays that the Court enter judgement against the Defendants, jointly and severally, as follows:

(1)  awarding compensatory damages in an amount to be determined at trial;

(2) awarding punitive damages to the Plaintiff in an amount to be determined at trial;

(3) awarding treble damages, as well as all costs and expenses of maintaining this action, including reasonable attorneys' fees, pursuant to statute where appropriate;

(4) awarding pre- and post-judgment interest;

(5) compelling the defendants to abate and remove the public nuisance they have caused by immediately ceasing the unlawful conduct described throughout this Complaint and by funding an abatement fund on behalf of the Plaintiff for the purpose of abating the ongoing opioid nuisance;

(6) such other and further relief as the Court deems just and proper.

*[signature page follows]*

**The Town of Bennington, Vermont**


_/s/Kevin Sharp_____

**SANFORD HEISLER SHARP, LLP**
Kevin Sharp (_pro hac vice to be submitted_)
ksharp@sanfordheisler.com
Grant Morris (_pro hac vice to be submitted_)
gmorris@sanfordheisler.com
Ross Brooks (_pro hac vice to be submitted_)
rbrooks@sanfordheisler.com
Andrew Miller _(pro hac vice to be submitted)_
amiller@sanfordheisler.com
Jonathan Tepe (_pro hac vice to be submitted_)
jtepe@sanfordheisler.com
611 Commerce Street, Suite 3100
Nashville, Tennessee 37203
Tel: (615) 434-7000
Fax: (615) 434-7020

**THE CICALA LAW FIRM PLLC**
Joanne Cicala (_pro hac vice to be submitted_)
joanne@cicalapllc.com
Josh Wackerly _(pro hac vice to be submitted)_
josh@cicalapllc.com
101 College Street
Dripping Springs, Texas 78620
Tel: (512) 275-6550
Fax: (512) 858-1801


**_Attorneys for Plaintiff_**